# 24-1964-cv

## United States Court of Appeals

### *for the*

## Second Circuit

———◆———

RADAR ONLINE LLC, JAMES ROBERTSON,

*Plaintiffs-Appellants,*

– v. –

FEDERAL BUREAU OF INVESTIGATION,

*Defendant-Appellee.*

———————————————

ON APPEAL FROM THE UNITED STATES DISTRICT COURT
FOR THE SOUTHERN DISTRICT OF NEW YORK

**BRIEF AND SPECIAL APPENDIX
FOR PLAINTIFFS-APPELLANTS**

CYNTHIA GIERHART
SARA BENSON
HOLLAND & KNIGHT LLP
800 17th Street NW, Suite 1100
Washington, D.C. 20006
(202) 469-5416

CHRISTINE WALZ
HOLLAND & KNIGHT LLP
787 Seventh Avenue
New York, New York 10019
(212) 513-3200

– and –

DANIEL NOVACK, ESQ.
NOVACK MEDIA LAW
1745 Broadway, 14th Floor
New York, New York 10019
(201) 213-1425

*Attorneys for Plaintiffs-Appellants*

## CORPORATE DISCLOSURE STATEMENT

Pursuant to Federal Rule of Appellate Procedure 26.1(a), Appellants Radar Online LLC and James Robertson (collectively "Radar Online") state that Radar Media Group LLC (RMG) is the parent company of Radar Online LLC. Radar Media Group LLC (RMG) is an independent and privately owned media company.

# Table of Contents

I.     JURISDICTIONAL STATEMENT ...................................................1

II.    STATEMENT OF THE ISSUES PRESENTED FOR REVIEW ...................1

III.   INTRODUCTION ...........................................................................2

IV.   STATEMENT OF THE CASE ............................................................4

    A.   Plaintiffs' FOIA Request ....................................................4

    B.   Initial Summary Judgment Briefing and Order...................6

    C.   Second Summary Judgment Order .....................................8

V.    SUMMARY OF THE ARGUMENT ....................................................9

VI.   STANDARD OF REVIEW ..............................................................11

VII.  ARGUMENT................................................................................12

    A.   The District Court Erred in Ruling That the FBI Met Its
         Burden to Withhold Documents Pursuant to Exemption 7(A)
         and That the FBI's Invocation of Exemption 7(A) Was Timely.......12

      1.   The FBI Failed to Demonstrate That Production of the Records at
           Issue Would Interfere with a Pending Law Enforcement Proceeding....13

      2.   The FBI's Retroactive Invocation of Exemption 7(A) Was Not
           Timely..........................................................................25

    B.   The District Court Erred in Finding that the FBI Met Its
         Burden Under Exemptions 6, 7(C) and 7(E). .......................29

      1.   The District Court Erred in Finding That the FBI Met Its Burden
           Under Exemptions 6 and 7(C)...............................................29

      2.   The District Court Erred in Finding That the FBI Met Its Burden
           Under Exemptions 7(E).........................................................39

    C.   The District Court Erred in Finding that the FBI Satisfied Its
         Segregability Burden with Respect to the Documents
         Withheld in Full. ..............................................................43

VIII. CONCLUSION...........................................................................46

## <u>TABLE OF AUTHORITIES</u>

**Cases**                                                      **Page(s)**

*A. Michael's Piano, Inc. v. FTC*,
18 F.3d 138 (2d Cir. 1994) ....................................................................11

*Allard K. Lowenstein Int'l Hum. Rts. Project v. Dep't of Homeland Sec.*,
626 F.3d 678 (2d Cir. 2010) ..........................................................40, 41

*Alper v. Dep't of Justice*,
No. 24-CV-1837 (DLF), 2025 WL 1503795 (D.D.C. May 27, 2025) ....................................................................................................24

*Am. C.L. Union v. Dep't of Def.*,
492 F. Supp. 3d 250 (S.D.N.Y. 2020) ............................................23, 24

*Application of Nat'l Broad. Co., Inc. v. Myers*,
635 F.2d 945 (2d Cir. 1980) ..................................................................20

*Associated Press v. U.S. Dep't of Def.*,
554 F.3d 274 (2d Cir. 2009) ......................................................30, 31, 37

*August v. F.B.I.*,
328 F.3d 697 (D.C. Cir. 2003) .........................................................14, 27

*Ayyad v. U.S. Dep't of Justice*,
No. 00 CIV. 960(KTD), 2002 WL 654133 (S.D.N.Y. Apr 18, 2002) ....................................................................................................44

*Barnard v. Dept. of Homeland Sec.*,
531 F. Supp. 2d 131 (D.D.C. 2008) .......................................................43

*Bast v. U.S. Dep't of Justice*,
665 F.2d 1251 (D.C. Cir. 1981) ............................................................39

*Brown v. Maxwell*,
929 F.3d 41 (2d Cir. 2019) ......................................................13, 22, 33

*Campbell v. U.S. Dep't of Health & Human Servs.*,
682 F.2d 256 (D.C. Cir. 1982)..........................................................15, 17

*Chesapeake Bay Found., Inc. v. U.S. Army Corps of Eng'rs*,
   677 F. Supp. 2d 101 (D.D.C. 2009) .................................................................17, 19

*Citizens for Resp. & Ethics in Washington v. U.S. Dep't of Justice*,
   746 F.3d 1082 (D.C. Cir. 2014) .............................................................................14

*Citizens for Resp. & Ethics in Washington v. U.S. Dep't of Justice*
   *("CREW I")*,
   658 F. Supp. 2d 217 (D.D.C. 2009) .......................................................................24

*Citizens for Resp. & Ethics in Washington v. United States Dep't of*
   *Justice ("CREW II")*,
   854 F.3d 675 (D.C. Cir. 2017) .........................................................................31, 32

*Conti v. U.S. Dep't of Homeland Sec.*,
   No. 12 Civ. 5827(AT), 2014 WL 1274517
   (S.D.N.Y. Mar. 24, 2014) .......................................................................................14

*Cottone v. Reno*,
   193 F.3d 550 (D.C. Cir. 1999) ...............................................................................23

*Cox v. Dep't of Justice*,
   504 F. Supp. 3d 119 (E.D.N.Y. 2020) ....................................................................46

*Ctr. for Const. Rts. v. C.I.A.*,
   765 F.3d 161 (2d Cir. 2014) ...................................................................................11

*Dep't of Air Force v. Rose*,
   425 U.S. 352 (1976) ................................................................................................30

*Dept. of Justice v. Reporters Comm. For Freedom of Press*,
   489 U.S. 749 (1989) ................................................................................................38

*Doe 171 v. Giuffre*,
   No. 22-3050, 2023 WL 4926196 (2d Cir. Aug. 2, 2023) ......................................36

*Dow Jones Co., Inc. v. F.E.R.C.*,
   219 F.R.D. 167 (C.D. Cal. 2003) ......................................................................18, 19

*Emuwa v. U.S. Dep't of Homeland Sec.*,
   No. 1:20-cv-01756 (TNM), 2022 WL 1451430 (D.D.C. May 9,
   2022), *aff'd*, 113 F.4th 1009 (D.C. Cir. 2024) .....................................................42

*Everytown for Gun Safety Support Fund v. Bureau of Alcohol, Tobacco, Firearms & Explosives*,
    984 F.3d 30 (2d Cir. 2020) .....................................................11

*Ferguson v. F.B.I.*,
    957 F.2d 1059 (2d Cir. 1992) ...............................................30

*Giglio v. United States*,
    405 U.S. 150 (1972)...............................................................18

*Giuffre v. Maxwell*,
    No. 15-cv-07433-LAP (S.D.N.Y.)..................................*passim*

*Halpern v. F.B.I.*,
    181 F.3d 279 (2d Cir. 1999) ..................................................11

*Intercept Media Inc. v. Nat'l Park Serv.*,
    No. 23 CIV. 10922 (PAE), 2024 WL 5009310
    (S.D.N.Y. Dec. 6, 2024) ....................................31, 32, 35, 38

*Judicial Watch, Inc. v. U.S. Dep't of Justice*,
    No. 17-5283, 2018 WL 10758508 (D.C. Cir. June 22, 2018) ...........14

*Keys v. Dep't of Homeland Sec.*,
    510 F. Supp. 2d 121 (D.D.C. 2007)......................................39

*Knight First Amend. Inst. at Columbia Univ. v. U. S. Citizenship & Immigr. Servs.*,
    30 F.4th 318 (2d Cir. 2022) ..................................................40

*Lion Raisins Inc. v. USDA*,
    354 F.3d 1072 (9th Cir. 2004) .........................................17, 19

*Matthews v. F.B.I.*,
    575 F. Supp. 3d 166 (D.D.C. 2021).......................................30

*Maydak v. U.S. Dep't of Justice*,
    218 F.3d 760 (D.C. Cir. 2000)...............................................27

*McDermott v. F.T.C.*,
    No. 80-2275, 1981 WL 2056 (D.D.C. Apr. 13, 1981) ............15, 16

*Mead Data Cent. Inc. v. Dep't of Air Force*,
566 F.2d 242 (D.C. Cir. 1977)................................................................45

*New York Times Co. v. United States Dep't of Just.*,
390 F. Supp. 3d 499 (S.D.N.Y. 2019) ...............................................15

*News-Press v. U.S. Dep't of Homeland Sec.*,
489 F.3d 1173 (11th Cir. 2007) ..........................................................30

*NLRB v. Robbins Tire & Rubber Co.*,
437 U.S. 214 (1978).............................................................................14

*North v. Walsh*,
881 F.2d 1088 (D.C. Cir. 1989)...................................................17, 20

*Patterson v. IRS*,
56 F.3d 832 (7th Cir. 1995) ...............................................................44

*Podhurst Orseck, P.A. v. Epstein*,
1:10-cv-21586-ASG (S.D. Fla. 2010)..........................................34, 38

*Radar Online LLC v. Fed. Bureau of Investigation*,
No. 1:17-cv-03956-PGG (S.D.N.Y.)....................................5, 44, 45

*Reps. Comm. for Freedom of the Press v. F.B.I.*,
3 F.4th 350 (D.C. Cir. 2021)........................................................41, 42

*Reps. Comm. for Freedom of the Press v. F.B.I.*,
754 F. Supp. 3d 56 (D.D.C. 2024)...............................................40, 41

*Scheer v. U.S. Dep't of Justice*,
35 F. Supp. 2d 9 (D.D.C. 1999).....................................................18, 19

*Schrecker v. U.S. Dept. of Justice*,
349 F.3d 657 (D.C. Cir. 2003).............................................................36

*Shapiro v. Dep't of Justice*,
No. 12-cv-313 (BAH), 2020 WL 3615511 (D.D.C. July 2, 2020)....................42

*Smith v. Maryland*,
442 U.S. 735 (1979)..............................................................................37

*Sousa v. Marquez*,
  702 F.3d 124 (2d Cir. 2012) ...............................................................11

*Stern v. F.B.I.*,
  737 F.2d 84 (D.C. Cir. 1984) ...........................................................30

*In re Terrorist Attacks on Sept. 11, 2001*,
  No. 03-MD-01570(GBD)(SN), 2022 WL 1805398 (S.D.N.Y. June
  2, 2022) ............................................................................................16

*United States v. Martoma*,
  2013 U.S. Dist. LEXIS 182959 (S.D.N.Y. Dec. 8, 2013) ..................21

*United States v. Ghislaine Maxwell*,
  1:20-cr-330-AJN (S.D.N.Y.) .............................................................18

*United States v. Maxwell*,
  No. 1:20-cr-00330-AJN (S.D.N.Y.) .......................................3, 25, 33

**Statutes**

5 U.S.C. § 552(b) ...................................................................................43, 45

5 U.S.C. § 552(b)(6) ...................................................................................29

5 U.S.C. § 552(b)(7)(A) .........................................................................14, 17

5 U.S.C. § 552(b)(7)(C) ...............................................................................29

5 U.S.C. § 552(b)(7)(E) ...............................................................................39

28 U.S.C. § 1291 ...........................................................................................1

28 U.S.C. § 1331 ...........................................................................................1

**Other Authorities**

Adam Reiss, et al., *Last batch of unsealed Jeffrey Epstein documents
  released*, https://www.nbcnews.com/news/us-news/last-batch-
  unsealed-jeffrey-epstein-documents-released-rcna132936 ...............33

Alan Dershowitz, *Guilt by Accusation: The Challenge of Proving
  Innocence in the Age of #MeToo* (2019)............................................34

Andrea Blanco and Rachel Sharp, *Alan Dershowitz posts 31-minute defense video after Epstein documents unsealed*, The Independent (January 6, 2024) https://www.independent.co.uk/news/world/americas/epstein-list-associates-alan-dershowitz-b2474376.html ........................................................34

*Executive Summary of Report*, DOJ Office of Professional Responsibility (Nov. 2020), https://www.justice.gov/opr/page/file/1336471/dl?inline= ..............................38

Kash Patel, *Federal Bureau of Investigation Budget Request to U.S. Senate for Fiscal Year 2026*, Federal Bureau of Investigation (May 8, 2025), https://www.fbi.gov/news/speeches-and-testimony/federal-bureau-of-investigation-budget-request-to-us-senate-for-fiscal-year-2026 ...............................................................41

Michael Balsamo & Eric Tucker, *Justice Dept.: 'Poor judgment' used in Epstein plea deal*, Associated Pres (Nov. 12, 2020), https://apnews.com/article/jeffrey-epstein-florida-e2a4431f7319afd037023d9a586aa291#:~:text=Under%20the%202008%20non%2Dprosecution,in%20a%20work%2Drelease%20program ...........................................................................38

"Press Release: Surviving Jeffrey Epstein Brand New & Exclusive To Crime+Investigation," My News Desk (Aug. 10, 2020), https://www.mynewsdesk.com/nl/aenetworks/pressreleases/press-release-surviving-jeffrey-epstein-on-crime-plus-investigation-r-3025267 ...............................................................................36

Public Affairs, "Attorney General Pamela Bondi Releases First Phase of Declassified Epstein Files" (Feb. 27, 2025), available at https://www.justice.gov/opa/pr/attorney-general-pamela-bondi-releases-first-phase-declassified-epstein-files. ...................................23

Times Radio, *I was in the Epstein files 137 times | Alan Dershowitz*, YouTube (Jan. 5, 2024) https://www.youtube.com/watch?v=0Hp7u-FmD3M .......................................34

## I.  JURISDICTIONAL STATEMENT

The District Court for the Southern District of New York had original jurisdiction over the underlying action pursuant to 28 U.S.C. § 1331.

This Court has jurisdiction over this appeal pursuant to 28 U.S.C. § 1291, because this is an appeal from a final order of the district court. This appeal is timely. The district court issued its final order on the renewed cross-motions for summary judgment on June 24, 2024. Appellants filed their Notice of Appeal on July 22, 2024.

## II.  STATEMENT OF THE ISSUES PRESENTED FOR REVIEW

This appeal presents the following issues:

1. Did the district court err in concluding that the FBI properly withheld or redacted documents pursuant to Exemption 7(A) of FOIA?

2. Did the district court err in concluding that Exemption 7(A) of the Freedom of Information Act (FOIA), which applies to law enforcement records, may be invoked retroactively to withhold and redact documents after the agency had already processed and produced documents without asserting that exemption?

3. Did the district court err in concluding that the FBI properly withheld or redacted documents pursuant to Exemptions 6, 7(C), and 7(E)?

4. Did the district court err in concluding that the FBI satisfied its segregability burden?

1

### III.   INTRODUCTION

In April 2017, Plaintiffs Radar Online LLC and James Roberton submitted a Freedom of Information Act ("FOIA") request for records related to the FBI's 2006 investigation of disgraced financier and accused child sex-trafficker Jeffrey Epstein.

Despite the FBI identifying at least 11,571 pages of responsive documents, 10,107 of those pages remain withheld nearly twenty years after the events at issue. Remarkably, the FBI claimed for two years that Epstein's personal privacy trumped the public's right to know the details of the FBI's investigation.

Once a public campaign – in which Plaintiffs played a prominent role – inspired the government to re-arrest Epstein in July 2019, the FBI pivoted to a new rationale to withhold records: Exemption 7(A), which guards against interference with a law enforcement proceeding. Though Epstein died a month later, the FBI continued to apply 7(A), pivoting to a new investigative target to continue justifying withholding: Ghislaine Maxwell.

In the ensuing eight years since the FOIA request was filed, there has been significant public disclosures about Epstein's abuse and the federal government's inaction. During the pendency of this case, his associate Ghislaine Maxwell was also charged, tried, and has since been convicted of child sex trafficking. Through these arrests and trials, the public has come to learn about how rich and powerful

individuals preyed on young girls and how a massive sex trafficking ring went unchecked for years without government intervention.

The accusations against Epstein and Maxwell, among other co-conspirators, resulted in a highly publicized trial and countless documentaries, news reports, podcasts, and interviews. Maxwell's defense team possesses "millions" of pages of investigative material in her case. Further, a substantial number of documents related to the Epstein allegations were disclosed following a heavily litigated defamation suit that one victim (Virginia Giuffre) filed against Maxwell, as well as Maxwell's criminal trial. *See generally Giuffre v. Maxwell*, No. 15-cv-07433-LAP (S.D.N.Y); *United States v. Maxwell*, No. 1:20-cr-00330-AJN (S.D.N.Y.).

Despite the substantial publicity afforded to these matters and the consequences that have come from shielding the individuals involved for so many years, the FBI continues to assert that it is proper to withhold over 10,000 pages from Epstein's file based on the speculative concern that it may have some impact on the unlikely re-trial of Ghislaine Maxwell should the Supreme Court grant her petition for certiorari, and then, grant her a new trial. Such concerns are far-fetched, overstated, and genuinely implausible.

The government cannot deny records under circumstances that did not exist at the time of the FOIA request, nor can it hide behind theoretical disruptions to speculative future trials. The FBI cannot keep public records from the public at large

3

on the misguided belief that they will all become jurors. Federal judges are well equipped to control their courtrooms, limit the evidence admitted, conduct voir dire, and ensure that Ghislaine Maxwell gets a fair and impartial retrial should she be afforded one.

There is no legitimate reason to continue to withhold more than 10,000 pages from Epstein's investigation file. The time is long overdue for these documents to be produced. The public deserves to know why Epstein was shielded from prosecution for over a decade.

The district court, therefore, erred in ruling that the FBI met its burden to withhold 10,000 pages from Epstein's investigation file based on speculative and illogical concerns for Maxwell's potential retrial and misguided claims regarding privacy of individuals who are already widely known to the public. This Court should reverse.

## IV.  STATEMENT OF THE CASE

### A.  Plaintiffs' FOIA Request

Appellants Radar Online LLC and James Robertson (Radar Online) filed a Freedom of Information Act ("FOIA") request with the Federal Bureau of Investigation ("FBI") on April 20, 2017, seeking all documents relating to the investigation and prosecution of Jeffrey Epstein. Appellants received no response and subsequently filed an action in the district court on May 25, 2017, for failure to

timely respond to the FOIA request. A-11–12. After an initial case management conference, the FBI agreed to begin processing documents at a rate of 500 pages per month. SPA-55. The FBI ultimately processed 11,571 responsive pages, of which only 181 pages were produced in full, 1,051 pages were produced with redactions, and 10,107 pages were withheld entirely initially based on Exemptions 3, 6, 7(C), 7(D), and 7(E).[1] SPA-1–2. The FBI withheld another unspecified number of pages "categorically" under Exemption 7(A). SPA-5.

The FBI withheld documents under Exemption 7(C) for the first two years of production (over the course of 21 productions) while Epstein was still free, asserting that Epstein's personal privacy outweighed the public interest in these records. *Radar Online LLC v. Fed. Bureau of Investigation*, No. 1:17-cv-03956-PGG (S.D.N.Y. July 18, 2023), ECF No. 48 at 1.

In July 2019, more than two years after the FOIA request was submitted, Epstein was arrested and charged with crimes related to child sex trafficking. After Epstein's indictment, the FBI began citing Exemption 7(A) as the basis for withholding records, asserting that disclosure of the records could reasonably be expected to interfere with law enforcement proceedings. A-50. The FBI at that time claimed to retroactively assert Exemption 7(A) over documents previously produced

---

[1] Another 105 pages were withheld entirely because they were sealed records, and 127 pages were withheld because they were duplicative of other pages.

5

and redacted under other exemptions, as well as the 10,107 pages fully withheld. A-353; A-421–422, ¶ 7; SPA-1–2. The FBI proceeded to make the remainder of its productions citing Exemption 7(A) as the basis for withholding disclosure. A-50. Epstein died in jail on August 10, 2019, while the charges were pending against him.

In June 2020, Ghislaine Maxwell was indicted by a federal grand jury for sex trafficking crimes related to Epstein's indictments. SPA-58. On June 28, 2022, Maxwell was sentenced to 20 years in prison for these crimes. *Id.*

## B.  Initial Summary Judgment Briefing and Order

The parties filed cross-motions for summary judgment on October 29, 2021. A-5. Because Maxwell's conviction came after the parties had filed their summary judgment briefs, and given the potential impact of the conviction on the FBI's claimed exemptions under 7(A), the court asked the parties to file supplemental briefing on June 30, 2023. A-354.

Following supplemental briefing, on September 19, 2023, the district court granted in part, and denied in part, each side's cross-motions for summary judgment (the "First Summary Judgment Order"). SPA-1. In the First Summary Judgment Order, the district court granted the FBI's motion for summary judgment as to records withheld under numerous exemptions, including Exemption 3 (only as it relates to the Child Victims' Act), Exemption 5, Exemptions 6, and Exemption 7(C), 7(D) (only as to information provided by local law enforcement agencies), and 7(E).

SPA-26, SPA-31–33, SPA-33–42, SPA-47–51, and SPA-54. The district court denied without prejudice the FBI's motion for summary judgment as to records withheld under Exemption 7(A) and under Exemptions 3 and 7(D), except for the limited instances described above. SPA-26–31, SPA-42–47.

The district court found that the FBI's invocation of Exemption 7(A) was timely and that the requested records were compiled for law enforcement purposes and related to a pending or prospective law enforcement proceeding. SPA-11–18. However, the district court found that the declarations submitted by Michael G. Seidel of the FBI's Information Management Division and Assistant United States Attorney Maureen Comey categorized the documents at issue inconsistently, and "the FBI has not explicitly linked any of the document categories… to the four types of potential harm" cited in a prior declaration by Assistant U.S. Attorney Maurene Comey. SPA-21. Accordingly, the district court denied the FBI's motion for summary judgment without prejudice as to Exemption 7(A) because the FBI had not demonstrated that the disclosure of the requested records would interfere with pending or prospective law enforcement proceedings. SPA-18–25.

The First Summary Judgment Order then directed the parties to submit a joint letter as to next steps and to set a schedule "for the FBI's submission of revised declarations, as well as any renewed motions for summary judgment." SPA-54. On

7

January 30, 2024, the parties filed their renewed cross-motions for summary judgment. A-7.

### C. Second Summary Judgment Order

On June 25, 2024, the district court issued an order on the renewed cross-motions for summary judgment (the "Second Summary Judgment Order"). SPA-55. In the Second Summary Judgment Order, the district court held that the FBI had now sufficiently linked the identified document categories to potential harms and explained how those harms would allegedly interfere with law enforcement proceedings. SPA-64–69. The district court concluded that the revised Seidel and Comey declarations submitted with the FBI's renewed motion for summary judgment provided sufficient detail for the court to trace a "rational link" between the information contained in the records and the potential interference with law enforcement proceedings, and thus the FBI met its burden for withholding disclosure of the records under Exemption 7(A). SPA-70–72. The district court additionally ruled that because Exemption 7(A) was asserted to protect all redacted information, the Court did not need to evaluate the applicability of the other exemptions. SPA-71–72.

Further, the district court held that the FBI satisfied its segregability burden with respect to the documents withheld in full under Exemption 7(A), giving credence to the FBI's assertion that "[t]he media coverage of speculation and

8

theories about Maxwell's association with Epstein makes the segregation of any possibly non-exempt information difficult." SPA-72–73. The court further held, "to the extent there is non-exempt information contained in the records withheld under Exemption 7(A), that information is intertwined with and cannot reasonably be segregated without risking interference with the Maxwell prosecution." *Id.*

## V.   SUMMARY OF THE ARGUMENT

In the underlying litigation, the district court found that the FBI's speculative assertions of harm were sufficient to justify withholding over 10,000 pages from Epstein's investigation file, in addition to an unspecified number of documents. None of the FBI's justifications warrant withholding these documents.

Specifically, under Exemption 7(A), the FBI has failed to demonstrate that disclosure of the records at issue would harm a pending law enforcement proceeding. The FBI has failed to demonstrate that the release of the requested records would reasonably be expected to cause harm to a law enforcement proceeding because (1) Maxwell already has access to the investigatory files as they were required to be provided to her during the criminal discovery process; (2) the extraordinary publicity surrounding Maxwell's trial, in combination with the press reports, social media discussion, television programs, and books devoted to Epstein's crimes render the FBI's claimed harm to the jury pool impractical; and (3) the FBI's concerns regarding witness testimony are unfounded given that these witnesses have already

testified at Maxwell's trial, have been exposed to extensive reporting on other witnesses' testimony, and are in some cases deceased.

The district also erred in finding that the FBI could retroactively assert Exemption 7(A) over documents processed prior to the initiation of any law enforcement investigation. Allowing agencies to retroactively apply exemptions to documents based on conditions that did not exist at the time of the pertinent productions creates an unfair process for requestors and encourages agencies to utilize placeholder exemptions to delay disclosure.

As to FOIA Exemptions 6, 7(C), and 7(E), the FBI has not met its burden to withhold documents under any of the pertinent standards. The FBI applied the privacy exemptions (Exemption 6 and Exemption 7(C)) far more expansively than was necessary to protect the identifies of third parties, many of whom have already revealed their own identities or whose identities have been revealed through other sources. Further, with respect to Exemption 7(E), the district court failed to distinguish between *guidelines*, which are subject to heightened scrutiny, and *techniques and procedures*, which are not. The district court also allowed the FBI to utilize Exemption 7(E) across the entirety of the FBI's seven claimed categories, without the appropriate examination of foreseeable harm.

Finally. the district court erred in finding that the agency met its segregability burden as to the documents withheld in full. There are numerous categories of

documents that could easily be segregated and produced without risking harm to any pending law enforcement investigation. For these reasons, this Court should find that the district court erred in each instance and order the FBI to produce the documents sought in Appellants' FOIA request.

## VI.  STANDARD OF REVIEW

A district court's grant of summary judgment in FOIA litigation should be reviewed *de novo*. *Halpern v. F.B.I.*, 181 F.3d 279, 288 (2d Cir. 1999). The appellate court reviews a district court's grant of summary judgment without deference to the district court. *See Ctr. for Const. Rts. v. C.I.A.*, 765 F.3d 161, 166 (2d Cir. 2014). Summary judgment is appropriate only "if the movant shows that there is no genuine dispute as to any material fact and the movant is entitled to judgment as a matter of law." *Sousa v. Marquez*, 702 F.3d 124, 127 (2d Cir. 2012) (quoting Fed. R. Civ. P. 56(a)).

The agency, in this case the FBI, bears the burden of proof, with "doubts resolved in favor of disclosure." *A. Michael's Piano, Inc. v. FTC*, 18 F.3d 138, 143 (2d Cir. 1994). On appeal, this Court must assess whether the FBI met its "burden of showing that the withheld records are exempt from the FOIA." *Everytown for Gun Safety Support Fund v. Bureau of Alcohol, Tobacco, Firearms & Explosives*, 984 F.3d 30, 37 (2d Cir. 2020).

# VII.  ARGUMENT

**A.**   **The District Court Erred in Ruling That the FBI Met Its Burden to Withhold Documents Pursuant to Exemption 7(A) and That the FBI's Invocation of Exemption 7(A) Was Timely.**

The FBI has failed to demonstrate that disclosure of the records at issue would harm a pending law enforcement proceeding pursuant to Exemption 7(A).

In its declaration supporting its second summary judgment motion, the FBI placed the responsive documents into three categories: (1) Evidentiary/Investigative Materials, (2) Administrative Materials, and (3) Public Source/Non-Investigative Harm. *See generally* A-418 (Second Declaration of Michael G. Seidel); A-605 (Third Declaration of Maurene Comey); SPA-65. The FBI produced the third category of documents to Plaintiffs but withheld the first two. The FBI asserted five speculative and generic "harms" that would result from the disclosure of the Evidentiary/Investigative Materials and Administrative Materials, alleging disclosure would (1) "impact witness testimony," (2) "impact witnesses' willingness to testify," (3) "prejudice the jury pool," (4) "provide Maxwell with greater access 'to the investigatory files than she would otherwise have during the criminal discovery process,'" and (5) "violate the Protective Order in the underlying case." SPA-67–68. No factual basis was asserted for these harms, rendering them entirely conclusory. In the Second Summary Judgment Order, the district court erroneously concluded that, through this categorization, the FBI met its burden of demonstrating

12

how the release of each category of records would interfere with law enforcement proceedings. SPA-68.

The FBI's explanations of how the disclosure of the records at issue would harm a pending law enforcement proceeding do not withstand scrutiny. The FBI's assertions of harm ignore the reality of this case, including the highly publicized trial of Maxwell, the disclosure of millions of documents to Maxwell in discovery, the unsealing of documents in the Epstein investigation file following Virginia Giuffre's civil suit,[2] the public disclosure of numerous individuals' identities involved in or associated with the sex trafficking scheme, extensive media coverage and interviews with sex abuse victims and Epstein's associates, and the recent (and allegedly ongoing) release of additional Epstein files by Attorney General Pamela Bondi and public statements from the FBI Director.

Further, the FBI's retroactive assertion of Exemption 7(A) (after its initial productions) should not be permitted. Allowing agencies to retroactively apply exemptions to documents based on conditions that did not exist at the time of the pertinent productions creates an unfair process for requestors and encourages agencies to utilize placeholder exemptions to delay disclosure.

1.    **The FBI Failed to Demonstrate That Production of the Records at Issue Would Interfere with a Pending Law Enforcement Proceeding.**

---

[2] *See Brown v. Maxwell,* 929 F.3d 41 (2d Cir. 2019).

Exemption 7(A) protects "records or information compiled for law enforcement purposes, but only to the extent that the production of such law enforcement records or information . . . could reasonably be expected to interfere with enforcement proceedings." 5 U.S.C. § 552(b)(7)(A). To successfully invoke Exemption 7(A), the FBI must demonstrate two critical elements: (1) a law enforcement proceeding remains pending or prospective and (2) releasing the requested information could reasonably be expected to cause some articulable harm to that proceeding.[3] *See NLRB v. Robbins Tire & Rubber Co.*, 437 U.S. 214, 224 (1978) (holding that the government must show how records "would interfere with

---

[3] Exemption 7(A) loses its relevance "when the proceeding at issue comes to a close." *Citizens for Resp. & Ethics in Washington v. U.S. Dep't of Justice*, 746 F.3d 1082, 1097 (D.C. Cir. 2014). The law enforcement proceeding that gives rise to the exemption "must remain pending at the time of [the court's] decision, not only at the time of the initial FOIA request." *Id.* Maxwell's criminal proceeding is nearly at an end. She was convicted and subsequently sentenced to 20 years in prison for child sex trafficking offenses on June 28, 2022. Following an unsuccessful appeal to the Second Circuit (case no. 22-1426), Maxwell filed a petition for certiorari with the U.S. Supreme Court on April 10, 2025. The government's response to the petition is due on July 14, 2025. If the Supreme Court denies Maxwell's cert petition, the government's basis for relying on Exemption 7(A) is extinguished, and the Court should reverse the trial court's determination on Exemption 7(A) on these grounds alone. *See Judicial Watch, Inc. v. U.S. Dep't of Justice*, No. 17-5283, 2018 WL 10758508, at *1 (D.C. Cir. June 22, 2018) (vacating and remanding case to the district court after finding that the law enforcement proceeding that served as basis for assertion of Exemption 7(A) was no longer pending); *August v. F.B.I.*, 328 F.3d 697, 698 (D.C. Cir. 2003) (remanding case and ordering further review of records withheld under Exemption 7(A) after conclusion of law enforcement proceedings); *Conti v. U.S. Dep't of Homeland Sec.*, No. 12 Civ. 5827(AT), 2014 WL 1274517, at *22 (S.D.N.Y. Mar. 24, 2014) (ordering production of un-redacted records withheld under Exemption 7(A) after conclusion of law enforcement proceeding).

a pending enforcement proceeding"); *New York Times Co. v. United States Dep't of Just.*, 390 F. Supp. 3d 499, 513 (S.D.N.Y. 2019).

The district court erroneously concluded in its June 25, 2024 order that "the FBI has adequately demonstrated the necessary logical and plausible connection between disclosure [of the records at issue] and harm" to law enforcement proceedings. SPA-69. This conclusion ignores that district courts must apply a "more rigorous analysis" when the requester is a "third party seeking information to which a potential target apparently has access" and is "not an actual or potential target" of the enforcement proceeding. *Campbell v. U.S. Dep't of Health & Human Servs.*, 682 F.2d 256, 265 (D.C. Cir. 1982). Further, when a document's contents have "apparently already been disclosed," it defies logic to claim that redisclosure would "likely interfere with any enforcement proceeding." *McDermott v. F.T.C.*, No. 80-2275, 1981 WL 2056, at *5 (D.D.C. Apr. 13, 1981).

While the government may apply exemptions to categories of records, the government "must demonstrate ***specifically*** how each document or category of documents, if disclosed, would interfere with the investigation, for example, how revelation of any ***particular*** record or record category identified as responsive to [the third party's] request would reveal to ***particular*** targets, actual or potential, the scope, direction, or focus of the [agency's] inquiry." *Campbell*, 682 F.2d at 265 (emphasis added).

15

In granting summary judgment to the FBI, the district court accepted the FBI's generic and conclusory assertions without demanding the specific demonstration of harm that Exemption 7(A) requires. The FBI has failed to demonstrate that the release of the requested records would reasonably be expected to cause the identified harms, namely, that release would (1) provide Maxwell with greater access to the investigatory files than she would otherwise have during the criminal discovery; (2) impact the jury pool, or (3) impact witness testimony or witnesses' willingness to testify.[4] SPA-67–68.

> a. *The Release Would Not Provide Maxwell with Greater Access to the Investigatory Files than She Would Otherwise Have During the Criminal Discovery Process.*

Exemption 7(A) requires the government to prove not just a pending proceeding but also that disclosure "could reasonably be expected to interfere with

---

[4] The FBI also asserted that the release of materials would violate the protective order in Maxwell's criminal case. SPA-67–68. The district court, however, did not address this argument in its ruling and therefore did not affirm this reasoning as a basis for withholding. *Id.* at 14-15. That is the correct outcome, as concerns of violating a protective order in third-party litigation does not provide a legitimate justification for withholding materials pursuant to a FOIA request. Documents obtained through FOIA are not subject to protective orders, and neither party to the protective order would be violating it, as they would not be the ones producing the documents. *See In re Terrorist Attacks on Sept. 11, 2001*, No. 03-MD-01570(GBD)(SN), 2022 WL 1805398, at *3 (S.D.N.Y. June 2, 2022) ("information obtained through a FOIA request or other public means falls outside the Protective Order because it is not obtained through this Court's processes… In short, so long as the Court's processes are not invoked, as in the case of a FOIA request, the resulting material falls outside the bounds of the Protective Order.").

enforcement proceedings." 5 U.S.C. § 552(b)(7)(A). This requires "more than conclusory statement[s]" about potential harm. *Campbell*, 682 F.2d at 259.

Exemption 7(A) "is designed to block the disclosure of information that will *genuinely* harm the government's case in an enforcement proceeding or impede an investigation." *North v. Walsh*, 881 F.2d 1088, 1097–98 (D.C. Cir. 1989) (emphasis added); *see id.* ("[T]he exemption was intended to apply whenever the Government's case in court—a concrete prospective law enforcement proceeding—would be harmed by the premature release of evidence or information not in the possession of known or potential defendants. This would apply also where the agency could show that the disclosure of such information would *substantially* harm such proceedings by impeding any necessary investigation before the proceeding.") (quoting 120 CONG.REC. S17,033 (May 30, 1974)) (emphasis added).

When the proceeding's subject already possesses the information, the rationale for withholding disappears. *See Chesapeake Bay Found., Inc. v. U.S. Army Corps of Eng'rs*, 677 F. Supp. 2d 101, 108 (D.D.C. 2009) (finding agency failed to explain "how its investigation will be impaired by the release of information that the targets of the investigation already possess"); *Lion Raisins Inc. v. USDA*, 354 F.3d 1072, 1085 (9th Cir. 2004) (where the investigatory target already possessed copies of the requested records, the "USDA [could not] argue that revealing the information would allow Lion premature access to the evidence upon which it intends to rely at

trial" or harm its investigation, because "Lion already has copies of the documents it seeks"); *Scheer v. U.S. Dep't of Justice*, 35 F. Supp. 2d 9, 14 (D.D.C. 1999) (finding that agency assertions of harm and "concern proffered . . . cannot stand" when agency itself disclosed information to target); *see also Dow Jones Co., Inc. v. F.E.R.C.*, 219 F.R.D. 167, 174 (C.D. Cal. 2003) (stating that there cannot be harm because "each target company has a copy ... and is therefore on notice as to the government's possible litigation strategy and potential witnesses").

In this case, the FBI concedes Maxwell viewed a significant portion of these documents through the criminal discovery process. According to her defense counsel, the government had produced "millions of documents" to the defense by January 2021. *United States v. Ghislaine Maxwell*, 1:20-cr-330-AJN (S.D.N.Y.), Letter to Judge Nathan, Jan. 14, 2021, ECF No. 116. And, in the declarations submitted in support of summary judgment, the FBI confirmed Maxwell's access to "among other things, testifying witness statements, material subject to disclosure pursuant to *Giglio v. United States*, 405 U.S. 150 (1972), and material subject to disclosure pursuant to Federal Rule of Criminal Procedure 16." A-614. Maxwell also already received any *Brady* materials she was entitled to prior to her trial.

The FBI's claim that disclosure would somehow interfere with enforcement proceedings ignores this reality. The FBI asserted that the release of such information would "provide Maxwell with greater access 'to the investigatory files

18

than she would otherwise have during the criminal discovery process.'" SPA-66–67. However, given that Maxwell's trial has already concluded, she received a substantial number of documents during discovery including *Brady* material and *Giglio* materials. And numerous other documents are already in the public domain through the extensive publicity of the Epstein investigation and Maxwell's trial. Thus, to the degree Epstein's 2006 investigative file is relevant to her case, Maxwell already possesses the documents and information at issue and has already seen the government's case. Even in a hypothetical retrial, there is no element of surprise available to the government, and therefore no harm that Maxwell would be provided with greater access to the investigatory files than she would otherwise have. *See Chesapeake Bay Found., Inc.*, 677 F. Supp. 2d at 108; *Lion Raisins Inc.*, 354 F.3d at 1085; *Scheer*, 35 F. Supp. 2d at 14; *Dow Jones Co., Inc*, 219 F.R.D. at 174.

  *b. The Release of the Requested Records Would Not Impact the Jury Pool.*

  In the Third Comey Declaration, the FBI asserted that if potential jurors were able to access documents within Epstein's investigative file, jurors may improperly consider this information in conjunction with the actual evidence that is presented at trial. A-612–613. The district court then uncritically accepted the FBI's arguments about potential jury prejudice without analyzing their logical flaws. The FBI claimed that premature disclosure "risks prejudicing the jury pool so as to hinder the Government's ability to presents its case in court" because jurors might "wonder

19

why those materials were absent from the trial" or develop "preconceived notions of that evidence's relevance or importance." A-613.

Put another way, the FBI posits that a critical mass of hypothetical Manhattan jurors – who missed the unprecedented media coverage of Maxwell's indictment, trial, and conviction – might nonetheless come across documents released via FOIA and form an incurable prejudice. Such arguments defy logic.

Of course, these arguments also ignore the myriad tools a district court has to shield jurors from outside information. As the D.C. Circuit explained in *North v. Walsh*, "the district court retains full control over the evidence admitted or lines of inquiry pursued in the criminal case. If any evidence or question is irrelevant to the trial, the court can simply keep it out." 881 F.2d 1088, 1100 (D.C. Cir. 1989). The court emphasized that agencies cannot withhold information based on speculative claims about jury prejudice because trial judges possess ample tools to manage what jurors see and hear. *Id.* Likewise, this Court held that "voir dire examination still remains a sufficient device to eliminate from jury service those so affected by exposure to pre-trial publicity that they cannot fairly decide issues of guilt or innocence." *Application of Nat'l Broad. Co., Inc. v. Myers*, 635 F.2d 945, 953 (2d Cir. 1980) (affirming order allowing videotapes admitted at trial to be televised, stating "We do not believe the public at large must be sanitized as if they all would become jurors").

In this case, the district court failed to apply this critical reasoning. In the unlikely scenario that Maxwell secures a retrial, and if those hypothetical jurors develop "preconceived notions" about certain evidence, the trial court can address this through voir dire, limiting instructions, or excluding prejudicial evidence. If jurors might "wonder why materials were absent," the court can instruct them to consider only admitted evidence. These basic judicial tools render the FBI's claims of potential harm entirely speculative and insufficient to justify withholding.

"[P]retrial publicity, even if pervasive and concentrated, cannot be regarded as leading automatically and in every kind of criminal case to an unfair trial." *United States v. Martoma*, 2013 U.S. Dist. LEXIS 182959, at *22 (S.D.N.Y. Dec. 8, 2013) (citing *Neb. Press Ass'n v. Stuart*, 427 U.S. 539, 565 (1976)). Besides, release of the records could hardly further color a jury any more than the ubiquitous press reports, social media chatter, television programs, and books devoted to the subject.

The Southern District of New York has already considered whether the release of sealed documents would harm Maxwell's right to a fair jury trial *while her criminal trial was still pending*, and, even then, the district court held that her claims were speculative and without merit. *See Giuffre v. Maxwell*, No. 15-cv-07433-LAP (S.D.N.Y. Jan. 19, 2021), ECF No. 1196 (Tr.), at 5. The district court noted that her trial was "likely many months away," and Maxwell did not articulate why the disclosure "cannot be cured through the normal processes in place for jury

21

selection." *Id.*; *see also Giuffre v. Maxwell*, No. 15-cv-07433 (LAP), 2021 WL 423445, at *2 (S.D.N.Y. Feb. 8, 2021) ("[W]hile the Court acknowledges Ms. Maxwell's interest in a fair criminal trial, … Ms. Maxwell can argue all her points to the presiding judge in her criminal trial, as she has already … and will still have at her disposal all of the tools that the Federal Rules of Evidence and Procedure afford her and any other criminal defendant."). Here, the concerns that release would result in an unfair jury trial for Ms. Maxwell are even more speculative, as her appeal for a retrial has already been denied by the Second Circuit and hangs on the implausible scenario that the U.S. Supreme Court grants her cert petition and ultimately grants a retrial.

Further, the FBI's declarations in the district court fail to establish how disclosure would harm enforcement proceedings, particularly since much of the information already exists in the public domain. *See, e.g.*, *Brown v. Maxwell,* 929 F.3d 41 (2d Cir. 2019) (unsealing more than 2,000 pages of summary judgment filings and exhibits pertaining to Maxwell's involvement with Epstein).

The government's own actions with respect to the Epstein investigative file further undermine the FBI's invocation of Exemption 7(A) and their assertions that disclosure would harm the potential jury pool for a retrial. Attorney General Pamela Bondi recently demanded that the FBI deliver the "full and complete files related to

22

Jeffery Epstein."[5] The FBI cannot assert that the release of this information would harm law enforcement proceedings and taint the potential jury pool when the exact investigative file sought here is urged to be released by the Attorney General. And the Department of Justice in February 2025 released numerous records from the Epstein file sought in this case, in an effort "to provide the public with long overdue accountability."[6] This official release of Epstein-related materials directly contradicts the FBI's assertion that disclosing similar materials would harm law enforcement proceedings. Materials already in the public domain "lose their protective cloak" under FOIA. *Cottone v. Reno,* 193 F.3d 550, 554 (D.C. Cir. 1999). And courts have recognized that a subsequent disclosure can "shift the factual groundwork on which the Court examines the propriety of the FOIA Exemptions" and make "the continued use of that exemption illogical and implausible." *Am. C.L. Union v. Dep't of Def.*, 492 F. Supp. 3d 250, 260 (S.D.N.Y. 2020).

---

[5] *See* Press Release, U.S. Dept. of Justice Office of Public Affairs, "Attorney General Pamela Bondi Releases First Phase of Declassified Epstein Files" (Feb. 27, 2025), available at https://www.justice.gov/opa/pr/attorney-general-pamela-bondi-releases-first-phase-declassified-epstein-files. (hereinafter, "February 27, 2025 DOJ Press Release"). Notably, FBI Director Kash Patel emphasized that the "[t]he FBI is entering a new era" and confirmed the FBI would "bring everything we find to the DOJ to be fully assessed and transparently disseminated to the American people as it should be." *Id.*

[6] *See* February 27, 2025 DOJ Press Release. Released records include evidence lists, flight logs, a redacted contact book, and a redacted masseuse list—precisely the types of materials responsive to Plaintiff's FOIA request.

23

When combined with the extensive media coverage, documentaries, television specials, books and public court proceedings concerning Epstein and Maxwell, these official disclosures render the FBI's claimed harm to the jury pool both "illogical and implausible." *Id.*

### c. The Release of the Documents at Issue Would Not Impact Witness Testimony.

The possibility that Maxwell's Supreme Court petition for certiorari is granted and that the Supreme Court then grants Maxwell a retrial is so speculative that the concern of future witness impact is nearly nonexistent. The witnesses have already testified at Maxwell's trial. The trial was covered extensively in the news. The witnesses would have already learned about other witnesses' testimony following the trial. Thus, any concern about further disclosures affecting witness testimony is far too remote and speculative to justify continued withholding of FBI documents. *See Citizens for Resp. & Ethics in Washington v. U.S. Dep't of Justice ("CREW I")*, 658 F. Supp. 2d 217, 231 (D.D.C. 2009) (finding government failed to meet its burden of demonstrating harm to law enforcement proceedings under Exemption 7(A) where the identified harm was too "inherently, incurably speculative *Alper v. Dep't of Justice*, No. 24-CV-1837 (DLF), 2025 WL 1503795, at *3 (D.D.C. May 27, 2025) ("Generalized concerns about the potential for witness tampering, evidence destruction, and the thwarting of the government's trial strategy … are not as compelling when the witnesses have already been disclosed, the evidence is

decades old, and the government has revealed its evidence and strategy in an earlier trial.").

Moreover, some of the key Epstein victims and witnesses, such as Virginia Giuffre, are now deceased. Giuffre did not testify at Maxwell's trial, and there is no risk of her changing her story.

### 2. The FBI's Retroactive Invocation of Exemption 7(A) Was Not Timely.

Appellants filed this action in May 2017, and the FBI thereafter began processing responsive documents between October 2017 and July 2019. SPA-55. But the FBI abruptly changed course after federal prosecutors charged Epstein with federal offenses in July 2019. For the first time, the FBI invoked Exemption 7(A) to withhold all remaining responsive documents and further claimed that all records previously withheld under other exemptions (such as privacy) would continue to be withheld under Exemption 7(A).

The district court endorsed this approach in its September 19, 2023 summary judgment order, finding that the FBI could retroactively invoke the exemption based on Maxwell's then-pending appeal.[7] SPA-11–18. But this retroactive application fundamentally misunderstands how FOIA exemptions work.

---

[7] Maxwell was indicted in June 2020. *See United States v. Maxwell*, No. 20-cr-00330 (S.D.N.Y.).

When Appellants' FOIA request was submitted, there was no pending law enforcement proceeding preventing disclosure of the file at issue. Similarly, for the first two years that the FBI produced documents, there was still no pending law enforcement proceeding. If anything, the attention brought to the issue by Plaintiffs and the media is what spurred the FBI to re-visit the issue.

Allowing agencies to retroactively apply exemptions based on post-request events creates an inherently unfair process for requesters and encourages agencies to improperly invoke placeholder exemptions to delay disclosure. Allowing the FBI to retroactively apply an exemption based on facts that did not exist at the time of the request, and did not develop until over two years after the request was made, sets a concerning precedent that would allow agencies to utilize placeholder exemptions to prevent disclosure until the agency finds a "better" justification for withholding.

There is an important distinction between retroactively applying an exemption that was available to the government at the time of the request and retroactively applying an exemption that was not available to the government at the time of the request. To illustrate the distinction, in *Senate of the Com. of Puerto Rico v. U.S. Dep't of Justice*, the DOJ was permitted to pivot to narrower exemptions after the basis for its broad assertion of 7(A) collapsed during the pendency of an appeal. 823 F.2d 574 (D.C. Cir. 1987). Those exemptions had been available to the agency at the time of the request but were simply not utilized. In other words, the invocation was

justifiable at the time of the request, if belated. *Id.*; *see also Maydak v. U.S. Dep't of Justice*, 218 F.3d 760 (D.C. Cir. 2000) (following collapse of 7(A) due to changed circumstances, the government asserted late exemptions on appeal, all of which it could have asserted at the time of the original request); *August*, 328 F.3d at 698 (same).

Conversely, in *Shapiro v. U.S. Dep't of Justice*, the DOJ adopted a new policy regarding its disclosure of "search slips and processing notes" during the district court proceedings and attempted to use this policy to justify withholding of certain records sought by the plaintiff. 177 F. Supp. 3d 467 (D.D.C. 2016). The court rejected this effort to claim that an "interim development" driven by the government's own actions should be permitted to serve as the basis for withholdings. *Id.* at 470 ("The FBI does not point to any 'interim development,' at least not to one outside its control.").

There is good reason to limit the changed circumstances exception to the facts of these cases. In *Puerto Rico*, the D.C. Circuit was concerned that mulligans go against the "interests of judicial finality and economy" as well as "fairness to parties seeking disclosure." 823 F.2d at 580. However, it found comfort in the fact that the plaintiff was no worse off than they would have been if the agency had used all exemptions available to it at the time of the request. *Id.*

27

As relevant here, it is improper to permit the government to invoke exemption 7(A) based on a pending law enforcement proceeding over the first two years of productions when there was no pending law enforcement during that period. Permitting the FBI to apply exemptions retroactively would reward the FBI's wrongful withholding of material for the first two years of productions based on Epstein's supposed personal privacy. For two years following Appellants' suit, the FBI redacted on a near-categorical basis based on Epstein's privacy. Such withholding was wrongful given the substantial public interest in the government's handling of the Epstein case and what the public has come to know regarding Epstein and the allegations against him.

Given that there was no pending law enforcement proceeding at the time of Appellants' original request, and no pending law enforcement proceedings during the first two years of productions (nor is there currently a pending law enforcement proceeding against Epstein), the FBI should not be entitled to reach back in time and assert that all such documents are properly withheld based on a law enforcement proceeding that was not in existence at the time the documents were processed.

The public's right to know cannot reasonably hinge on the variability of government's processing schedules. For example, had the FBI processed the request at a reasonable rate of 1,000 records a month, the production would have been

completed prior to Epstein's arrest in 2019 and the FBI would have been left to defend its prioritization of Epstein's personal privacy over the public interest.

**B.    The District Court Erred in Finding that the FBI Met Its Burden Under Exemptions 6, 7(C) and 7(E).**

In the First Summary Judgment Order, the district court ruled that the FBI met its burden documents to withhold documents pursuant to FOIA Exemptions 6, 7(C), and 7(E). SPA-33–42, SPA-48–50. However, the FBI applied these privacy exemptions far more expansively than was necessary to protect the identities of third parties, many of whom have already revealed their own identities, or whose identities have been revealed through other sources. For the forthcoming reasons, this Court should reverse.

**1.    The District Court Erred in Finding That the FBI Met Its Burden Under Exemptions 6 and 7(C).**

FOIA Exemption 6 provides that documents may be withheld from disclosure only if they are "personnel and medical files and similar files the disclosure of which would constitute a clearly unwarranted invasion of personal privacy." 5 U.S.C. § 552(b)(6). Exemption 7(C) exempts from disclosure records or information compiled for law enforcement purposes where its production "could reasonably be expected to constitute an unwarranted invasion of personal privacy." 5 U.S.C. § 552(b)(7)(C).

29

Congress designed Exemption 6 to be among the narrowest and most difficult exemptions to satisfy. *See Stern v. F.B.I.*, 737 F.2d 84, 91-92 (D.C. Cir. 1984). Indeed, Exemption 6 is the only FOIA exemption that requires the Government to demonstrate that the invasion of privacy resulting from the disclosure of the requested documents would be "clearly unwarranted." *Id.* The Supreme Court has held that this language represents a "considered and significant determination" by Congress intended to prevent Exemption 6 from being applied broadly and thereby contravening FOIA's goal of promoting disclosure of Government information. *Dep't of Air Force v. Rose,* 425 U.S. 352, 378, n.16 (1976); *see also News-Press v. U.S. Dep't of Homeland Sec.,* 489 F.3d 1173, 1206 (11th Cir. 2007).

Under Exemption 7(C), the agency must demonstrate that (1) the records or information were compiled for a law enforcement purpose and (2) the release of the material would constitute an unwarranted invasion of personal privacy. *See Ferguson v. F.B.I.*, 957 F.2d 1059, 1065 (2d Cir. 1992); *Matthews v. F.B.I.*, 575 F. Supp. 3d 166, 172 (D.D.C. 2021).

"Exemption 7(C) requires a court to 'balance the public interest in disclosure against the [privacy] interest Congress intended the Exemption to protect.'" *Associated Press v. U.S. Dep't of Def.*, 554 F.3d 274, 284 (2d Cir. 2009). The relevant public interest the Court must consider "is the extent to which disclosure of the information sought would shed light on an agency's performance of its statutory

30

duties or otherwise let citizens know what their government is up to." *Intercept Media Inc. v. Nat'l Park Serv.*, No. 23 CIV. 10922 (PAE), 2024 WL 5009310, at *11 (S.D.N.Y. Dec. 6, 2024). Put another way, the Court must consider the public interest in "open[ing] agency action to the light of public scrutiny." *Associated Press*, 554 F.3d at 288.

At bottom, "courts must bear in mind that FOIA mandates a strong presumption in favor of disclosure, and that the statutory exemptions… are to be narrowly construed." *Citizens for Resp. & Ethics in Washington v. United States Dep't of Justice ("CREW II")*, 854 F.3d 675, 681 (D.C. Cir. 2017).

> a. *The District Court Erred in Finding Ordinary Citizens Cannot Have a Diminished Privacy Interest by Prior Disclosure of Their Names and Involvement.*

Appellants argued at summary judgment that several individuals "have already been publicly connected to the [Epstein/Maxwell trafficking investigation and criminal cases and] controversy or have voluntarily identified themselves," and thus have diminished privacy interests. SPA-38. The district court dismissed this argument, wrongly stating that only public officials may have diminished privacy interests, but that "an ordinary citizen's privacy interest" may not be diminished by prior disclosures of their names in court filings or in public statements concerning the investigation. *Id.* The district court's holding is contrary to established law.

31

In *CREW II*, the Circuit Court for the District of Columbia expressly held that "individuals who have already been publicly identified—either through agency press releases or testimony in open court—as having been charged, convicted or otherwise implicated in connection with the public corruption investigation … have a diminished privacy interest in certain information that may be contained in the records at issue." *CREW II*, 854 F.3d at 682. The court was specifically looking at third parties other than the target of the investigation, and there is no indication those unnamed third parties were public officials. *See also Intercept Media Inc.*, 2024 WL 5009310, at *10 (finding individuals retained their privacy interests "because, based on the record before the Court, no such person has publicly so identified himself or herself [as a subject of the investigation]," suggesting that if the person *had* been publicly identified, the individual's privacy interests would be diminished).

There is simply no support for the district court's finding that only public officials may have diminished privacy interests by public disclosure of their involvement in a law enforcement investigation, and the court's finding should be reversed as a matter of law.

> b. *The District Court Failed to Adequately Consider the Extent of Prior Disclosures of Multiple Third Parties.*

A staggering amount of information has already been made public concerning Epstein's conduct and the hundreds of people involved in some way – including alleged co-conspirators and perpetrators, social and business affiliates, witnesses,

and victims among them. Ghislaine Maxwell was publicly tried and convicted for her involvement, which was widely publicized and revealed copious amounts of documents and testimony to the public. *See generally United States v. Maxwell*, No. 1:20-cr-00330-AJN (S.D.N.Y.). And this Court ordered the release of more than 2,000 pages of summary judgment filings and exhibits pertaining to Maxwell's involvement with Epstein and remanded to the district court for the release of thousands more pages and dozens of individuals' names, where the court find their privacy interests were outweighed by countervailing interests. *Brown v. Maxwell,* 929 F.3d 41 (2d Cir. 2019); *see generally Giuffre v. Maxwell*, No. 15-cv-07433-LAP (S.D.N.Y.) (periodically ordering the release of new rounds of documents and identities between July 23, 2020, and Dec. 18, 2023).[8] This is all in addition to the numerous documentaries, books, news articles, and other media covering the very people and issues now withheld by the FBI under a claim of privacy for these individuals, many of whom volunteered to speak publicly.

As a few examples, the government identified Sarah Kellen, Adriana Ross, Lesley Groff, and Nadia Marcinkova as "potential co-conspirators of Esptein" and

---

[8] *See also* Adam Reiss, et al., *Last batch of unsealed Jeffrey Epstein documents released*, NBC News (Jan. 9, 2024, 3:41 PM), https://www.nbcnews.com/news/us-news/last-batch-unsealed-jeffrey-epstein-documents-released-rcna132936 ("In total, 4,553 pages of documents were made public, and they included the names of more than 150 people connected to or mentioned in legal proceedings related to Epstein and his network").

provided them immunity in Epstein's Non-Prosecution Agreement. *Podhurst Orseck, P.A. v. Epstein*, 1:10-cv-21586-ASG (S.D. Fla. 2010). Lawsuits have been filed against Leon Black (S.D.N.Y. No. 23-cv-06418), Prince Andrew (S.D.N.Y. No. 21-cv-6702), and Alan Dershowitz (S.D.N.Y. 19-cv-3377), regarding their alleged involvement with Epstein, to name a few. Alan Dershowitz has written several articles, published a book, and appeared in a number of interviews on the topic of his involvement with Epstein.[9] Dershowitz, in fact, intervened in the litigation between Giuffre and Maxwell for the purpose of unsealing records related to him and stated in a letter to the court: "Dershowitz specifically waives and disclaims any privacy interest in any of these documents—most of which were sealed as a result of confidentiality designations applied by Plaintiff Virginia Giuffre—and urges the Court to unseal them." *Giuffre v. Maxwell*, No. 15-cv-07433-LAP (S.D.N.Y Oct. 9, 2019), ECF No. 992, at 4; *see also id.* at ECF No. 957, at 1 ("Dershowitz has been litigating to unseal materials from this case for nearly two years.").

---

[9] *See e.g.,* Alan Dershowitz, *Guilt by Accusation: The Challenge of Proving Innocence in the Age of #MeToo*, (2019); Times Radio, *I was in the Epstein files 137 times | Alan Dershowitz*, YouTube (Jan. 5, 2024) https://www.youtube.com/watch?v=0Hp7u-FmD3M; Andrea Blanco and Rachel Sharp, *Alan Dershowitz posts 31-minute defense video after Epstein documents unsealed*, The Independent (January 6, 2024, 19:24 GMT) https://www.independent.co.uk/news/world/americas/epstein-list-associates-alan-dershowitz-b2474376.html.

The district court failed to adequately consider that widespread public disclosure of these and others' alleged involvement diminishes their privacy interests in trying to remain unassociated with Epstein. Their association is already known and cannot become unknown by continued withholding. *See Intercept Media Inc.*, 2024 WL 5009310, at *9 ("[B]y publicly announcing that he was the investigative target, has waived any privacy interest in that fact.").

Some of the victims have also chosen to speak out about the abuse they suffered. Virginia Giuffre, a self-identified victim of Epstein's and others' abuse, was a longtime advocate of unsealing records related to Epstein and Maxwell, including documents that identify her. *See Giuffre v. Maxwell*, No. 15-cv-07433-LAP (S.D.N.Y), ECF No. 945 (Apr. 27, 2018) (Giuffre supporting newspaper's motion to intervene and unseal the entire case docket); *id.* ECF No. 1003 (Nov. 1, 2019), at 1 ("As set forth in her earlier filings, Giuffre supports the unsealing of this case's docket."). Yet the district court held that "Giuffre and those similarly situated maintain significant privacy interests in the records at issue." SPA-41. For the district court to use her privacy as an excuse to shield information about a sex trafficking operation that Giuffre had to suffer in secret for years is an affront to her

35

years-long pursuit to shine a spotlight on the abuse she and others endured and the government's failure to intervene.[10]

She was not alone in her quest for public disclosure. The four-hour television miniseries "Surviving Jeffrey Epstein" features interviews from seven other Epstein victims: Rachel Benavidez, Jena Lisa Jones, Kiki Doe, Courtney Wild, Chauntae Davies, Teresa Helm, and Marijke Chartouni.[11] Additionally, this Court has already upheld the unsealing of Emmy Tayler's name in connection with Epstein. *See Doe 171 v. Giuffre*, No. 22-3050, 2023 WL 4926196, at *1 (2d Cir. Aug. 2, 2023) (finding the district court did not abuse its discretion in ordering the unsealing of materials that identify Doe 171); *Giuffre v. Maxwell*, No. 15-cv-07433-LAP (S.D.N.Y Nov. 18, 2022), ECF No. 1284 (Tr.), at 5-6 (identifying Doe 171 as Emmy Tayler and noting that she voluntarily filed a lawsuit identifying herself as being associated with Epstein and that "numerous other public sources" already identify her).

The district court "acknowledge[d] that certain of Epstein's victims have publicly discussed being trafficked by Maxwell and Epstein." SPA-41. And while

---

[10] Ms. Giuffre passed away on April 25, 2025, which additionally leads to a diminished privacy interest in nondisclosure.[10] *Schrecker v. U.S. Dept. of Justice*, 349 F.3d 657, 660 (D.C. Cir. 2003) ("The fact of an individual's death, we held, is a relevant factor in determining whether the Government properly withheld the individual's personal information under Exemption 7(C)").

[11] *See* "Press Release: Surviving Jeffrey Epstein Brand New & Exclusive To Crime+Investigation," My News Desk (Aug. 10, 2020), available at: https://www.mynewsdesk.com/nl/aenetworks/pressreleases/press-release-surviving-jeffrey-epstein-on-crime-plus-investigation-r-3025267

the district court asserts that individuals in "high profile criminal investigations . . . have more than a minimal privacy interest in not having their identities exposed," *id.* (quoting *Summers v. U.S. Dep't of Justice*, No. 98-1837 (RWR), 2004 WL 7333532, at *4 (D.D.C. Apr. 13, 2004)), the court failed to reason that these identities have already been publicly exposed, often *by the individuals themselves. See Smith v. Maryland*, 442 U.S. 735, 743–44 (1979) ("a person has no legitimate expectation of privacy in information he voluntarily turns over to third parties"). Because these individuals have already been named – often multiple times over – their privacy interests are vastly diminished.

        *c.*  *The District Court Failed to Weigh the Public Interest in Disclosure.*

The district court was required to balance the public interest in disclosure against the privacy interests asserted. *Associated Press*, 554 F.3d at 284. It failed to even identify the public interest at issue here and did not assess the weight of the public interest. Instead, it stated in conclusory fashion that disclosure "would not advance the public's understanding of the [FBI's] performance of its statutory duties." SPA-37; *see also* SPA-41 ("[T]he public interest in shedding light on the Bureau's activities is not served by the disclosure of records that name and identify [individuals] listed in Plaintiff's brief.").

The public interest can be anything that "shed[s] light on an agency's performance of its statutory duties or otherwise let citizens know what their

government is up to." *Intercept Media Inc.*, 2024 WL 5009310, at *11. The Supreme Court has made clear that "matters of substantive law enforcement policy… are properly the subject of public concern." *Dept. of Justice v. Reporters Comm. For Freedom of Press*, 489 U.S. 749, 766 n.18 (1989).

Here, the public interest in the investigation and prosecution of Epstein and his fellow perpetrators – and, perhaps more importantly, the government's initial inaction – is paramount in this case. In 2007, the United States Attorney for the Southern District of Florida now famously entered into a Non-Prosecution Agreement ("NPA") with Epstein, whereby Epstein averted federal prosecution in exchange for pleading guilty to a state charge of soliciting prostitution from a minor. *See Podhurst Orseck, P.A. v. Epstein*, 1:10-cv-21586-ASG (S.D. Fla. 2010). An investigation by the Department of Justice more than 10 years later concluded that the U.S. Attorney exercised "poor judgment" in entering into the NPA with Epstein.[12] In a news interview, a lead prosecutor in the Florida investigation stated, "That injustice, I believe, was the result of deep, implicit institutional biases that prevented me and the FBI agents who worked diligently on this case from holding Mr. Epstein accountable for his crimes."[13] Questions remain today how the

---

[12] *Executive Summary of Report*, DOJ Office of Professional Responsibility (Nov. 2020), https://www.justice.gov/opr/page/file/1336471/dl?inline=.
[13] Michael Balsamo & Eric Tucker, *Justice Dept.: 'Poor judgment' used in Epstein plea deal*, Associated Pres (Nov. 12, 2020), https://apnews.com/article/jeffrey-epstein-florida-

government handled the investigation both before and after the 2007 NPA. There is, therefore, a substantial public interest in understanding the full breadth of the government's actions and inactions pertaining to Epstein and his associates. *See Bast v. U.S. Dep't of Justice*, 665 F.2d 1251, 1255 (D.C. Cir. 1981) (identifying "important public interest" in disclosure of documents that would "determine whether the Department properly exercised its prosecutorial discretion."). The district court failed to consider this public interest or assess its weight in determining whether the public interest in disclosure outweighed the diminished privacy interests of individuals already publicly identified. Its decision on Exemptions 6 and 7(c) should therefore be reversed.

## 2. The District Court Erred in Finding That the FBI Met Its Burden Under Exemptions 7(E).

Exemption 7(E) withholds from disclosure law enforcement records which "would disclose techniques and procedures for law enforcement investigations or prosecutions, or would disclose guidelines for law enforcement investigations or prosecutions if such disclosure could reasonably be expected to risk circumvention of the law." 5 U.S.C. § 552(b)(7)(E). "Because the Exemption grants categorical protection to [techniques and procedures], it requires no demonstration of harm or balancing of interests." *Keys v. Dep't of Homeland Sec.*, 510 F. Supp. 2d 121, 129

---

e2a4431f7319afd037023d9a586aa291#:~:text=Under%20the%202008%20non%2Dprosecution,in%20a%20work%2Drelease%20program.

(D.D.C. 2007). However, the Exemption protects "'guidelines' from disclosure only if public access to such guidelines would risk circumvention of the law" – an additional showing that is not required before withholding "techniques or procedures." *Allard K. Lowenstein Int'l Hum. Rts. Project v. Dep't of Homeland Sec.*, 626 F.3d 678, 681 (2d Cir. 2010); *Knight First Amend. Inst. at Columbia Univ. v. U. S. Citizenship & Immigr. Servs.*, 30 F.4th 318, 327 (2d Cir. 2022).

Finally, "Exemption 7(E)—like all other exemptions except Exemption 3—is 'subject to the foreseeable harm requirement.'" *Reps. Comm. for Freedom of the Press v. F.B.I.*, 754 F. Supp. 3d 56, 65 (D.D.C. 2024).

The district court held "that the FBI has satisfied its burden under Exemption 7(E) – each category of information identified in the Seidel declaration qualifies as" exempt under 7(E). SPA-49. The court further held "that the FBI has 'logically explain[ed] how the [requested information] could help criminals circumvent the law, and that suffices here to justify invocation of Exemption 7(E).'" SPA-50 (quoting *Blackwell v. F.B.I.*, 646 F.3d 37, 42 (D.C. Cir. 2011)). This is insufficient for two related reasons.

First, the district court did not sufficiently distinguish between *guidelines*, which are subject to heightened scrutiny under *Allard* and *Knight*, and *techniques and procedures*, which are not. SPA-49–50. Second, the court allowed the FBI to

apply Exemption 7(E) across the entirety of the FBI's seven asserted categories of withholding, without the appropriate examination of foreseeable harm. *Id.*

The district court pointed to "the Seidel's declaration's detailed description of the guidelines, techniques and procedures the FBI seeks to protect under Exemption 7(E)." SPA-50. But at least one of the FBI's claimed categories, "Monetary Payments/Funding for Investigative Purposes," cites "limited resources that it must allocate strategically" as a reason to support withholding. *See* A-87. This kind of "resource allocation" is precisely the kind of *guideline* subject to a showing of particularized harm by this Court in *Allard*.[14] *See* 626 F.3d at 682. But the court failed to assess how the release of a document identifying how the FBI allocates its monetary resources could help criminals circumvent the law, as it must to justify withholding a guideline.

Additionally, the court failed to assess the foreseeability of harm for any of the withholdings under Exemption 7(E). *See* SPA-48–50; *see also Reps. Comm. for Freedom of the Press v. F.B.I.*, 3 F.4th 350, 36970 (D.C. Cir. 2021) ("The government broadly failed to 'specifically focus[]' its foreseeable harm demonstration 'on the information at issue in [the documents] under review'")

---

[14] *See e.g.*, Kash Patel, *Federal Bureau of Investigation Budget Request to U.S. Senate for Fiscal Year 2026*, Federal Bureau of Investigation (May 8, 2025), https://www.fbi.gov/news/speeches-and-testimony/federal-bureau-of-investigation-budget-request-to-us-senate-for-fiscal-year-2026.

(quoting *Machado Amadis v. U.S. Dep't of State*, 971 F.3d 364, 371 (D.C. Cir. 2020)). Rather than determining whether the FBI articulated the harm that would result from disclosure, the district court accepted the FBI's generic language. *Id.* In fact, the language in question in the case cited by the district court for support in withholding monetary payments *is the exact same language* offered in the Seidel Declaration. *Compare* A-87 *with Shapiro v. Dep't of Justice*, No. 12-cv-313 (BAH), 2020 WL 3615511, at *36 (D.D.C. July 2, 2020) ("Revealing the amount of money the FBI has paid or plans to pay in order to implement certain investigative techniques would reveal the FBI's level of focus on certain types of law enforcement or intelligence gathering efforts and priority given to certain investigative matters"). This kind of generalized language is not sufficient for the examination of reasonably foreseeable harm. *See Reps. Comm.*, 3 F.4th at 369; *see also Emuwa v. U.S. Dep't of Homeland Sec.*, No. 1:20-cv-01756 (TNM), 2022 WL 1451430, *2 (D.D.C. May 9, 2022), *aff'd*, 113 F.4th 1009 (D.C. Cir. 2024) ("[T]he agency must articulate, in a 'focused and concrete' way, the harm that would result from disclosure, including the basis and likelihood of that harm) (internal citations omitted).

    As the FBI failed to identify how the disclosure of guidelines would reasonably be expected to risk circumvention of the law and failed to identify reasonably foreseeable harm, this Court should reverse the district court's order

finding that the FBI met its burden for withholding documents pursuant to Exemption 7(E).

**C.    The District Court Erred in Finding that the FBI Satisfied Its Segregability Burden with Respect to the Documents Withheld in Full.**

The district court additionally erred in finding that the agency met its segregability burden as to the documents withheld in full. SPA-72–73. As referenced above, there are numerous categories of documents that could easily be segregated and produced without risking harm to any pending law enforcement investigation. This Court should reverse.

An agency shall "consider whether partial disclosure of information is possible whenever the agency determines that a full disclosure of a requested record is not possible; and take reasonable steps necessary to segregate and release nonexempt information." 5 U.S.C. § 552(b). The question of segregability is "subjective based on the nature of the document in question, and an agency must provide a reasonably detailed justification rather than conclusory statements to support its claim that the non-exempt material in a document is not reasonably segregable." *Barnard v. Dept. of Homeland Sec.*, 531 F. Supp. 2d 131, 140 (D.D.C. 2008) (citing *Mead Data Cent. Inc. v. Dep't of Air Force*, 566 F.2d 242, 261 (D.C. Cir. 1977)). This justification "should at least detail what proportion of the information in a document is non-exempt and how that material is dispersed throughout the document." *Id*. "[T]o justify withholding an entire document the DOJ

43

. . . must demonstrate that [it] cannot delineate between exempt and non-exempt information therein." *Ayyad v. U.S. Dep't of Justice*, No. 00 CIV. 960(KTD), 2002 WL 654133, at *2 (S.D.N.Y. Apr 18, 2002).

An agency's blanket and conclusory statements regarding the general segregability of the information is insufficient. *See Patterson v. IRS*, 56 F.3d 832, 839 (7th Cir. 1995) ("[B]ecause the [agency declaration] lumps all of the withheld information together in justifying nondisclosure, the district court could not have independently evaluated whether exempt information alone was being withheld or deleted in each instance.").

The district court here "conclude[ed] that the FBI has satisfied its segregability burden with respect to documents withheld in full under Exemption 7(A)." SPA-73. The FBI represented that "to the extent there is non-exempt information contained in the records withheld under Exemption 7(A), that information is intertwined with exempt information and cannot reasonably be segregated without risking interference with the Maxwell prosecution. . . ." *Radar Online LLC v. Fed. Bureau of Investigation*, No. 1:17-cv-03956-PGG (S.D.N.Y. Jan. 30, 2024), ECF No. 57, at 30. This is because, according to the FBI, "media coverage of speculation and theories about Maxwell's association with Epstein makes the segregation of any possibly non-exempt information particularly difficult because providing information pertaining to Epstein without complete context can

reasonably be expected to contribute to the dissemination of speculation and theories about the Maxwell case." A-618–619, ¶ 17. This reasoning is insufficient.

The FBI's speculative and conclusory statements about the possibility of "dissemination of speculation" is inapposite to *Mead Data*'s mandate to "provide a more detailed justification rather than conclusory statements" when declining to segregate withheld material. 566 F.2d at 261. Further, the FBI's above statements acknowledge that it is indeed possible to "delineate between exempt and non-exempt information" in the withheld documents. *Radar Online LLC v. Fed. Bureau of Investigation*, No. 1:17-cv-03956-PGG (S.D.N.Y. Jan. 30, 2024), ECF No. 57, at 30; A-618–619, ¶ 17.

The FBI has failed to meet its burden here, as it relies exclusively on conclusory statements to support its assertion that it conducted a sufficient segregability analysis. The FBI's declarations do not demonstrate that the FBI made any attempt to identify, segregate and release non-exempt portions of requested material, as required under FOIA. 5 U.S.C. § 552(b) ("Any reasonably segregable portion of a record shall be provided to any person requesting such a record after deletion of the portions which are exempt."). As discussed above, this request seeks Jeffrey Epstein's full investigative file, not Ghislaine Maxwell's. It is likely that there are a substantial number of documents that relate only to Epstein but have no bearing on Maxwell's criminal acts. Such documents would be easily identifiable

for purposes of production. Similarly, there are a substantial number of documents that were produced to Ghislaine Maxwell during her trial. Any such documents do not demonstrate any threat to potential retrial as the subject of the investigation has already seen these materials. All such documents could easily be identified and produced. Given these practical realities, the FBI must provide more than the conclusory statements included in the current Seidel declaration to support its failure to identify all segregable material.

The FBI's decision to withhold over 10,000 pages in full under Exemption 7(A) runs counter to FOIA's goal of transparency. The suggestion that there is no way to segregate and produce certain categories of documents within the set of 10,000 pages is implausible. Accordingly, Appellants respectfully request that this Court reverse the district court and order the FBI to conduct a thorough segregability analysis of the withheld documents and to release all reasonably segregable, non-exempt portions. *See Cox v. Dep't of Justice*, 504 F. Supp. 3d 119, 155–56 (E.D.N.Y. 2020) (holding FBI failed to present affidavits with reasonable specificity supporting a finding that it released all segregable, non-exempt information).

## VIII. <u>CONCLUSION</u>

For the foregoing reasons, Appellants respectfully request that the Court reverse the district court's order finding that the agency has met its burden to withhold documents pursuant to Exemption 7(A), the agency's invocation of

Exemption 7(A) was timely; the agency met its burden to withhold documents pursuant to Exemptions 6, 7(C), and 7(E), and that the agency met its segregability burden with respect to the documents withheld in full.

Dated: June 25, 2025

Respectfully submitted,

/s/ Christine N. Walz
Christine N. Walz
HOLLAND & KNIGHT, LLP
787 Seventh Avenue, 31st Floor
New York, NY 10019
Telephone: 212.513.3200
Fax: 212.385.9010

Cynthia A. Gierhart
Sara J. Benson
HOLLAND & KNIGHT, LLP
800 17th Street, NW, Suite 1100
Washington, DC 20006
Telephone: 202.469.5416
Fax: 202.955.5564

Daniel Novack
NOVACK MEDIA LAW
1745 Broadway, 14th Floor
New York, New York 10019
(201) 213-1425

*Attorneys for Plaintiffs-Appellants*

## <u>CERTIFICATION OF COMPLIANCE WITH RULE 32(a)</u>

I hereby certify, pursuant to the Federal Rule of Appellate Procedure 32(a)(7)(C), that:

1. This brief complies with the type-volume limitation of Fed. R. App. P. 32(a)(7)(B) and Local Rule 32.1(a)(4) because this brief contains 10,879 words, excluding the parts of the brief exempted by Fed. R. App. P. 32(f).

2. This brief complies with the typeface requirements of Fed. R. App. P. 32(a)(5) and the type style requirements of Fed. R. App. P. 32(a)(6), and Local Rule 32.1(a), because this brief has been prepared in a proportionately spaced typeface using Microsoft Office Word in 14-point Times New Roman font.

Dated: June 25, 2025

/s/ Christine N. Walz
Christine N. Walz
HOLLAND & KNIGHT, LLP
787 Seventh Avenue, 31st Floor
New York, NY 10019
Telephone: 212.513.3200
Fax: 212.385.9010

# SPECIAL APPENDIX

i

## TABLE OF CONTENTS

**Page**

Memorandum Opinion and Order of the Honorable
    Paul G. Gardephe, dated September 19, 2023,
    Appealed From ........................................................    SPA-1

Order of the Honorable Paul G. Gardephe, dated
    June 25, 2024, Appealed From .............................    SPA-55

Judgment dated June 26, 2024 ...................................    SPA-75

SPA-1

UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF NEW YORK

RADAR ONLINE LLC and JAMES
ROBERTSON,

                                    Plaintiffs,

               - against -

FEDERAL BUREAU OF
INVESTIGATION,

                                    Defendant.

**MEMORANDUM
OPINION & ORDER**

17 Civ. 3956 (PGG)

PAUL G. GARDEPHE, U.S.D.J.:

               Plaintiffs Radar Online LLC and James Robertson bring this action under the

Freedom of Information Act ("FOIA"), seeking records related to the FBI's investigation and

prosecution of financier Jeffrey Epstein for child sex trafficking crimes.  (See Am. Cmplt. (Dkt.

No. 12))  Plaintiff Radar Online is an online investigative news outlet and Plaintiff Robertson is

one of its senior editors.  (Id. ¶¶ 2-3)

               Plaintiffs submitted their FOIA request on the Federal Bureau of Investigation

("FBI") on April 20, 2017.  (Id.¶ 10)  After receiving no response, Plaintiffs commenced this

action on May 25, 2017.  (Cmplt. (Dkt. No. 1))  The Amended Complaint was filed on August

28, 2017.  (Am. Cmplt. (Dkt. No. 12))  After an initial case management conference on

September 7, 2017, the FBI agreed to begin producing documents at a rate of 500 pages per

month.  As of December 8, 2020, the FBI had reviewed 11,571 responsive pages, most of which

were redacted in part or withheld in full based on certain exemptions to disclosure under FOIA,

including exemptions 3, 6, 7(C), 7(D), and 7(E).  (See Dec. 8, 2020 Joint Ltr. (Dkt. No. 25) at 1)[1]

---

[1]  The page numbers referenced in this opinion correspond to the page numbers designated by
this District's Electronic Case Filing ("ECF") system.

SPA-2

On July 6, 2019, Jeffrey Epstein was arrested and charged with new Federal offenses, at which point the FBI asserted Exemption 7(A) to FOIA – the exemption for "records or information compiled for law enforcement purposes[,] . . . [the disclosure of which] could reasonably be expected to interfere with enforcement proceedings" 5 U.S.C. § 552(b)(7)(A) – over the 10,107 pages that were previously processed and withheld and over all "remaining responsive records." (Id.)

On December 10, 2020, this Court directed the parties to file cross-motions for summary judgment. (Dkt. No. 26)

For the reasons stated below the parties' cross-motions will each be granted in part and denied in part.

## BACKGROUND

I.    **FACTS**

In support of its summary judgment motion, the FBI submitted a declaration from Maureen Comey, an Assistant United States Attorney ("AUSA") in the United States Attorney's Office for the Southern District of New York. (2021 Comey Decl. (Dkt. No. 39) ¶ 1) Comey is one of the AUSAs "handling the prosecution of Ghislaine Maxwell" and, prior to Epstein's death, was one of the AUSAs "in charge of [his] prosecution." (Id.) The FBI has also submitted a declaration from Michael G. Seidel, the Section Chief of the Record/Information Dissemination Section ("RIDS") of the FBI's Information Management Division ("IMD"). (Seidel Decl. (Dkt. No. 50) ¶ 1) Attached as exhibits to Seidel's declaration are, inter alia, Plaintiff's FOIA request and the FBI's response.[2] (Dkt. Nos. 50-1, 50-2)

---

[2] Local Rule 56.1 requires those moving for summary judgment to "annex[] to the notice of motion a separate, short and concise statement, in numbered paragraphs, of the material facts as to which the moving party contends there is no genuine issue to be tried." Local Civ. R. 56.1(a).

Epstein was a financier who in June 2008 pleaded guilty to "a criminal charge of procuring prostitution of a minor," and served thirteen months of an eighteen-month sentence. (Seidel Decl. (Dkt. No. 50) ¶ 5)  On July 2, 2019, Epstein was indicted by a federal grand jury in this District on "one count of conspiracy to commit sex trafficking . . . [and] one count of sex trafficking."  (Id. (citing United States v. Epstein, 19 Cr. 490 (RMB) (S.D.N.Y.), Indictment (Dkt. No. 2)))  Epstein committed suicide at the Metropolitan Correction Center in Manhattan on August 10, 2019, while the charges against him were pending.  (Id. (citing United States v. Epstein, 19 Cr. 490 (RMB), Nolle Prosequi (Dkt. No. 52)))  Epstein's 2019 indictment, arrest, and death were the subject of extensive media coverage.

### A.    Plaintiff's FOIA Request and the Instant Action

On April 20, 2017, Plaintiff Robertson submitted a FOIA request to the FBI seeking "all documents relating to the FBI's investigation and prosecution" of Epstein.  (Seidel Decl., Ex. A. (FOIA Request) (Dkt. No. 50-1) at 4)  Plaintiff asked that his FOIA request receive expedited treatment.  (Id. at 5)

On April 28, 2017, the FBI sent Robertson a letter confirming receipt of his FOIA request and informing him that because he had requested information about a "third party individual[]" – Epstein – "the FBI would neither confirm nor deny the existence of such records pursuant to FOIA Exemptions 6 and 7(C)."[3]  (Seidel Decl. (Dkt. No. 50) ¶ 7)  The FBI informed

---

Neither side has submitted a Rule 56.1 statement here.  However, "the general rule in this Circuit is that in FOIA actions, agency affidavits alone will support a grant of summary judgment." Ferguson v. Fed. Bureau of Investigation, 1995 WL 329307, at *2 (S.D.N.Y. June 1, 1995) (citing Carney v. United States Dept. of Justice, 19 F.3d 807, 812 (2d Cir. 1994)).  Accordingly, this Court will not require the submission of Local Rule 56.1 statements.

[3]  FOIA Exemption 6 provides that "personnel and medical files and similar files the disclosure of which would constitute a clearly unwarranted invasion of personal privacy" are exempted from disclosure.  5 U.S.C. § 552(b)(6).  Exemption 7(C) similarly exempts from disclosure "records or information compiled for law enforcement purposes, but only to the extent that the

SPA-4

Roberts that it was closing his request, and provided information about "making requests for records on third party individuals" and about appealing the FBI's determination.  (Id.; see also id., Ex. B (FOIA Response) (Dkt. No. 50-1))

Plaintiffs filed the instant action on May 25, 2017 (Cmplt. (Dkt. No. 1)), and filed the Amended Complaint on August 28, 2017.  (Am. Cmplt. (Dkt. No. 12))  In a stipulation so-ordered by this Court on October 5, 2017, Plaintiffs agreed to "limit the scope of their [FOIA] request to the records located in" certain files identified by the FBI in their search for responsive records.  (Dkt. No. 17)  The parties also agreed that the FBI would process 500 pages of the records per month, starting October 1, 2017.  (Id.)

Between October 2017 and Epstein's July 2019 indictment the FBI processed 500 pages of the records per month.[4]  (Seidel Decl. (Dkt. No. 50) ¶¶ 9-29)  Following Epstein's July 2019 indictment, the FBI "withheld in full all remaining responsive records" and "all previously protected information" pursuant to Exemption 7(A).  (Id. ¶ 30 & n.4)

"By letter dated January 31, 2020, the FBI . . . released 46 [additional] pages of records in full or part."  (Id. ¶ 31)  In total, "the FBI processed on a document-by-document basis a total of 11,571 pages of responsive records.  Of these pages, the FBI released 181 pages in full, released 1,051 pages in part, and withheld 10,339 pages in full."  (Id. ¶ 3)  The records were withheld because one or more FOIA Exemption applied, the pages were "duplicative of other pages" already produced by the FBI, "and/or the pages are sealed pursuant to [a court order]."  (Id. ¶ 3)  The FBI does not state how many records comprise the "remaining responsive records"

_____

production of such law enforcement records or information . . . could reasonably be expected to constitute an unwarranted invasion of personal privacy."  Id. § 552(b)(7)(C).

[4]  The FBI notes that no records were produced between January and March 2019 "because of the lapse in appropriations funding for the Department of Justice" during that time.  (Seidel Decl. (Dkt. No. 50) n.3)

4

SPA-5

that were reviewed on a "categorical basis," and over which the FBI has asserted only Exemption 7(A).  (See id. ¶ 44 & n.11) The FBI likewise has not disclosed how many records were "categorically withheld" pursuant to Exemption 7(A).  The FBI's Vaughn index[5] addresses only the records processed before Epstein's indictment and does not address the categorically withheld records.  (Id. ¶ 44)

    **B.**    **The Prosecution of Ghislaine Maxwell**

On June 29, 2020, Ghislaine Maxwell – "an individual who associated with Jeffrey Epstein" (2021 Comey Decl. (Dkt. No. 39) ¶ 1) – was indicted by a grand jury in this District on "one count of conspiracy to entice minors to travel to engage in illegal sex acts"; "one count of enticement of a minor to travel to engage in illegal sex acts"; "one count of conspiracy to transport minors with intent to engage in criminal sexual activity"; "one count of transportation of a minor with intent to engage in criminal sexual activity"; "and two counts of perjury."  (Id. ¶ 6)

On December 29, 2021, a jury found Maxwell guilty on five of the six counts against her.  (2023 Comey Decl. (Dkt. No 47) ¶ 6; 20 Cr. 330, Dkt. Sheet at Dec. 29, 2021)  On June 28, 2022, Maxwell was sentenced to 20 years' imprisonment.  (2023 Comey Decl. (Dkt. No 47) ¶ 6; 20 Cr. 330, Judgment (Dkt. No. 696))

---

[5] A "'Vaughn index is an affidavit that specifically describes the withheld or redacted documents and justifies, in detail, why each withheld record that would be responsive to the request is exempt from disclosure under FOIA.'"  Heartland All. for Hum. Needs & Hum. Rts. v. United States Immigr. & Customs Enf't, 406 F. Supp. 3d 90, 125 (D.D.C. 2019) (quoting Campaign For Responsible Transplantation v. U.S. Food And Drug Admin., 180 F. Supp. 2d 29, 32 (D.D.C. 2001)).

SPA-6

On July 7, 2022, Maxwell appealed her conviction to the Second Circuit. (2023 Comey Decl. (Dkt. No 47) ¶ 7) Maxwell seeks, inter alia, "a new trial based on alleged juror misconduct and alleged evidentiary issues." (Id.) Her appeal remains pending. (Id. ¶ 8)

## II.  **PROCEDURAL HISTORY**

The Complaint was filed on May 25, 2017 (Cmplt. (Dkt. No. 1)), and the Amended Complaint was filed on August 28, 2017. (Am. Cmplt. (Dkt. No. 12)) After the FBI asserted that Exemption 7(A) categorically applies to the documents it had previously withheld, as well as all remaining responsive documents, the Court directed the FBI to produce a Vaughn index by July 1, 2020. (Dkt. No. 21) On December 2, 2020, this Court ordered the parties to provide a status update (Dkt. No. 24), and on December 10, 2020, the Court directed the parties to file cross-motions for summary judgment. (Dkt. No. 26) The FBI requested several extensions, which this Court granted, and the parties' motions were not fully briefed until October 29, 2021. (Dkt. Nos. 27-37, 42)

Two months later, Maxwell was convicted at trial. (2023 Comey Decl. (Dkt. No. 47) ¶ 6) Because the parties' summary judgment briefing "turn[ed] on the ongoing prosecution of Ghislaine Maxwell,"[6] this Court ordered the parties to submit supplemental briefing and declarations addressing the impact of Maxwell's conviction "on the parties' [cross] motions." (June 30, 2023 Order (Dkt. No. 45)) The FBI submitted a supplemental brief and declaration from Maureen Comey on July 11, 2023 (Dkt. Nos. 46-47), and Plaintiffs filed a supplemental brief on July 20, 2023. (Dkt. No. 48)

---

[6]  In seeking summary judgment, the FBI argued, inter alia, that releasing the records (1) would "allow Maxwell earlier or greater access to agency investigatory files than she otherwise would have through the criminal discovery process"; (2) might improperly "influenc[e] witness testimony"; and (3) might "impair the ability to seat a fair and impartial jury in the Maxwell trial." (Def. Br. (Dkt. No. 38) at 16-18).

SPA-7

## DISCUSSION

### I.     LEGAL STANDARDS

#### A.     Summary Judgment Standard

Summary judgment is warranted where the moving party shows that "there is no genuine dispute as to any material fact" and that it "is entitled to judgment as a matter of law." Fed. R. Civ. P. 56(a). "A dispute about a 'genuine issue' exists for summary judgment purposes where the evidence is such that a reasonable jury could decide in the non-movant's favor." Beyer v. County of Nassau, 524 F.3d 160, 163 (2d Cir. 2008). "When no rational jury could find in favor of the nonmoving party because the evidence to support its case is so slight, there is no genuine issue of material fact and a grant of summary judgment is proper." Gallo v. Prudential Residential Servs., Ltd. P'ship, 22 F.3d 1219, 1224 (2d Cir. 1994) (citing Dister v. Cont'l Grp., Inc., 859 F.2d 1108, 1114 (2d Cir. 1988)).

In deciding a summary judgment motion, the Court "'resolve[s] all ambiguities, and credit[s] all factual inferences that could rationally be drawn, in favor of the party opposing summary judgment.'" Spinelli v. City of New York, 579 F.3d 160, 166 (2d Cir. 2009) (quoting Brown v. Henderson, 257 F.3d 246, 251 (2d Cir. 2001) (internal quotation marks and citation omitted)). However, a "'party may not rely on mere speculation or conjecture as to the true nature of the facts to overcome a motion for summary judgment. . . . [M]ere conclusory allegations or denials . . . cannot by themselves create a genuine issue of material fact where none would otherwise exist.'" Hicks v. Baines, 593 F.3d 159, 166 (2d Cir. 2010) (alterations in original) (quoting Fletcher v. Atex, Inc., 68 F.3d 1451, 1456 (2d Cir. 1995)).

"The same standard[s] appl[y] where, as here, the parties file[] cross-motions for summary judgment. . . ." Morales v. Quintel Entm't, Inc., 249 F.3d 115, 121 (2d Cir. 2001).

**SPA-8**

"[W]hen both parties move for summary judgment, asserting the absence of any genuine issues of material fact, a court need not enter judgment for either party. Rather, each party's motion must be examined on its own merits, and in each case all reasonable inferences must be drawn against the party whose motion is under consideration." Id. (internal citations omitted).

**B.    Summary Judgment in FOIA Cases**

"Summary judgment is the procedural vehicle by which most FOIA actions are resolved." Jones-Edwards v. Appeal Bd. of Nat. Sec. Agency Cent. Sec. Agency, 352 F. Supp. 2d 420, 423 (S.D.N.Y. 2005). "In order to prevail on a motion for summary judgment in a FOIA case, the defending agency has the burden of showing that [1] its search was adequate[,] and [2] any withheld documents fall within an exemption to the FOIA." Carney v. U.S. Dept. of Justice, 19 F.3d 807, 812 (2d Cir. 1994).

A government agency may sustain its burden through "'[a]ffidavits or declarations [that] supply[] facts indicating that the agency has conducted a thorough search and [that] giv[e] reasonably detailed explanations why any withheld documents fall within an exemption.'" Associated Press v. U.S. Dept. of Justice, 2007 WL 737476, at *3 (S.D.N.Y. Mar. 7, 2007) (quoting Carney, 19 F.3d at 812); accord Garcia v. U.S. Dept. of Justice, Office of Info. & Privacy, 181 F. Supp. 2d 356, 366 (S.D.N.Y. 2002). "'[T]he general rule in this Circuit is that in FOIA actions, agency affidavits alone will support a grant of summary judgment,' and Local Civil Rule 56.1 statements are not required." N.Y. Times Co. v. U.S. Dept. of Justice, 872 F. Supp. 2d 309, 314 (S.D.N.Y. 2012) (quoting Ferguson v. FBI, 1995 WL 329307, at *2 (S.D.N.Y. June 1, 1995), aff'd, 83 F.3d 41 (2d Cir. 1996)). "Affidavits submitted by an agency are presumed to have been made in good faith." Garcia, 181 F. Supp. 2d at 366.

"[D]iscovery relating to the agency's search and the exemptions it claims for withholding records generally is unnecessary if the agency's submissions are adequate on their face." Carney, 19 F.3d at 812. "A district court . . . may grant summary judgment in favor of an agency 'on the basis of agency affidavits if they contain reasonable specificity of detail rather than merely conclusory statements, and if they are not called into question by contradictory evidence in the record or by evidence of agency bad faith.'" Grand Cent. P'ship, Inc. v. Cuomo, 166 F.3d 473, 478 (2d Cir. 1999) (emphasis in original) (quoting Gallant v. N.L.R.B., 26 F.3d 168, 171 (D.C. Cir. 1994)). A plaintiff may avoid summary judgment and obtain discovery where, "once the agency has satisfied its burden, the plaintiff . . . make[s] a showing of bad faith on the part of the agency . . . or provide[s] some tangible evidence that the exemption claimed by the agency should not apply." Conti v. U.S. Dept. of Homeland Sec., 2014 WL 1274517, at *10 (S.D.N.Y. Mar. 24, 2014).

## II.    FOIA EXEMPTION 7(A)

The FBI argues that all of the withheld records responsive to Plaintiffs' FOIA request were properly withheld under Exemption 7(A) to FOIA.[7] (See 2021 Comey Decl. (Dkt. No. 39); 2023 Comey Decl. (Dkt. No. 47)) Plaintiff contends that (1) "FOIA does not allow agencies to retroactively redact material based on developments that post-dated their decision to withhold"; (2) the "FBI's declarations fail to explain how release of the records would interfere with Maxwell's prosecution"; and (3) the "FBI failed to undertake the required segregability analysis." (Pltf. Br. (Dkt. No. 43) at 11-18)

---

[7] The FBI also contends that its search for responsive records was adequate. (See Def. Br. (Dkt. No. 38) at 12-14) Plaintiff does not dispute this point, however. (See Pltf. Br. (Dkt. No. 43); Pltf. Reply Br. (Dkt. No. 44); Pltf. Supp. Reply (Dkt. No. 48)) Accordingly, this Court addresses only the second step of the analysis – whether Exemption 7(A) applies to the withheld material. See Carney, 19 F.3d at 812.

A.    <u>Applicable Law</u>

Exemption 7(A) to FOIA permits government agencies to withhold "records or information compiled for law enforcement purposes" where "the production of such law enforcement records or information . . . could reasonably be expected to interfere with enforcement proceedings." 5 U.S.C. § 552(b)(7)(A). "This exemption 'prevent[s] harm to the government's case in court by not allowing litigants earlier or greater access to agency investigatory files than they would otherwise have.'" <u>N.Y. Times Co. v. United States Dept. of Justice</u>, 2016 WL 5946711, at *7 (S.D.N.Y. Aug. 18, 2016) (quoting <u>Conti</u>, 2014 WL 1274517, at *22). "[I]f the exemption applies, it 'will justify denial of release, not only to the objects of the investigation and any pending or prospective enforcement actions, but to third parties as well.'" <u>Stein v. U.S. Sec. & Exch. Comm'n</u>, 2017 WL 3141903, at *11 (D.D.C. July 24, 2017) (quoting <u>Kanter v. IRS</u>, 433 F. Supp. 812, 817 (N.D. Ill. 1977)).

In order to demonstrate that Exemption 7(A) applies, the government must satisfy three elements. First, as a threshold matter, the government must show that "that the requested records were compiled for law enforcement purposes." <u>Local 32B-32J, Serv. Employees Int'l Union, AFL-CIO v. Gen. Servs. Admin.</u>, 1998 WL 726000, at *7 (S.D.N.Y. Oct. 15, 1998) (internal quotation marks omitted). Second, the government must show that "a law enforcement proceeding is pending or prospective." <u>Amnesty Int'l USA v. C.I.A.</u>, 728 F. Supp. 2d 479, 525 (S.D.N.Y. 2010). With respect to this element, "it is sufficient that the government's ongoing . . . investigation is likely to lead to [law enforcement] proceedings." <u>Azmy v. U.S. Dept. of Def.</u>, 562 F. Supp. 2d 590, 605 (S.D.N.Y. 2008). Third, the government must show that "release of the information could reasonably be expected to cause some articulable harm." <u>Amnesty Int'l</u>, 728 F. Supp. 2d at 525.

10

"'[A]lthough [courts] give deference to an agency's predictive judgment of the harm that will result from disclosure of information, it is not sufficient for the agency to simply assert that disclosure will interfere with enforcement proceedings; it must rather demonstrate *how* disclosure will do so.'" Stein, 2017 WL 3141903, at *9 (quoting Citizens for Responsibility & Ethics in Wash. v. U.S. Dept. of Justice ("CREW I"), 746 F.3d 1082, 1096 (D.C. Cir. 2014)) (emphasis in CREW I). "Ultimately, the government must 'allow[] the court to trace a rational link between the nature of the document and the alleged likely interference.'" N.Y. Times Co., 2016 WL 5946711, at *7 (quoting Ctr. for Nat'l Sec. Studies v. U.S. Dept. of Justice, 331 F.3d 918, 940 (D.C. Cir. 2003)).

### B.    Whether the FBI's Invocation of Exemption 7(A) was Timely

Plaintiffs contend that the FBI's invocation of Exemption 7(A) was untimely. (Pltf. Br. (Dkt. No. 43) at 11-14)  It is the "'general rule'" in FOIA cases that "'a FOIA decision is evaluated as of the time it was made and not at the time of a court's review.'" ACLU v. NSA, 925 F.3d 576, 602 (2d. Cir. 2019) (quoting New York Times Co. v. U.S. DOJ, 756 F.3d 100, 111 (2d Cir.), as amended, 758 F.3d 436 (2d Cir. 2014), and supplemented, 762 F.3d 233 (2d Cir. 2014)).  According to Plaintiffs, the FBI is not entitled to rely on Exemption 7(A) at summary judgment, "because there were no active 'enforcement proceedings' at the time of Plaintiffs' requests."  (Pltf. Br. (Dkt. No. 43) at 11-12)  But "Plaintiffs' requests" are not the "FOIA decision" of which the Second Circuit speaks.  Indeed, Plaintiffs have not cited any case holding that government agencies may only rely on exemptions applicable at the time a FOIA request is submitted.

While in ACLU the Second Circuit "reaffirm[ed] the general rule . . . that a court reviewing a[n] [agency's] FOIA decision must not order reprocessing simply to reassure itself

that a correct decision remains current," ACLU, 925 F.3d. at 602, this rule exists to preserve

judicial economy and to limit the burdens of FOIA requests on agencies, not to prevent agencies

from asserting applicable exemptions when they arise during document processing.  See ACLU,

925 F.3d at 602 ("'[T]o require an agency to adjust or modify its FOIA response based on post-

response occurrences could create an endless cycle of judicially mandated reprocessing each

time some circumstance changes.'") (quoting Florez v. Cent. Intel. Agency, 829 F.3d 178, 188

(2d Cir. 2016)).

        In sum, the "FOIA decision" under review here is the FBI's decision to withhold

responsive documents pursuant to various exemptions, including Exemption 7(A).  (See Pltf. Br.

(Dkt. No. 43) at 9-10 ("[Following the] July 2019[] . . . indictment of Epstein[,] . . . in the

twenty-second monthly production to Plaintiffs (out of twenty eight total), the FBI for the first

time invoked the law enforcement exemption, Exemption 7(A) categorically over all the

remaining responsive documents."))  Bonner v. U.S. Dep't of State, 928 F.2d 1148, 1152 (D.C.

Cir. 1991) ("In FOIA cases particularly, court review properly focuses on the time the

determination to withhold is made.").

        As to the timeliness of an agency's asserted exemption, the "general rule" is that

agencies "must assert all exemptions at the same time, in the original district court proceedings."

Maydak v. U.S. Dep't of Just., 218 F.3d 760, 764 (D.C. Cir. 2000); Jud. Watch, Inc. v. U.S.

Dep't of State, 282 F. Supp. 3d 338, 341 (D.D.C. 2017) (same).  This is because "allowing an

agency to invoke new FOIA exemptions on remand – thereby essentially restarting the litigation

– could interfere with the FOIA's 'statutory goals of efficient, prompt, and full disclosure of

information, and with interests of judicial finality and economy.'"  Elec. Priv. Info. Ctr. v. Dep't

of Just., 296 F. Supp. 3d 109, 122 (D.D.C. 2017) (quoting Maydak, 218 F.3d at 764).

"Essentially, Maydak prohibits the government from 'play[ing] cat and mouse by withholding its

most powerful cannon until after the District Court has decided the case and then springing it on

surprised opponents and the judge.'" Marino v. Drug Enf't Admin., 2021 WL 3793053, at *5

(D.D.C. Aug. 26, 2021) (quoting Aug. v. FBI, 328 F.3d 697, 699 (D.C. Cir. 2003)).

> Courts have recognized two exceptions to this rule:
>
> (1) "extraordinary circumstances where, from pure human error, the government
> failed to invoke the correct exemption and will have to release information
> compromising national security or sensitive, personal, private information unless
> the court allows it to make an untimely exemption claim"; and (2) "a substantial
> change in the factual context of the case or an interim development in the
> applicable law forces the government to invoke an exemption after the original
> district court proceedings have concluded."

Id. (quoting Maydak, 218 F.3d at 767); Senate of the Com. of Puerto Rico on Behalf of

Judiciary Comm. v. U.S. Dep't of Just., 823 F.2d 574, 581 (D.C. Cir. 1987) (agency permitted to

raise new exemptions on appeal due in part to "special circumstances"); Adamowicz v. I.R.S.,

552 F. Supp. 2d 355, 361 (S.D.N.Y. 2008) (finding that an agency's "failure to raise an

exemption prior to an adverse determination does not give rise to waiver").

 Plaintiffs have not cited any case suggesting that agencies may not raise new

exemptions during the document review and production process, however.  To the contrary,  "the

document-production process is a fluid one at the district-court level, and it often includes

contemporaneous review and continuous production determinations by agency-defendants."

Elec. Priv. Info. Ctr., 296 F. Supp. 3d at 122.  Agencies are therefore permitted to review their

determinations, and, as here, raise new FOIA exemptions as they become applicable prior to the

district court's final decision.  See id. ("The Court does not perceive the government as having

acted in bad faith, nor does it view the government's filings as providing post-hoc

rationalizations for withholdings already made."); see also Heffernan v. Azar, 317 F. Supp. 3d

94, 119 & n.14 (D.D.C. 2018) (exemption permissibly raised in agency's reply brief); Senate of

Puerto Rico, 823 F.2d at 581 (Exemption 7(A) properly raised two years after initial FOIA request).

Here, the FBI asserted Exemption 7(A) soon after Epstein's 2019 indictment. (Seidel Decl. (Dkt. No. 50) ¶ 30 & n.4)  While the FBI's invocation of Exemption 7(A) took place after Plaintiff initiated this action in 2017 (Cmplt. (Dkt. No. 1)), it was well before this Court reached "the merits of the parties' initial summary judgment motions, [and well before] . . . any appellate proceedings." Elec. Priv. Info. Ctr., 296 F. Supp. 3d at 122.  Moreover, as discussed below, Plaintiffs have "not been prejudiced in any meaningful sense by the [timing of] the government's assertion of Exemption [7(A)], nor [have Plaintiffs] provided any evidence of bad faith with respect to the government's timing on this issue." Id. (emphasis omitted).  To the contrary, the FBI produced records in response to Plaintiffs FOIA requests for well over a year before Epstein was indicted and the FBI asserted Exemption 7(A).  In other words, the FBI has not raised different exemptions at different times throughout the proceedings in an apparent attempt to gain a "tactical advantage."  See Senate of Puerto Rico, 823 F.2d at 581.

Plaintiffs argue, however, that this Court should find the FBI's invocation of Exemption 7(A) to be untimely because (1) "this Court should not permit the assertion of retroactive exemptions"; (2) the cases cited by the FBI are distinguishable; and (3) "the need to limit the changed circumstances doctrine is particularly striking here because the changed circumstance is entirely of the Government's own making."  (Pltf. Br. (Dkt. No. 43) at 13-14) None of these arguments is persuasive.

Plaintiffs complain that "the FBI [improperly] asserted Exemption 7(A) retroactively to cover the first two years of the production in its Motion for Summary Judgment." (See Pltf. Supp. Reply Br. (Dkt. No. 48) at 1-2)  As discussed above, however, the FBI asserted

Exemption 7(A) soon after Epstein was indicted in 2019 and in any case years before the parties'

summary judgment briefing was complete.  While government agencies are generally required to

assert all applicable FOIA exemptions prior to the district court's ruling on "the merits of the

parties' initial summary judgment motions," Elec. Priv. Info. Ctr., 296 F. Supp. 3d at 122, that is

exactly what the FBI did here.  Moreover, whether Exemption 7(A) now applies to bar disclosure

of the records sought does not depend on the propriety of any previously raised exemptions.[8]

Plaintiffs' attempt to distinguish Senate of Puerto Rico, 823 F.2d 574 – in which

the Second Circuit concluded that Exemption 7(A) was properly invoked two years after the

initial FOIA request – and similar cases is not persuasive.  Plaintiffs contend that these cases are

distinguishable because the exemptions at issue were "available to [the relevant agencies] . . . at

the time of the [original FOIA] request."  (Pltf. Br. (Dkt. No. 43) at 12 ("In other words, the

[agency's] invocation [of additional exemptions] was justifiable, if belated.")) But in Senate of

Puerto Rico, the Second Circuit upheld an Exemption 7(A) assertion made on remand, two years

after the original FOIA request, because the "Senate [did not] contend that the DOJ [had] acted

irresponsibly, with a purpose to delay, in failing to anticipate the swift course of the federal

prosecution in Puerto Rico" that triggered the applicability of Exemption 7(A).  Senate of Puerto

Rico, 823 F.2d at 580-81.  Nothing in Senate of Puerto Rico suggests that an agency may not

assert an exemption once it becomes applicable during district court proceedings.

Finally, there is no "need to limit the changed circumstances doctrine" here, as

Plaintiffs suggest (Pltf. Br. (Dkt. No. 43) at 13), because there is no evidence that the

government manipulated the course of events to frustrate Plaintiffs' FOIA request.  As discussed

---

[8]  The FBI may thus assert the applicability of Exemption 7(A) both as to responsive records that
the FBI categorically withheld after its July 2019 review, and to records processed before
Epstein's indictment, concerning which the FBI subsequently asserted Exemption 7(A) coverage.

above, the "changed circumstances doctrine" is an exception to the general rule that agencies "must assert all exemptions at the same time." Maydak, 218 F.3d at 764. Here, the "changed circumstance" was the 2019 Epstein indictment, which triggered the applicability of Exemption 7(A). (Seidel Decl. (Dkt. No. 50) ¶ 30 & n.4) While it is true that the government controlled the timing of the Epstein indictment, there is no evidence that the FBI delayed or manipulated the production of responsive documents in anticipation of the Epstein indictment, or that the government obtained the Epstein indictment in order to avoid producing documents responsive to Plaintiffs' FOIA request.

Shapiro v. DOJ, 177 F. Supp. 3d 467 (D.D.C. 2016), cited by Plaintiffs (Pltf. Br. (Dkt. No. 43) at 13) is not on point. In that FOIA action, the FBI sought to "advance a new policy that would protect some of [the] records" it had been ordered to produce by the district court at summary judgment. Shapiro, 177 F. Supp. 3d at 469-70. The court concluded that the "changed circumstances" exception did not apply because the FBI "changed its policy . . . [well] before the Court issued its [summary judgment] opinion in this matter. . . . The FBI [did] not point to any 'interim development,' . . . outside its control [that caused it to change its policy]; it only represent[ed] that [it] developed a new policy that it would like to apply to the plaintiffs' requests." Id. The court also commented that the FBI had "not lacked for opportunities to inform the Court or the plaintiffs that it had adopted a new policy," but had not done so. Id. at 470-71. Given these circumstances, the court expressed concern that the FBI's "new policy" might constitute "'an attempt to gain a tactical advantage over the FOIA requester.'" Id. at 470 (quoting Aug., 328 F.3d at 698).

There are no such facts here. The FBI raised Exemption 7(A) soon after Epstein's 2019 indictment, when the exemption became applicable and before any briefing in this case.

And there is no suggestion that the FBI manipulated either its document production or the timing of the Epstein's indictment in "'an attempt to gain a tactical advantage over the FOIA requester.'" Id. (quoting Aug., 328 F.3d at 698).

In sum, the FBI's invocation of Exemption 7(A) was timely.

**C.    Whether Exemption 7(A) Applies**

The FBI contends that Exemption 7(A) applies to "all of the records that were withheld by the FBI in full or in part" (Def. Br. (Dkt. No. 38) at 13), because their "public disclosure . . . could reasonably be expected to interfere with the pending prosecution of [Ghislaine] Maxwell." (2021 Comey Decl. (Dkt. No. 39) ¶ 11)

**1.    Law Enforcement Records**

With respect to the first requirement for application of Exemption 7(A) – whether the requested records were "compiled for law enforcement purposes" 5 U.S.C. § 552(b)(7) – the records withheld by the FBI concern the FBI's "investigation of criminal child prostitution involving Jeffrey Epstein." (Seidel Decl. (Dkt. No. 50) ¶ 55). Accordingly, the records plainly were "compiled for law enforcement purposes." See Halpern v. F.B.I., 181 F.3d 279, 296 (2d Cir. 1999) ("[A]ll records of investigations compiled by the FBI are for law enforcement purposes.").

**2.    Pending or Prospective Law Enforcement Proceeding**

As to whether a "law enforcement proceeding is pending or prospective," Maxwell was convicted on December 29, 2021, was sentenced to 20 years' imprisonment on June 28, 2022. (20 Cr. 330, Dkt. Sheet at Dec. 29, 2021; id. Judgment (Dkt. No. 696)) Maxwell appealed her conviction on July 7, 2022, and the appeal remains pending. (2023 Comey Decl. (Dkt. No. 47) ¶ 7)

17

A "law enforcement proceeding" remains "pending or prospective" for purposes of Exemption 7(A) even though the target of such an investigation has been convicted and filed an appeal. See Kansi v. U.S. Dep't of Just., 11 F. Supp. 2d 42, 44 (D.D.C. 1998) ("The potential for interference with witnesses and highly sensitive evidence that drives the 7(A) exemption exists at least until plaintiff's conviction is final.") (citations omitted); James v. U.S. Secret Serv., 2007 WL 2111034, at *5 (D.D.C. July 23, 2007) ("A pending appeal of a criminal conviction qualifies as an ongoing or prospective law enforcement proceeding for purposes of Exemption 7(A).").

Plaintiffs argue, however, that the FBI has only cited "cases that support the abstract principle that a pending appeal could provide the 'potential' for appropriately utilizing the exemption, [and has not] offer[ed] a logical or plausible justification against release of the records." (Pltf. Supp. Reply (Dkt. No. 48) at 3) But Maxwell's "success on appeal . . . is not foreclosed," and accordingly, her prosecution remains "pending" for purposes of Exemption 7(A). Kidder v. F.B.I., 517 F. Supp. 2d 17, 28 (D.D.C. 2007).

### 3.    Interference with Law Enforcement Proceedings

Prior to the Maxwell trial, the FBI asserted that release of the withheld records (1) would "allow Maxwell earlier or greater access to agency investigatory files than she otherwise would have through the criminal discovery process" (2021 Comey Decl. (Dkt. No. 39) ¶ 13); (2) "could reasonably be expected to influence witnesses' potential testimony at trial" (id. ¶¶ 14, 15-16); (3) "could reasonably be expected to influence potential jurors' perceptions of the witnesses and the evidence to be presented at trial" (id. ¶¶ 14, 17-21); and (4) "would identify the FBI's investigative interest in particular individuals . . . and provide subjects . . . the opportunity to destroy evidence and/or alter their behavior to avoid detection." (Id. ¶ 22) The FBI further

asserted that disclosure of the records to the media carried a greater than ordinary risk of tainting jury impartiality and witness testimony, given the "heightened . . . media coverage of [Maxwell's] prosecution." (Id. ¶ 14)

Because Maxwell's appeal remains pending, the FBI maintains that these same risks still exist. (See 2023 Comey Decl. (Dkt. No. 47) ¶ 8 ("Given that the Maxwell criminal prosecution is still pending on appeal, and if the Second Circuit grants Maxwell the relief she seeks, there could be a new trial, [and] public disclosure of the FBI's records relating to the investigation and prosecution of Epstein would still likely interfere with the prosecution of Maxwell, for similar reasons as explained in [the] June 2021 [Comey] declaration."); Def. Supp. Br. (Dkt. No. 46) at 4-5 ("[P]ublic disclosure of the FBI's records relating to the investigation and prosecution of Epstein would still reasonably be expected to interfere with the prosecution of Maxwell[, because Maxwell seeks a new trial on appeal]."))

Plaintiffs argue that the "FBI's supporting declarations do not offer sufficient detail . . . [and] merely summarize what types of documents exist within Epstein's FBI file without specifically demonstrating how they could harm the specific law enforcement case at issue." (Pltf. Br. (Dkt. No. 43) at 15-16) Plaintiffs further contend that the Comey declarations contain only "conclusory justifications of harm . . . [that] do not withstand scrutiny." (Id. at 16)

> "[U]nder exemption 7(A) the government is not required to make a specific factual showing with respect to each withheld document that disclosure would actually interfere with a particular enforcement proceeding. Rather, federal courts may make generic determinations that, with respect to particular kinds of enforcement proceedings, disclosure of particular kinds of investigatory records while a case is pending would generally interfere with enforcement proceedings."

Radcliffe v. I.R.S., 536 F. Supp. 2d 423, 437 (S.D.N.Y. 2008), aff'd, 328 F. App'x 699 (2d Cir. 2009) (quoting Barney v. I.R.S., 618 F.2d 1268,1273 (8th Cir.1980)). "Because generic determinations are permitted, the government need not justify its withholdings document-by-

19

document; it may instead do so category-of-document by category-of-document. The government may not, however, make its justifications file-by-file." Crooker v. Bureau of Alcohol, Tobacco & Firearms, 789 F.2d 64, 67 (D.C. Cir. 1986) ("Congress did not authorize [a] 'blanket exemption' for 'all records relating to an ongoing investigation.'") (quoting Campbell v. Department of Health and Human Services, 682 F.2d 256 (D.C. Cir.1982)); CREW I, 746 F.3d at 1098 ("[A]n agency may satisfy its burden of proof 'by grouping documents in categories and offering generic reasons for withholding the documents in each category.'") (quoting Maydak, 218 F.3d at 765).

> "[I]f [an agency] wishes to adopt the generic approach, [it] has a three-fold task. First, it must define its categories functionally. Second, it must conduct a document-by-document review in order to assign documents to the proper category. Finally, it must explain to the court how the release of each category would interfere with enforcement proceedings."

CREW I, 746 F.3d at 1098 (quoting Bevis v. Dep't of State, 801 F.2d 1386, 1389-90 (D.C. Cir. 1986)).

While appearing to adopt a "category-of-document by category-of-document" approach, the FBI in fact argues that Exemption 7(A) applies to the withheld records on an impermissible "file-by-file" basis.

The 2021 Comey Declaration groups the responsive records sought by Plaintiffs and withheld by the FBI into three categories: (1) "[i]nterview forms, reports and notes . . . of interviews with individuals, including victims"; (2) "Federal Grand Jury Subpoenas and Subpoenaed information"; and (3) other records including "documents provided by state and local law enforcement agencies, . . . . background information for witnesses . . . and subjects for the investigation[,] communications within the FBI [and between the FBI and other agencies] regarding the investigation[,] organizational documents, . . . the sources from and techniques through which such information and evidence was gathered[,] . . . the methods used to analyze

20

the information and evidence, . . . and the focus of the investigation." (2021 Comey Decl. (Dkt. No. 39) ¶ 11)

The Seidel declaration organizes the responsive documents differently, however, listing nine "types of responsive records"[9] and three "functional categories of information": (1) "Evidentiary/Investigative Materials," including "confidential witness statements" and "information exchanged between the FBI and its local law enforcement partners"; (2) "Administrative materials," including internal agency "reporting communications" pertaining to an investigation, and other "standardized forms used for a variety of purposes"; and (3) "public source material," including news articles and court transcripts which have already been "released . . . to Plaintiffs." (Seidel Decl. (Dkt. No. 50) ¶¶ 58-68 (capitalization altered)) The document categories in the Seidel declaration and in the 2021 Comey declaration do not match, and documents falling within each of the Comey categories likely span multiple categories described by Seidel.

In any event, the FBI has not explicitly linked any of the document categories – whether Seidel's or Comey's – to the four types of potential harm cited in the 2021 Comey declaration – (1) "allow[ing] Maxwell earlier or greater access to agency investigatory files than she otherwise would have through the criminal discovery process"; (2) "influenc[ing] witnesses' potential testimony at trial"; (3) "influenc[ing] potential juror's perceptions of the witnesses and the evidence to be presented at trial"; and (4) "identify[ing] the FBI's investigative interest in

---

[9] (1) "FD-1057 - Electronic Communication"; (2) "Interview Forms (FD-302)"; (3) "Handwritten Interview Notes"; (4) "State and Local Law Enforcement Documents"; (5) "Documents Implementing Sensitive Investigative Techniques"; (6) "Federal Grand Jury Subpoenas/Subpoenaed Information"; (7) "FD-340, IA Envelopes"; (8) "Other Investigative Documents"; and (9) "Internet Printouts." (Seidel Decl. (Dkt. No. 50) ¶¶ 58-68 (formatting altered))

Case: 24-1964, 06/27/2025, DktEntry: 46.1, Page 81 of 144

particular individuals . . . and [thus] provid[ing] subjects [with] . . . the opportunity to destroy

evidence and/or alter their behavior to avoid detection." (2021 Comey Decl. (Dkt. No. 39) ¶¶

13-22)

The FBI instead merely asserts that "disclosure of the records" in general would

"interfere with enforcement proceedings." 5 U.S.C. § 552(b)(7)(A). As to Maxwell obtaining

"earlier or greater access to agency investigatory files than she otherwise would have," the FBI

links that harm to "the entirety of the records at issue in this litigation." (2021 Comey Decl.

(Dkt. No. 39) ¶ 13) Likewise, the FBI's concern that "[p]remature disclosure of the records

withheld under Exemption 7(A) . . . could reasonably be expected to impair the Government's

(and the defendant's) ability to seat a fair and impartial jury in Maxwell" is not tied to any

clearly identified functional category of investigatory records.[10] (2021 Comey Decl. (Dkt. No.

---

[10] Moreover, the FBI's concerns regarding the effects of disclosure on jury impartiality are
properly raised under Exemption 7(B), and not under Exemption 7(A). Exemption 7(A) applies
to records "compiled for law enforcement purposes, but only to the extent that the production of
such law enforcement records or information (A) could reasonably be expected to interfere with
enforcement proceedings." 5 U.S.C. § 552(b)(7)(A). There is a separate exemption for records
the disclosure of which "would deprive a person of a right to a fair trial or an impartial
adjudication." Id. § 552(b)(7)(B). The FBI has not argued that Exemption 7(B) applies to any of
the records withheld here, however. (See generally Def. Br. (Dkt. No. 38)) Nor has the FBI
identified any case holding that Exemption 7(A) applies to records the disclosure of "which
could impair the . . . ability to seat a fair and impartial jury" (2021 Comey Decl. (Dkt. No. 39) ¶
17) – and this Court has not discovered any such case.

As the D.C. Circuit recently noted, "Exemption 7(B) applies only when the disclosure of law
enforcement records would deprive a person of the right to 'a fair trial or an impartial
adjudication[]' . . . [and] the word 'trial' means the ultimate determination of factual and legal
claims by judge or jury in a judicial proceeding." Chiquita Brands Int'l Inc. v. S.E.C., 805 F.3d
289, 295 (D.C. Cir. 2015) (quoting 5 U.S.C. § 552(b)(7)(B)); see also Washington Post Co. v.
U.S. Dep't of Just., 863 F.2d 96, 101 (D.C. Cir. 1988) ("The exemption[] . . . was meant to
prevent disclosures from conferring an unfair advantage upon one party to an adversary
proceeding or leading to prejudicial publicity in pending cases that might inflame jurors or
distort administrative judgment."). "Congress made the threshold of (7)(B) higher than for
[7(A)] . . . . Whereas (7)(A), (C), (D) and (F) permit records to be withheld if release 'could

39) ¶¶ 17-19; see also Def. Br. (Dkt. No. 38) at 18 (asserting that "the release of these categories

of records could reasonably be expected to impair the ability to seat a fair and impartial jury in

the Maxwell trial" without identifying any such categories))

As to interference with witness testimony, the FBI asserts that the withheld

records include

> information about which witnesses may be expected to testify at trial, [] details
> that are not publicly known or known to other witnesses, and [] information and
> documents authored by potential trial witnesses.  These records also include
> potential trial exhibits that the Government anticipates will be entered into
> evidence, many of which the potential trial witnesses have not seen.

(2021 Comey Decl. (Dkt. No. 39) ¶ 15)

The FBI cites N.L.R.B. v. Robbins Tire & Rubber Co., 437 U.S. 214, 224 (1978)

to argue that "Exemption 7(A) was enacted precisely to prevent such an end run around the rules

governing criminal discovery."  (See Def. Br. (Dkt. No. 38) 17)  That case concerns an

employer's request, "pursuant to FOIA, that [the National Labor Relations Board] make

available for inspection and copying, at least seven days prior to [a] hearing [concerning the

employer's labor practices], copies of all potential witnesses' statements collected during the

---

reasonably be expected to' cause a particular evil, (7)(B) requires that release 'would' deprive a
person of fair adjudication."  Washington Post Co., 863 F.2d at 102 (quoting 5 U.S.C. § 552(b)).

It appears unlikely that Congress intended that Exemption 7(A) apply to documents "which
could reasonably be expected to impair the . . . ability to seat a fair and impartial jury."  (2021
Comey Decl. (Dkt. No. 39) ¶ 23)  That reading of Exemption 7(A) would swallow Exemption
7(B), despite the latter's heightened standard and distinct requirements.  See U.S. DOJ v. Reps.
Comm. For Freedom of Press, 489 U.S. 749, 776 (1989) ("[T]he language of Exemptions 7(B),
(C), and (D) seems to contemplate a case-by-case [analysis whereas] . . . Exemption 7(A)
'appears to contemplate that certain generic determinations might be made.'") (quoting Robbins
Tire, 437 U.S. at 223–24).

In any event, the parties have not briefed the applicability of Exemption 7(B) and – despite the
reference to the "ability to seat a fair and impartial jury" in the Comey declarations – the Court
does not understand the FBI to be claiming that Exemption 7(B) applies here.

Board's investigation." Robbins Tire, 437 U.S. at 216. The Court declined to read FOIA as "overrid[ing] a long tradition of [relatively limited] agency discovery" in the "absence of clear congressional direction." Id. at 238-239. The Court also noted, however, that "[t]he most obvious risk of 'interference' with enforcement proceedings . . . is that employers or, in some cases, unions will coerce or intimidate employees and others who have given statements, in an effort to make them change their testimony or not testify at all." Id. at 239. Accordingly, the Court's holding in favor of the agency was premised on the danger of "disclosure of [a] particular kind[] of investigatory record[]," i.e., witness statements, id. at 236, and not on concerns over disclosure of "the entirety of the records at issue" (2021 Comey Decl. (Dkt. No. 39) ¶ 13) – here, more than 10,000 pages of records.[11] (Seidel Decl. (Dkt. No. 50) ¶ 3)

In sum, the FBI has not demonstrated that the "disclosure of particular kinds of investigatory records," Robbins Tire, 437 U.S. at 236, would interfere with any retrial of Maxwell if she were to prevail on appeal. Accordingly, the FBI's motion for summary judgment will be denied to the extent it is predicated on Exemption 7(A). See CREW I, 746 F.3d at 1099 ("[A]lthough the DOJ identifies [] distinct categories of documents[,] . . . it never explains how the specific risks entailed in premature disclosure of one category of document might differ from risk of disclosure of the other."); Campbell v. Dep't of Health & Hum. Servs., 682 F.2d 256, 263-64 (D.C. Cir. 1982) ("If . . . an active investigation [alone] . . . constituted a sufficient

---

[11] While the Seidel Declaration discusses certain harm that could flow from the disclosure of certain categories of documents (Seidel Decl. (Dkt. No. 50) ¶¶ 59-68), the FBI has not argued that the Seidel Declaration sufficiently supports withholding the records, and the Bureau does not rely on the Seidel Declaration in arguing that "disclosure of the records [at issue] would interfere with pending criminal proceedings." (Def. Br. (Dkt. No. 38) at 16-18 (capitalization altered); see also Def. Reply (Dkt. No. 41) at 10-13; Def. Supp. Br. (Dkt. No. 46) at 2-9) The FBI's briefing instead tracks the various harms cited in the 2021 Comey declaration, without linking those harms to any particular category of documents.

predicate for the invocation of Exemption 7(A), the Court in Robbins Tire would not have

examined the special risks entailed in premature disclosure of . . . a particular kind of records. . . .

Instead, the Court would simply have held those statements clearly related to a concrete

enforcement matter and, . . . [therefore,] properly withheld."); Prop. of the People, Inc. v. DOJ,

2021 WL 3052033, at *3 (D.D.C. July 20, 2021) (holding that an agency's withholding of

documents at the file level was inadequate).

## III.    EXEMPTION 3

Exemption 3 allows an agency to withhold records that are "specifically exempted

from disclosure by statute."  5 U.S.C. § 552(b)(3).  "To claim this Exemption, the government

must demonstrate that:  '(1) the statute invoked qualifies as an [E]xemption 3 withholding

statute, and (2) the materials withheld fall within that statute's scope.'"  Spadaro v. U.S. Customs

& Border Protection, 978 F.3d 34, 42 (2d Cir. 2020) (quoting A. Michael's Piano, Inc. v. FTC,

18 F.3d 138, 143 (2d Cir. 1994)).

Here, the FBI relies on three statutes that preclude disclosure of certain

documents sought by Plaintiffs:  (1) the Child Victims' and Child Witnesses' Rights Act, 18

USC. § 3509; (2) Fed. R. Crim. P. 6(e)'s shield of "matters occurring before the grand jury"; and

(3) the Juvenile Justice and Delinquency Act, 18 U.S.C. § 5038.  (Seidel Decl. (Dkt. No. 50)

¶¶ 48-51)  Plaintiffs "do not contest" that these statutes qualify as Exemption 3 withholding

statutes, but they argue that "the FBI fails to identify how it employed these exemptions and to

25

what degree," and that the Seidel declaration does not "establish that the records were reviewed for segregable, non-exempt material." (Pltf. Br. (Dkt. No. 43) at 23)

### A.    Child Victims Information

As Plaintiffs acknowledge, "the Child Victims' Act unambiguously qualifies as an Exemption 3 statute." Corley v. Dep't of Just., 998 F.3d 981, 985 (D.C. Cir. 2021).[12] (Pltf. Br. (Dkt. No. 43) at 23)  The Seidel declaration states that the FBI asserted Exemption 3 as to certain of the withheld records "to protect names, images, and identifying information of minor children victims and witnesses within the child prostitution investigation of Jeffrey Epstein." (Seidel Decl. (Dkt. No. 50) ¶ 49)  Plaintiffs have not offered any basis to believe that the FBI's justification is insufficient.  The Court therefore concludes that the FBI properly withheld material pursuant to the Child Victims' Act. See Vaskas v. DHS, 2023 WL 4930092, at *2 (D.D.C. Aug. 2, 2023) ("Defendants' declaration establishes that some of their records . . . included statutorily protected information about children, regardless of whether [Plaintiff] specifically requested that information.  That is sufficient to withhold those records.").

### B.    Grand Jury Materials

Federal Rule of Criminal Procedure 6(e) prohibits government attorneys, grand jurors, and others from "'disclos[ing] a matter occurring before the grand jury,' . . . and, although

---

[12] The Child Victim's Act provides that "all employees of the Government connected with [a particular] case" "shall (i) keep all documents that disclose the name or any other information concerning a child in a secure place to which no person who does not have reason to know their contents has access; and (ii) disclose documents described in clause (i) or the information in them that concerns a child only to persons who, by reason of their participation in the proceeding, have reason to know such information." 18 U.S.C. § 3509(d).  "This two-part requirement, that documents 'shall' be kept 'in a secure place' and disclosed 'only' to authorized personnel (as opposed to the general public), clearly 'requires that . . . matters be withheld from the public in such a manner as to leave no discretion on the issue.'" Corley, 998 F.3d at 985 (quoting 5 U.S.C. § 552(b)(3)(A)(i)).

a rule is not generally considered to be a statute, it qualifies as one under FOIA [and Exemption 3,] because the Congress has enacted it into positive law." Murphy v. Exec. Off. for U.S. Att'ys, 789 F.3d 204, 206 (D.C. Cir. 2015) (quoting Fed. R. Crim. P. 6(e)).  Rule 6(e) and Exemption 3 apply where responsive documents would "'tend to reveal some secret aspect of the grand jury's investigation,' including 'the identities of witnesses or jurors, the substance of testimony, the strategy or direction of the investigation,' or 'the deliberations or questions of jurors.'" Hodge v. F.B.I., 703 F.3d 575, 580 (D.C. Cir. 2013) (quoting Senate of Puerto Rico, 823 F.2d at 582). "The disclosure of information 'coincidentally before the grand jury [which can] be revealed in such a manner that its revelation would not elucidate the inner workings of the grand jury' is not prohibited." Senate of Puerto Rico, 823 F.2d at 582 (quoting Fund for Constitutional Government v. National Archives and Records Service, 656 F.2d 856, 870 (D.C. Cir.1981)).

Here, the Seidel declaration asserts that certain records responsive to Plaintiffs' request address or detail "matters occurring before one or more federal grand juries empaneled in relation to the investigations at issue." (Seidel Decl. (Dkt. No. 50) ¶ 50)  In particular, responsive records contain "names of recipients of federal grand jury subpoenas"; "information that identifies specific records subpoenaed by a federal grand jury"; and "copies of specific records provided pursuant to federal grand jury subpoenas." (Id.)

Plaintiffs complain that the Seidel declaration fails "to show a 'nexus between disclosure and revelation of a protected aspect of the grand jury's investigation.'" (Pltf. Br. (Dkt. No. 43) at 23-24 (quoting Senate of Puerto Rico, 823 F.2d at 584))

There is support for the FBI's argument that "information about the names of recipients of federal grand jury subpoenas[ and] . . . that identifies specific records subpoenaed by a federal grand jury" (Seidel Decl. (Dkt. No. 50) ¶ 50) would  "tend to reveal some secret

aspect of the grand jury's investigation." Senate of Puerto Rico, 823 F.2d at 582 (internal

quotation marks omitted). The D.C. Circuit has rejected the argument that "copies of specific

records provided to a federal grand jury" are automatically exempt from disclosure, however.

See Labow v. United States Dep't of Just. ("Labow II"), 831 F.3d 523, 529 (D.C. Cir. 2016)

(vacating in part and remanding).

           In Labow, the D.C. Circuit criticized the district court for failing to provide an

"explanation" in support of its conclusion that "releasing [such] documents would 'reveal the

strategy or direction of the [grand jury's] investigation.'" Id. (quoting Labow v. U.S. Dep't of

Just. ("Labow I"), 66 F. Supp. 3d 104, 121 (D.D.C. 2014)) Here, as in Labow, Plaintiffs "did not

request documents related to a grand jury" and it is the "government [that has] revealed the

existence of a grand jury by withholding the documents." Id.; compare id. ("It is possible that,

had the government released the documents without invoking Exemption 3, [plaintiff] would

never have known that any of the documents had been subpoenaed by a grand jury."); with

Boehm v. Fed. Bureau of Investigation, 983 F. Supp. 2d 154, 159 (D.D.C. 2013) ("[P]laintiff

seeks these documents to learn what occurred before the grand jury, not for use in furtherance of

a lawful investigation.") Moreover, the FBI has not explained or provided details regarding its

conclusory assertion that "[a]ny disclosure of this information would clearly violate the secrecy

of the grand jury proceedings and could reveal the inner workings of a federal grand jury."

(Seidel Decl. (Dkt. No. 50) ¶ 50). See also Labow II, 831 F.3d at 530 (describing the same

justification as "conclusory"); see id. ("[W]e do not know why documents obtained through the

grand jury's subpoenas would necessarily reveal" the "inner workings of a federal grand jury.")

(emphasis in original).

The Second Circuit has followed the D.C. Circuit's analysis in applying

Exemption 3 to Rule 6(e) materials:

> Documents requested under the FOIA may be withheld under Rule 6(e) only
> when their "disclosure would tend to reveal some secret aspect of the grand jury's
> investigation . . . [i.e.,] identities of witnesses or jurors, . . . [and] the strategy or
> direction of the investigation." . . . The government defendants have simply failed
> to demonstrate "a nexus between disclosure and revelation of a protected aspect
> of the grand jury's investigation." A document that is otherwise available to the
> public does not become confidential simply because it is before a grand jury.
> Instead, there must be a showing that disclosure of the document will result in
> exposure of some other aspect of the grand jury proceeding that is secret. No
> such showing has been made in the instant case. Indeed, the subject matter of the
> investigation was sufficiently known to have prompted the FOIA request.

John Doe Corp. v. John Doe Agency, 850 F.2d 105, 109 (2d Cir. 1988), rev'd on other grounds,

493 U.S. 146 (1989) (quoting Senate of Puerto Rico, 823 F.2d at 582, 584).

In Grynberg v. DOJ, plaintiff "sought . . . bank records, court transcripts, and

corporate records received from subpoenas directed at [third parties] . . . in the course of [a

government investigation]." 758 F. App'x 162, 163 (2d Cir. 2019) (summary order). The

Second Circuit found adequate an agency's declaration that the disclosure of such materials

"would publicly reveal the scope and secret aspects of the grand jury investigation by showing

where the Government sought its evidence, the sources of information it had relied on to develop

the facts of its investigation, and the steps that the Government anticipated taking and actually

took in furtherance of the investigation," and "make clear who produced them and show what

criminal actions were being investigated." Id. at 164. The Second Circuit concluded that the

declaration "establishe[d] an ample 'nexus between disclosure and revelation of a protected

aspect of the grand jury's investigation.'" Id. (quoting John Doe Corp., 850 F.2d at 109); see

also Sorin v. DOJ, 758 F. App'x 28, 31 (2d Cir. 2018) ("(1) communications from a law firm to

federal prosecutors, accompanying the production of documents requested by grand jury

subpoena and discussing the contents of specific subpoenas; and (2) communications from those

29

federal prosecutors to that law firm referencing specific grand jury subpoenas . . . 'tend to reveal what transpired before' the grand jury.") (quoting United States v. E. Air Lines, Inc., 923 F.2d 241, 244 (2d Cir. 1991)).

In sum, "copies of specific records provided to a federal grand jury" are not exempt from disclosure under FOIA merely because "the documents were subpoenaed." Id. Because the FBI has not separately categorized records withheld pursuant to Rule 6(e), the Court cannot determine which categories of records, if any, are properly exempt under Exemption 3 and pursuant to Rule 6(e). See Lopez v. DOJ, 393 F.3d 1345, 1349 (D.C. Cir. 2005) (discussing different categories of grand jury materials requested pursuant to FOIA). Accordingly, the FBI has failed to meet its burden with respect to grand jury materials under Exemption 3.

C.    **Juvenile Arrest and Criminal History Information**

The FBI asserts that it properly withheld records "that contain arrest information and criminal history of third party juveniles" pursuant to the Juvenile Justice and Delinquency Act (the "Delinquency Act"). (Def. Br. (Dkt. No. 38) at 22) The FBI has not argued – or cited to any case law holding – that the Delinquency Act "'qualifies as an [E]xemption 3 withholding statute.'" Spadaro, 978 F.3d at 42 (quoting A. Michael's Piano, Inc., 18 F.3d at 143). Assuming arguendo that the Delinquency Act qualifies as an Exemption 3 withholding statute, the FBI has not met its burden to show that "'the materials withheld fall within that statute's scope.'" Id. (quoting A. Michael's Piano, Inc., 18 F.3d at 143); A. Michael's Piano, Inc., 18 F.3d at 143 ("The burden of proof, upon such review, rests with the agency asserting the exemption, with doubts resolved in favor of disclosure.").

The Delinquency Act provides that "[t]hroughout and upon the completion of [] juvenile delinquency proceeding[s], the records [regarding these proceedings] shall be

safeguarded from disclosure to unauthorized persons." 18 U.S.C. § 5038(a). The Delinquency Act defines a "juvenile delinquency" as a "violation of a law of the United States committed by a person prior to his eighteenth birthday which would have been a crime if committed by an adult." 18 U.S.C. § 5031; see also id. § 5032 (establishing procedures for delinquency proceedings in federal district court). "Read in the context of these sections, the phrase 'juvenile delinquency proceeding' in section 5038(a) is clearly a reference to a federal delinquency proceeding." McDonnell v. United States, 4 F.3d 1227, 1249 (3d Cir. 1993).

The FBI does not state whether there are responsive documents that concern federal juvenile proceedings. (See Seidel Decl. (Dkt. No. 50) ¶ 51) Accordingly, even assuming that the Delinquency Act qualifies as an Exemption 3 withholding statute, this Court is not in any position to determine whether responsive records fall within the scope of the Delinquency Act. See McDonnell, 4 F.3d at 1249. ("Because Rogers' juvenile records are state juvenile records, they do not fall within the scope of § 5038.").[13]

## IV.    EXEMPTION 5

Exemption 5 protects from disclosure records consisting of "inter-agency or intra-agency memorandums or letters that would not be available by law to a party other than an agency in litigation with the agency, provided that the deliberative process privilege shall not apply to records created 25 years or more before the date on which the records were requested."

---

[13]    The FBI states that it "also asserted Exemptions 6 and 7(C) over all information [withheld pursuant to the Delinquency Act]." (Seidel Decl. (Dkt. No. 50) ¶ 51) As discussed below, the Court concludes that the FBI has met its burden as to Exemptions 6 and 7(C) to the extent that it seeks to withhold "names and identifying information" of eight categories of people, including "third party victims" of Epstein's crimes. (Id. ¶¶ 73-83) Accordingly, any "names and identifying information" contained within the relevant juvenile delinquency records are protected from disclosure under Exemptions 6 and 7(C), but the entirety of these records is not protected under these provisions.

5 U.S.C. § 552(b)(5). "To qualify, a document must thus satisfy two conditions: its source must

be a Government agency, and it must fall within the ambit of a privilege against discovery under

judicial standards that would govern litigation against the agency that holds it." Dep't of Interior

v. Klamath Water Users Protective Ass'n, 532 U.S. 1, 8 (2001). "'Courts have interpreted

Exemption 5 to encompass traditional common-law privileges against disclosure, including the

work-product doctrine and . . . deliberative process and attorney-client privileges." ACLU v.

U.S. DOJ, 210 F. Supp. 3d 467, 476 (S.D.N.Y. 2016) (quoting Nat'l Council of La Raza v. U.S.

DOJ, 411 F.3d 350, 356 (2d Cir.2005)).

> "'The work-product doctrine shields materials "prepared in anticipation of

litigation or for trial by or for another party or by or for that other party's representative

(including the other party's attorney, consultant, surety, indemnitor, insurer, or agent.""

McKinley v. Bd. of Governors of Fed. Rsrv. Sys., 647 F.3d 331, 341 (D.C. Cir. 2011) (quoting

Judicial Watch, Inc. v. U.S. DOJ, 432 F.3d 366, 369 (D.C. Cir. 2005)) (quoting in turn Fed. R.

Civ. P. 26(b)(3)).

> The FBI contends that the following documents are protected by the attorney

work-product privilege:

> > (i) two internal FBI memoranda which relay information provided by an AUSA
> > relating to the timing of Epstein's indictment and information being gathered or
> > gathered by the FBI, pursuant to the instruction of an AUSA, for the purpose of
> > assessing a potential forfeiture action to seize Epstein's assets; (ii) one
> > memorandum from an FBI investigator to an AUSA, relating to the value of an
> > asset owned by Epstein for consideration of its seizure, with attachments
> > providing supporting information gathered by the FBI regarding the value of the
> > asset; (iii) an internal FBI memorandum that describes actions being taken by the
> > FBI, at the direction of an AUSA, to gather evidence in support of a potential
> > forfeiture action regarding certain of Epstein's assets; (iv) an internal FBI
> > memorandum that describes actions being taken by the FBI, at the direction an
> > AUSA, to gather evidence for the potential prosecution of Epstein and others and
> > seizure of an asset.

(Seidel Decl. (Dkt. No. 50) ¶ 54)

The FBI asserts that these "memoranda were created at the request of an AUSA in reasonable anticipation of litigation, and they provide the AUSA's prosecutorial strategy and the information the AUSA was gathering to either support an indictment of Jeffrey Epstein or a civil forfeiture action." (Id.) Plaintiffs do not contest the FBI's description of the memoranda, and do not discuss the work-product privilege. Plaintiffs instead address the deliberative process privilege, which the FBI has not asserted. (See Pltf. Br. (Dkt. No. 43) at 24-25 ("[T]he deliberative process privilege 'does not operate indiscriminately to shield all decision-making by public officials.'") (quoting New York Times Co. v. DOD, 499 F. Supp. 2d 501, 514 (S.D.N.Y. 2007)))

Because the memoranda listed by the FBI were prepared in anticipation of litigation against Jeffrey Epstein, they are exempt from disclosure under FOIA. See Shapiro v. DOJ, 969 F. Supp. 2d 18, 29 (D.D.C. 2013) ("'[A]ny part of [a document] prepared in anticipation of litigation, not just the portions concerning opinions, legal theories, and the like, is protected by the work product doctrine and falls under exemption 5.'") (quoting Tax Analysts v. IRS, 117 F.3d 607, 620 (D.C. Cir.1997)).

## V.    EXEMPTIONS 6 AND 7(C)

The FBI has also invoked FOIA Exemptions 6 and 7(C) to withhold information in certain responsive records. Exemption 6 provides that "personnel and medical files and similar files the disclosure of which would constitute a clearly unwarranted invasion of personal privacy" are exempt from disclosure. 5 U.S.C. § 552(b)(6). As discussed above, Exemption 7 protects from disclosure certain "records or information compiled for law enforcement purposes." 5 U.S.C. § 552(b)(7). Plaintiffs do not dispute that the records they seek were compiled for law enforcement purposes. Subpart (C) applies "only to the extent that the

33

production of such law enforcement records or information . . . could reasonably be expected to constitute an unwarranted invasion of personal privacy." Id.

"When information is claimed to be exempt from disclosure under both [Exemption 6 and Exemption 7(C)], courts 'focus . . . on Exemption 7(C) because it provides broader privacy protection than Exemption 6 and thus establishes a lower bar for withholding material.'" Citizens for Resp. & Ethics in Washington v. DOJ ("CREW II"), 854 F.3d 675, 681 (D.C. Cir. 2017) (quoting CREW I, 746 F.3d at 1091).

Where an "agency identifies a privacy interest in the requested documents," the documents should be disclosed only if "the requester '[] show[s] that the [countervailing] public interest sought to be advanced is a significant one,'" and outweighs the privacy interest. Behar v. United States Dep't of Homeland Sec., 39 F.4th 81, 91 (2d Cir. 2022) (quoting NARA v. Favish, 541 U.S. 157, 172 (2004)). The public interest at stake must be "'more specific than having the information for its own sake,'" and the information sought must be "'likely to advance that interest.'" Id. (quoting Favish, 541 U.S. at 172). "'[G]oals other than opening agency action to public scrutiny are deemed unfit to be accommodated under FOIA when they clash with privacy rights.'" Id. (quoting Associated Press v. U.S. Dep't of Def., 554 F.3d 274, 293 (2d Cir. 2009)). "Thus, 'whether disclosure of a private document under Exemption 7(C) is warranted must turn on the nature of the requested document and its relationship to the basic purpose of the Freedom of Information Act to open agency action to the light of public scrutiny.'" Id. (quoting DOJ v. Reps. Comm. For Freedom of Press, 489 U.S. 749, 772 (1989)).

The FBI asserts that Exemption 7(C) protects from disclosure the "names and identifying information" of eight categories of people: (1) "third parties who were of investigative interest to the FBI"; (2) "FBI Special Agents [] and Victim Specialists . . .

responsible for conducting, supervising, and/or maintaining the investigation/investigative activities"; (3) "third-party victims"; (4) "local law enforcement employees"; (5) "third parties who were merely mentioned in the investigative records responsive to Plaintiffs' request"; (6) "personnel from non-FBI, federal government agencies who provided information to or otherwise assisted the FBI in its investigation of Jeffrey Epstein"; (7) "local government personnel"; and (8) "individuals who were interviewed, and/or provided information by other means, to the FBI during the course of its investigation of Jeffrey Epstein." (Seidel Decl. (Dkt. No. 50) ¶¶ 73-83) The FBI argues that an individual who falls within these categories has "strong privacy interests . . . 'in preventing dissemination of his or her name and home address'" that are protected by Exemption 7(C). (Def. Br. (Dkt. No. 38) at 25-26 (quoting Federal Labor Relations Auth. v. U.S. Dep't of Veterans Affairs, 958 F.2d 503, 510 (2d Cir. 1992)))

Plaintiffs respond that they "recognize the appropriateness of redacting the names of uninvolved third-parties or juvenile victims who have not come forward." But Plaintiffs argue that the FBI has improperly taken a "categorical approach" to Exemption 7(C) and that – in balancing the relevant interests – it has ignored the "diminished privacy of certain individuals and the immense public interest underlying this case." (Pltf. Br. (Dkt. No. 43) at 20-23)

Plaintiffs complain that "the FBI applied [the] privacy [exemptions] far more expansively than necessary to merely protect the identities of third parties." (Id. at 20) According to Plaintiffs, while

> FOIA allows for the redaction of the names and identifying information of private citizens mentioned in law enforcement files, "it does not permit an agency to exempt from disclosure all material in an investigatory record solely on the grounds that the record includes some information which identifies a private citizen or provides that person's name and address."

(Id. (quoting CREW I, 746 F.3d at 1094)) But the Seidel declaration states that the FBI withheld the "names and identifying information" of eight specific categories of people

35

throughout the records (Seidel Decl. (Dkt. No. 50) ¶¶ 73-83), not that it withheld "every

responsive document in toto." CREW I, 746 F.3d at 1094. Moreover, the Seidel

declaration and the Vaughn index reveal that hundreds of pages of records for which the

FBI has asserted Exemptions 6 and 7(C) were "released in part" to Plaintiffs. (See

generally Vaughn index (Dkt. No. 50-31)) And Plaintiffs have not identified any

individual records listed in the Vaughn index that the FBI improperly withheld in their

entirety based on Exemptions 6 and 7(C).[14]

       Plaintiffs also argue that "the FBI offers no information whatsoever as to how

individuals' privacy interests were weighed against the substantial public interest in this matter."

(Pltf. Br. (Dkt. No. 43) at 20) Where Exemption 7(C) has been invoked, however, the

government agency must "account for the privacy interests at stake," while it is Plaintiffs'

"burden to 'show the information [withheld as private under Exemption 7(C)] is likely to

advance' the public interest in learning whether [a government agency] pulled its punches."

CREW II, 854 F.3d at 683 (quoting Nat'l Archives & Recs. Admin. v. Favish, 541 U.S. 157, 172

(2004)).

       As to the FBI's balancing of the relevant interests, Plaintiffs do not dispute that

the eight categories of individuals listed by the FBI have cognizable privacy interests in their

---

[14] To the extent that the Plaintiffs' complaint with respect to the FBI's "categorical" approach is
that the Bureau has not properly weighed the relevant privacy interests against the public interest
in disclosure for each individual record, that complaint is unavailing. There are more than
10,000 pages of records at issue in this case; reviewing each individual redaction, page, or record
would "actually impede court review and undermine the functions served by a Vaughn index."
Jud. Watch, Inc. v. Food & Drug Admin., 449 F.3d 141, 147 (D.C. Cir. 2006) ("Especially where
the agency has disclosed and withheld a large number of documents, categorization and
repetition provide efficient vehicles by which a court can review withholdings that implicate the
same exemption for similar reasons."). The FBI's categorization of the types of individual
names and identifying information found in the records and withheld is thus appropriate under
the circumstances.

names and identities under Exemption 7(C).  See Levy v. U.S. Postal Serv., 567 F. Supp. 2d 162,

167 (D.D.C. 2008) ("Suspects, witnesses, and investigators all have substantial privacy interests

that are implicated by the public release of law enforcement investigative materials."); Summers

v. United States Dep't of Just., 2004 WL 7333532, at *6 (D.D.C. Apr. 14, 2004) ("The privacy

interest is very strong with respect to disclosure of identities of third-party individuals in law

enforcement documents.").  That interest is heightened "[i]n the context of this high profile

criminal investigation" involving Epstein and Maxwell.  Summers, 2004 WL 7333532, at *6.

       The "weighty" public interest in ensuring "the diligence of the FBI's

investigation" concerning Epstein and Maxwell notwithstanding, CREW I, 746 F.3d at 1093, the

privacy interest of "witnesses and third parties" outweighs the public interest in disclosure to the

extent that "names . . . [and] identifying characteristics, [should] properly [be] redacted."

Perlman v. U.S. Dep't of Just., 312 F.3d 100, 106 (2d Cir. 2002), vacated on other grounds, 541

U.S. 970 (2004).  Indeed, the D.C. Circuit has held "categorically" that "unless access to the

names and addresses of private individuals appearing in files within the ambit of Exemption 7(C)

is necessary in order to confirm or refute compelling evidence that the agency is engaged in

illegal activity, such information is exempt from disclosure."  SafeCard Servs., Inc. v. S.E.C.,

926 F.2d 1197, 1206 (D.C. Cir. 1991).  Plaintiffs have not argued that the FBI has engaged in

"illegal activity" here.

       The Court concludes that disclosure of the names and identifying information of

government employees, victims, witnesses, arrestees, or informants here "would not advance the

public's understanding of the [FBI's] performance of its statutory duties."  Behar, 39 F.4th at 94

(internal quotation marks omitted).

Plaintiffs argue, however, that several individuals "have already been publicly connected to the [Epstein/Maxwell trafficking investigation and criminal cases and] controversy or have voluntarily identified themselves," undermining the applicability of Exemption 7(C) as to them.  In this regard, Plaintiffs cite (1) certain individuals "explicitly named in [Epstein's 2007] plea document as receiving immunity"; (2) several alleged victims of Epstein and Maxwell's scheme; and (3) a former attorney for Epstein, Alan Dershowitz.  (Pltf. Br. (Dkt. No. 43) at 20-22)

The "SafeCard rule" discussed above does not apply to individuals "who were convicted or pled guilty for their roles" in the relevant conduct or investigation.  CREW II, 854 F.3d at 681.  Courts have likewise stated that public officials, government employees, and prominent politicians' privacy interests with respect to law enforcement records are diminished where they have made public statements regarding an investigation.  Kimberlin v. Dep't of Just., 139 F.3d 944, 949 (D.C. Cir. 1998) ("government officials, as we have stated before, may have a 'somewhat diminished' privacy interest") (quoting Quinon v. FBI, 86 F.3d 1222, 1230 (D.C. Cir. 1996)); Perlman, 312 F.3d at 107 ("[An individual's] privacy interest is 'somewhat diminished' by his status as a government employee.") (quoting Kimberlin 139 F.3d at 949)); Nation Mag., Washington Bureau v. U.S. Customs Serv., 71 F.3d 885, 896 (D.C. Cir. 1995) ("[Presidential Candidate Ross] Perot's decision to bring information connecting himself with such efforts into the public domain differentiates his privacy interest from the interest of unnamed SafeCard witnesses.").  To the extent that a politician, public official, or government employee has made public statements concerning the subject matter of an investigation, district courts must determine whether shielding their identifying information "would [] serve any useful purpose in protecting [the individual's] privacy."  Nation Mag., 71 F.3d at 896.

While <u>Kimberlin</u> and similar cases cited by Plaintiffs suggest that certain public officials have a "somewhat diminished" privacy interest based on their prominence, <u>Kimberlin</u>, 139 F.3d at 944, 949, Plaintiffs have not cited any case holding that an ordinary citizen's privacy interest diminishes because his or her name was mentioned in a court filing or because they have made public statements concerning the investigation. Individuals do not "waive" their privacy interests "merely by acknowledging [an] investigation." <u>Id.</u> at 949.

As to the first group cited by Plaintiffs – people "explicitly named in [Epstein's 2007] plea document as receiving immunity" – Plaintiffs rely on a 2007 "non-prosecution agreement" between Epstein and the United States Attorney's Office for the Southern District of Florida. (Pltf. Br. (Dkt. No. 43) at 20-21) In the non-prosecution agreement – which was filed as an exhibit to a civil complaint filed against Epstein – the "United States [] agree[d] that it [would] not institute criminal charges against any potential co-conspirators of Epstein, including but not limited to [certain individuals listed in Plaintiffs' brief]." (<u>Podhurst Orseck, P.A. v. Epstein</u>, 10 Civ. 21586 (ASG) (S.D. Fla 2010) Cmplt., Ex. A (Non-Prosecution Agreement) (Dkt. No. 1-3) at 6) Plaintiffs do not allege, however, that these individuals (1) have been "convicted or [pleaded] guilty" to a role in Epstein and Maxwell's sex trafficking scheme, <u>see</u> <u>CREW II</u>, 854 F.3d at 681; (2) are "government official[s]" who have made "statement[s] to the press" concerning "what[,] [if anything, they] were accused of," <u>see Kimberlin</u>, 139 F.3d at 949; (3) are the subject of government "agency press releases or testimony in open court" naming them "as having been charged, convicted or otherwise implicated" in the Epstein affair, <u>CREW II</u>, 854 F.3d at 682; or (4) are discussed in a published judicial opinion reviewing allegations of misconduct made against them. <u>See Bartko v. United States Dep't of Just.</u>, 898 F.3d 51, 69 (D.C. Cir. 2018) ("Wheeler's [privacy] interest is substantially diminished . . . [given that] the

allegations of misconduct during the Bartko trial are already a matter of public record, as is the

referral to OPR published in the Fourth Circuit's decision, and the U.S. Attorney's public

announcement that it too was referring the allegations of misconduct to OPR.").

       Acknowledging that the four individuals at issue are listed as potential "co-

conspirators" of Epstein in the latter's non-prosecution agreement, the Court cannot conclude

that – as a result – they have a diminished expectation of privacy with respect to documents held

by the FBI containing their names.

       Epstein and Maxwell's alleged victims, and Dershowitz, are likewise not public

officials, nor are their "activities significant in their connection to agency conduct." Nation

Mag., 71 F.3d at 895 ("[FOIA requesters were] especially interested in documents and records

that pertain to offers by Mr. Perot to assist the Customs Service in the interdiction of illegal

drugs.").

       As to certain of Epstein's alleged victims who have discussed their involvement

with Epstein publicly, however, Plaintiffs have proffered (1) an article discussing a documentary

featuring interviews with those victims; and (2) three articles concerning the release of

transcripts of testimony in a lawsuit brought by Virginia Giuffre against Maxwell for her role in

Epstein's trafficking ring.  (See Pltf. Br. (Dkt. No. 43) at 21-22)  The articles discuss, inter alia,

Giuffre's allegations that "Maxwell and Epstein ordered her to have sex with men."  See, e.g.,

Bill Chappell & Scott Neuman, "Judge Releases Trove of Sealed Records Related To Lawsuit

Against Ghislaine Maxwell," NPR, (July 31, 2020)

https://www.npr.org/2020/07/31/896627505/judge-releases-trove-of-sealed-records-related-

tocase-against-ghislaine-maxwell.

Acknowledging that certain of Epstein's victims have publicly discussed being trafficked by Maxwell and Epstein, these individuals remain victims of and witnesses to the scheme. And given the nature of Epstein and Maxwell's conduct towards the alleged victims, it is almost certain that the records sought by Plaintiffs contain highly sensitive material about Giuffre and other victims and witnesses. See Summers, 2004 WL 7333532, at *4 ("[I]n the context of this high profile criminal investigation, these individuals clearly have more than a minimal privacy interest in not having their identities exposed."). Accordingly, Giuffre and those similarly situated maintain significant privacy interests in the records at issue.

As to Dershowitz, Plaintiffs have cited only articles in which Dershowitz denies any wrongdoing in connection with his representation of Epstein. (Pltf. Br. (Dkt. No. 43) at 22) To the extent that Dershowitz has been accused of misconduct, "official confirmation of what has been reported in the press and the disclosure of additional details could reasonably be expected to constitute an unwarranted invasion of [Dershowitz's] personal privacy." Kimberlin, 139 F.3d at 949. Accordingly, Dershowitz's privacy interest with respect to the records at issue is undiminished.

As with the other witnesses, third parties, and investigators named in the FBI's records, the public interest in shedding light on the Bureau's activities is not served by the disclosure of records that name and identify Giuffre or any of Epstein's victims, Dershowitz, and the others listed in Plaintiff's brief. See U.S. Dep't of Just. v. Reps. Comm. For Freedom of Press, 489 U.S. 749, 774 (1989) ("[Revealing sensitive private information] would tell us nothing directly about the character of the [agency's] behavior.").

41

*     *     *     *

In sum, the FBI has met its burden to establish that it properly withheld private information pertaining to the eight categories of individuals listed in the Seidel declaration.

## VI.    EXEMPTION 7(D)

Exemption 7(D) protects from disclosure law enforcement records that "could reasonably be expected to disclose the identity of a confidential source, . . . [who] furnished information on a confidential basis[] . . . [or] information furnished by a confidential source." 5 U.S.C. § 552(b)(7)(D). "Under Exemption 7(D), the question is not whether the requested document is of the type that the agency usually treats as confidential, but whether the particular source spoke with an understanding that the communication would remain confidential." DOJ v. Landano, 508 U.S. 165, 172 (1993) (emphasis in original). "[C]onfidentiality is not limited to complete anonymity or secrecy. A statement can be made 'in confidence' even if the speaker knows the communication will be shared with limited others, as long as the speaker expects that the information will not be published indiscriminately." Id. Accordingly, "disclosure is not required 'if the source provided information under an express assurance of confidentiality or in circumstances from which such an assurance could be reasonably inferred.'" Halpern v. F.B.I., 181 F.3d 279, 298 (2d Cir. 1999) (quoting Landano, 508 U.S. at 172).

There is no "presumption" that an FBI source has provided information pursuant to an explicit or implicit assurance of confidentiality. Landano, 508 U.S. at 174-78; see also CREW I, 746 F.3d at 1101 ("'[I]t is not enough for the agency to claim that all sources providing information in the course of a criminal investigation do so on a confidential basis.'") (quoting Roth v. DOJ, 642 F.3d 1161, 1184 (D.C. Cir. 2011)).

Instead, the FBI must "point to more narrowly defined circumstances that . . . support the inference" of confidentiality. When no express assurance of

42

> confidentiality exists, courts consider a number of factors to determine whether
> the source nonetheless "spoke with an understanding that the communication
> would remain confidential." These factors include "the character of the crime at
> issue," "the source's relation to the crime," whether the source received payment,
> and whether the source has an "ongoing relationship" with the law enforcement
> agency and typically communicates with the agency "only at locations and under
> conditions which assure the contact will not be noticed."

Roth, 642 F.3d at 1184 (quoting Landano 608 U.S. at 172, 179) And "[e]ven when the FBI

contends that a source received an express assurance of confidentiality, it must, in order to

'permit meaningful judicial review,' present sufficient evidence that such an assurance was in

fact given." Id. (quoting Campbell v. DOJ, 164 F.3d 20, 34 (D.C. Cir. 1998)).

The Seidel declaration identifies four Exemption 7(D) categories: (1) names and

identifying information of sources and information provided by sources "under circumstances in

which confidentiality can be inferred"; (2) names and identifying information of sources and

information provided by sources "under express grants of confidentiality"; (3) "information

provided to the FBI from a foreign agency under circumstances in which confidentiality can be

inferred"; and (4) names and identifying information of local law enforcement personnel, and

information provided such personnel "under an implied assurance of confidentiality." (Seidel

Decl. (Dkt. No. 50) ¶¶ 87-94)

Plaintiffs challenge all four categories and argue that "the FBI has only offered a

bald claim that witnesses expected confidentiality," has provided no evidence that its sources

received an express grant of confidentiality, and has not "pointed to 'more narrowly defined

circumstances' that support the inference of confidentiality." (Pltf. Br. (Dkt. No. 43) at 26-27

(quoting CREW I, 746 F.3d. at 1101))

As to the Seidel declaration's second category – information provided under an express grant of confidentiality – Seidel merely asserts that

> when processing the records at issue, the FBI found evidence these individuals, who provided specific and detailed information that is singular in nature, either requested their identities not be revealed; and/or FBI investigators would have, by standard practice, expressly promised these third parties their identities and the information they provided would remain confidential.

(Seidel Decl. (Dkt. No. 50) ¶ 90)  The FBI has not submitted any "probative evidence" that any source received an express grant of confidentiality in the form of, for example, "notations on the face of a withheld document, the personal knowledge of an official familiar with the source, a statement by the source, or contemporaneous documents discussing practices or policies for dealing with the source or similarly situated sources."  Campbell v. DOJ, 164 F.3d 20, 34 (D.C. Cir. 1998), as amended (Mar. 3, 1999); Roth, 642 F.3d at 1184 ("Even when the FBI contends that a source received an express assurance of confidentiality, it must . . . present sufficient evidence that such an assurance was in fact given.").

Moreover, Seidel is the FBI's "Section Chief for the Record/Information Dissemination Section [], Information Management Division" (Seidel Decl. (Dkt. No. 50) ¶ 1), and there is no evidence that he participated in the Epstein investigation or otherwise has "personal knowledge of the particular events" in which sources received express assurances of confidentiality.  Campbell, 164 F.3d at 35.  And if any of the records "reveal express guarantees of confidentiality on their face," no such evidence has been presented to the Court.  Id.

In sum, the FBI has not carried its burden to demonstrate an express assurance of confidentiality.

As to Seidel's first category – sources who provided information under "circumstances in which confidentiality can be inferred" – the only factual circumstance cited by the FBI is that its sources held "unique positions allowing them ready access to and/or

44

knowledge about investigative targets and others involved in child prostitution or trafficking of a minor." (Seidel Decl. (Dkt. No. 50) ¶ 88)  While "generic circumstances" can sometimes give rise to an "implied assurance of confidentiality," Landano, 508 U.S. at 179, the fact that Epstein and Maxwell's crimes involved "child sexual abuse" does not alone "support a finding of some implicit confidentiality agreement."  See Bagwell v. U.S. Dep't of Just., 588 F. Supp. 3d 58, 71 (D.D.C. 2022)  While "courts are more willing to infer confidentiality in cases where the crimes at issue are particularly violent," Ramaci v. FBI, 568 F. Supp. 3d 378, 388 (S.D.N.Y. 2021), the sources at issue here are not comparable to a "'witness[] to a gang-related murder[,]' [which] the Supreme Court offered as an example of someone who might be 'unwilling to speak . . . except on the condition of confidentiality.'"  Bagwell, 588 F. Supp. 3d at 71 (quoting Landano, 508 U.S. at 179).  Nor has the Bureau proffered evidence that its sources have reason to fear retaliation.  See Computer Pros. for Soc. Resp. v. U.S. Secret Serv., 72 F.3d 897, 906 (D.C. Cir. 1996), amended (Feb. 20, 1996) ("[T]he Service offered no evidence that a fear of retaliation by hackers is sufficiently widespread to justify an inference that sources of information relating to computer crimes expect their identities and the information they provide to be kept confidential.").

Nor does the Seidel declaration discuss any "narrowly defined circumstances that [] support the inference" of confidentiality, such as a paid informant, an informant that had an "ongoing relationship with the Bureau," or an informant who met with the Bureau in unique or unusual "locations and [] conditions."  See Landano, 508 U.S. at 179.  Indeed, the portions of the Seidel declaration addressing this category are mere boilerplate, citing "1) the singularity of the information provided and the likelihood these individuals could be identified through release of this information by those familiar with the events described; 2) the proximity of these sources to

45

the investigative subjects and events they described; 3) and the nature of the criminal acts they described." (Seidel Decl. (Dkt. No. 50) ¶ 87)  But Seidel does not explain or provide any details regarding the "singularity of the information provided," "the proximity of [the FBI's] sources" to Epstein, Maxwell or other investigative subjects, or "the nature of [any] criminal acts." (Id.) Accordingly, the FBI has not satisfied its burden to show that its sources provided information under an implicit expectation of confidentiality.

As to Seidel's third category – information provided by foreign agencies – the FBI asserts that it "solicits and receives information from . . . foreign agencies" in connection "with a wide variety of criminal and national security investigations." (Seidel Decl. (Dkt. No. 50) ¶ 92)  According to the FBI, the "understanding that the identity of such a source . . . will be held in confidence" is "[i]nherent" to such cooperation. (Id.)  The FBI then notes that the release of records which "reveal the existence of a confidential relationship with a foreign government reasonably could be expected to strain relations between the United States and the foreign government and lead to diplomatic or economic retaliations . . . [and to have] a chilling effect on the free flow of vital information to" the FBI. (Id.)

These justifications are insufficient.  As noted at the outset, the relevant inquiry is whether release of the records "could reasonably be expected to disclose the identity of a confidential source, including a state, local or foreign agency," or information provided by such a source – not whether release could reasonably be expected to "strain relations" between the United States and other countries.  5 U.S.C. § 552(b)(7)(D).  In any event, the FBI has not submitted evidence that any "particular foreign government agency that the FBI [seeks] to protect via its redactions requested that its identity, relationship with FBI, and the information it provided be classified and withheld."  Shapiro v. Cent. Intel. Agency, 247 F. Supp. 3d 53, 68

(D.D.C. 2017); Stein v. U.S. Dep't of Just., 134 F. Supp. 3d 457, 486 (D.D.C. 2015) ("The only statement that the FBI makes about the implied assurance of confidentiality purportedly made [to the foreign agency or agencies] . . . is an entirely conclusory recitation of the burden it must meet[.] . . . This is not sufficient.")  Accepting the FBI's assertion that expectations of privacy are "[i]nherent" to cooperation with foreign agencies (Seidel Decl. (Dkt. No. 50) ¶ 92) – without evidence of any explicit or implicit assurance of confidentiality – amounts to applying the sort of "presumption of confidentiality" that the Supreme Court has explicitly rejected. See Landano, 508 U.S at 181 ("[T]he Government is not entitled to a presumption that a source is confidential within the meaning of Exemption 7(D) whenever the source provides information to the FBI in the course of a criminal investigation.").

        As to Seidel's fourth category – information from local law enforcement agencies – he states that local

> law enforcement authorities provided specific detailed information of value to the FBI, that is singular in nature, concerning Jeffrey Epstein.  The FBI inferred these personnel provided this information to the FBI with an expectation their involvement in the investigation, and/or the information they provided, would remain confidential due to the following:  the information provided pertains to unknown investigations pursued by these agencies; or the information would expose the agency's personnel to undue public scrutiny based on their involvement with these particular matters.

(Seidel Decl. (Dkt. No. 50) ¶ 93)

        The Court concludes that the FBI has sufficiently established that records provided by local law enforcement authorities were provided under "more narrowly defined[,] . . . [although] generic circumstances [from] which an implied assurance of confidentiality can fairly be inferred."  See Landano, 508 U.S. at 179.  Epstein's illegal activities spanned decades and took place in a variety of locations, including New York, Florida, and the Virgin Islands.  It is reasonable to assume that local law enforcement authorities who provided information to the

FBI have their own sources and investigations to protect. It is also reasonable to assume that local law enforcement agencies would expect that the information they provided to the FBI would be maintained as confidential.

In sum, the FBI has not provided sufficient evidence that explicit or implicit assurances of confidentiality were made to the FBI's own sources and to foreign agencies. However, the FBI has met its burden with respect to information provided by local law enforcement agencies.

## VII.   EXEMPTION 7(E)

Exemption 7(E) applies to law enforcement records the release of which "would disclose techniques and procedures for law enforcement investigations or prosecutions, or would disclose guidelines for law enforcement investigations or prosecutions if such disclosure could reasonably be expected to risk circumvention of the law." 5 U.S.C. § 552(b)(7)(E). The qualification "'such disclosure could reasonably be expected to risk circumvention of the law'[] modifies only 'guidelines' and not 'techniques and procedures.'" Allard K. Lowenstein Int'l Hum. Rts. Project v. Dep't of Homeland Sec., 626 F.3d 678, 681 (2d Cir. 2010); see also id. ("When Congress [amended FOIA] . . . in 1986, it expanded the scope of Exemption 7(E) by adding the entire second clause[,] . . . thereby exempting 'guidelines' from disclosure only if public access to such guidelines would risk circumvention of the law."). Accordingly, "techniques and procedures" are exempt from disclosure "without need for [a] demonstration of harm." Id. (quoting Keys v. Dep't of Homeland Sec., 510 F.Supp.2d 121, 129 (D.D.C. 2007)). "The term 'guidelines' . . . generally refers in the context of Exemption 7(E) to resource allocation . . . [while the] phrase 'techniques and procedures,' [] refers to how law enforcement officials go about investigating a crime." Id. at 682.

48

SPA-49

The FBI has asserted Exemption 7(E) as to the following categories of information found within the records Plaintiffs seek:  (1) "methods the FBI uses to collect and analyze information it obtains for investigative purposes"; (2) "sensitive investigative file numbers . . . [which identify] the investigative interest or priority given to [particular] matters"; (3) the "type of investigations," such as "preliminary" or "full"; (4) "the target, dates and scope of [] surveillance [operations]"; (5) information located within the FBI's FD-515 forms used to report "investigative accomplishments, . . . such as an arrest, conviction, sentencing, [or] asset seizure"; (6) nonpublic database identifiers or printouts; and (7) monetary payments or funding needed for investigative purposes.  (Seidel Decl. (Dkt. No. 50) ¶¶ 98-112)  For each category of information, regardless of whether classified as "guidelines" or "techniques and procedures," the Seidel declaration explains how "disclosure could reasonably be expected to risk circumvention of the law."  (Id.)

The Court concludes that the FBI has satisfied its burden under Exemption 7(E) – each category of information identified in the Seidel declaration qualifies as "techniques and procedures . . . [or] guidelines . . . [the] disclosure [of which] could reasonably be expected to risk circumvention of the law."  5 U.S.C. § 552(b)(7)(D); see also Shapiro v. Dep't of Just., 2020 WL 3615511, at *36 (D.D.C. July 2, 2020), aff'd in part, remanded in part on other grounds, 40 F.4th 609 (D.C. Cir. 2022) (finding that the FBI met its burden under Exemption 7(E) as to, inter alia, "methods the FBI uses to collect and analyze the information," "information regarding monetary payments," "how, under what circumstances, and on whom the FBI conducts surveillance," and "FBI Form FD-515"); Gonzalez v. United States Citizenship & Immigr. Servs., 475 F. Supp. 3d 334, 352 (S.D.N.Y. 2020) ("[Law enforcement file and] event codes and URLs of internal law enforcement databases[] [are] properly withheld under Exemption 7(E).");

Ford v. Dep't of Just., 208 F. Supp. 3d 237, 253 (D.D.C. 2016) ("[The FBI] also withheld

information pertaining to . . . whether an investigation is preliminary or full and the date of its

initiation. . . . [T]he FBI's justification for withholding this information is adequate.").

      Plaintiffs do not contest the FBI's reasoning and instead argue that, as with

Exemption 7(D), the FBI "offers nothing more [] than a paraphrase of [E]xemption 7(E)."  (Pltf.

Br. (Dkt. No. 43) at 27)  This argument ignores the Seidel declaration's detailed description of

the guidelines, techniques and procedures the FBI seeks to protect under Exemption 7(E).  The

Court concludes that the FBI has "logically explain[ed] how the [requested information] could

help criminals circumvent the law, and that suffices here to justify invocation of Exemption

7(E)."  Blackwell v. F.B.I., 646 F.3d 37, 42 (D.C. Cir. 2011).

## VIII.  SEGREGABILITY

      "FOIA . . . provides that '[a]ny reasonably segregable portion of a record shall be

provided to any person requesting such record after deletion of the portions which are exempt.'"

Conti, 2014 WL 1274517, at *25 (quoting 5 U.S.C. § 552(b)).  "[T]he agency must provide a

detailed justification for its decision that non-exempt material is not segregable," but "is entitled

to a presumption that it complied with its obligation to disclose reasonably segregable material."

Id. (citing Mead Data Cent., Inc. v. U.S. Dept. of Air Force, 566 F.2d 242, 261 (D.C. Cir. 1977)).

"[T]o justify withholding an entire document[,] the DOJ . . . must demonstrate that [it] cannot

delineate between exempt and non-exempt information therein."  Ayyad v. U.S. Dept. of Justice,

2002 WL 654133, at *2 (S.D.N.Y. Apr. 18, 2002).

Here, the FBI argues that the "records withheld in full under . . . Exemption 7(A)" do "not contain any reasonably segregable information."[15]  The FBI has not met its burden to establish the applicability of Exemption 7(A) as to all of the withheld documents, however. Accordingly, the Court cannot evaluate whether the FBI has met its burden with respect to segregability.  See Seife v. United States Dep't of State, 298 F. Supp. 3d 592, 629 (S.D.N.Y. 2018) (court "not yet in a position to reach the question of segregability" where the agency has failed to meet its burden in initial summary judgment briefing).

## IX.  PLAINTIFFS' CROSS-MOTION

Where, as here, an agency "'fails to provide a sufficiently detailed [declaration] to enable the district court to make a de novo determination of the agency's claims of exemption, the district court then has several options, including inspecting the documents in camera, requesting further affidavits, or allowing the plaintiff discovery.'"  Id. (quoting Spirko v. U.S. Postal Serv., 147 F.3d 992, 997 (D.C. Cir. 1998))  Because there are tens of thousands of pages of records at issue here (see Vaughn index (Dkt. No. 50-31) at 164), in camera review is not a practical solution for the FBI's inadequate declarations.  In any event, "'[a] district court should not undertake in camera review of withheld documents as a substitute for requiring an agency's

---

[15]  In its moving brief, the FBI states that "[t]he records withheld in full by the FBI do not contain any reasonably segregable non-exempt information.  With regard to the records withheld in full under Exemption 7(A), the Comey Declaration explains why each category of records is exempt from disclosure. . . . As to the remaining records withheld in full, either the records are privileged in their entirety or any non-exempt information in the documents is inextricably intertwined with exempt information." (Def. Br. (Dkt. No. 38) at 33 (citations omitted))  It is not clear what the FBI's purpose is in differentiating between "records withheld in full under Exemption 7(A)" and "the remaining records withheld in full." (Id.)  The Seidel declaration and the FBI's brief say that the FBI has asserted Exemption 7(A) as to "all [] protected information" withheld before the July 2019 Epstein indictment as well as "all remaining responsive documents." (Seidel Decl. (Dkt. No 50) ¶ 30 & n.4; Def. Br. (Dkt. No. 38) at 11)  The FBI's 11,000 line Vaughn index also indicates that the FBI has asserted Exemption 7(A) as to each record withheld in full.  (Vaughn Index (Dkt. No. 50-31))

explanation of its claimed exemptions in accordance with Vaughn.'" New York Times Co. v.

U.S. Food & Drug Admin., 529 F. Supp. 3d 260, 270 (S.D.N.Y. 2021) (quoting Seife, 298 F.

Supp. 3d at 629).

Moreover, given the circumstances here, it would not be appropriate for this Court

to order the FBI to produce the responsive records with redactions for those portions that fall

within one of the exemptions for which the FBI has sustained its burden. "'Before approving the

application of a FOIA exemption, the district court must make specific findings of segregability

regarding the documents to be withheld.'" See Spadaro, 978 F.3d at 41 (quoting Sussman v.

U.S. Marshals Serv., 494 F.3d 1106, 1116 (D.C. Cir. 2007)). As discussed above, a segregability

analysis cannot be performed, because the FBI has not carried its burden as to certain

exemptions. The inadequacy of the FBI's declarations as to the bulk of the claimed exemptions

thus makes it impossible for this Court to make the necessary segregability findings.

District courts frequently encounter such circumstances in FOIA cases, and direct

the defendant agency to file revised declarations and the parties to file renewed motions for

summary judgment. See, e.g., Prop. of the People, 2021 WL 3052033, at *3 ("For the foregoing

reasons, the Court will deny Defendant's Cross-Motion for Summary Judgment . . . and require

more specific justifications for its withholdings."); McGehee, 800 F. Supp. 2d at 239

("Defendant's Motion for Summary Judgment is granted in part and denied in part. . . .

Defendant must file an updated Vaughn index in conformity with this Memorandum Opinion

. . . ."); ACLU, 210 F. Supp. 3d at 486 ("DOJ is directed to submit revised Vaughn submissions a

. . . and a segregability analysis . . . along with a renewed motion for partial summary

judgment."); New York Times Co., 499 F. Supp. 2d at 519 ("Following a review of Defendants'

additional submissions, the Court will determine whether summary judgment is appropriate with

respect to the Unclassified Documents and the adequacy of the DOD search."); Seife, 298 F. Supp. 3d at 629 ("The State Department is directed to submit revised Vaughn submissions . . . as well as a segregability analysis . . . along with a renewed motion for partial summary judgment . . . .[Plaintiff] may [also] file a renewed cross-motion for summary judgment.").

Of course, where an agency "has satisfied its burden," a FOIA requester may still, in theory, secure production of the requested documents by demonstrating "bad faith on the part of the agency sufficient to impugn the agency's affidavits or declarations, or provide some tangible evidence that an exemption claimed by the agency should not apply or summary judgment is otherwise inappropriate." Carney, 19 F.3d at 812. But this rule says nothing about a FOIA requester's remedy where an agency has failed to meet its burden in the first instance, but the requester lacks evidence of bad faith or proof that a claimed exemption should not apply.[16] In any event, Plaintiff has submitted no such "tangible evidence" in this case. See Elec. Frontier Found. v. Cent. Intel. Agency, 2013 WL 5443048, at *26 (N.D. Cal. Sept. 30, 2013) ("[S]ummary judgment is not warranted [for the plaintiff] given the Court's conclusion that Defendants' Vaughn submissions are inadequate, not that information has been improperly withheld.").

While the current FOIA regime does not incentivize agencies to file adequate declarations in the first instance – because they will likely be given another opportunity to seek summary judgment on the basis of revised declarations – this Court is not aware of any decision

---

[16] Where the adequacy of an agency's search, rather than the applicability of a FOIA exemption, is at issue, district courts may order discovery. See Fams. for Freedom v. U.S. Customs & Border Prot., 837 F. Supp. 2d 331, 337 (S.D.N.Y. 2011) (ordering "limited discovery" where defendants had, "[f]or over a year, . . . not complied with FOIA's requirements" and conducted "inadequate searches" for responsive records). Here, however, Plaintiffs have not disputed the adequacy of the FBI's search.

that has directed disclosure of agency records where an agency's initial declaration has been inadequate to support the applicability of a FOIA exemption. And, as discussed above, this Court cannot order disclosure of some portion of the requested records at this juncture because it cannot make the requisite finding as to segregability. See Spadaro, 978 F.3d at 41.

## CONCLUSION

For the reasons stated above, Defendant's motion for summary judgment is granted with respect to documents withheld pursuant to Exemption 3 (as it relates to the Child Victims' Act) and Exemptions 5, 6, 7(C), 7(D) (as to information provided by local law enforcement agencies), and 7(E), and is otherwise denied without prejudice. Plaintiffs' cross-motion for summary judgment is granted to the extent that this Court has found that the Government's declarations are inadequate to support application of certain FOIA exemptions. Plaintiffs' summary judgment is otherwise denied without prejudice.

The parties shall confer and submit a joint letter by **October 6, 2023**, stating how they propose to proceed. The parties' letter should contain a proposed schedule for the FBI's submission of revised declarations, as well as any renewed motions for summary judgment.

The Clerk of Court is directed to terminate the motions (Dkt. Nos. 37, 42).

Dated: New York, New York
        September 19, 2023               SO ORDERED.


                                        _____
                                        Paul G. Gardephe
                                        United States District Judge

UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF NEW YORK

RADAR ONLINE LLC and JAMES
ROBERTSON,

               Plaintiffs,

      - against -

FEDERAL BUREAU OF
INVESTIGATION,

               Defendant.

**<u>ORDER</u>**

17 Civ. 3956 (PGG)

PAUL G. GARDEPHE, U.S.D.J.:

       Plaintiffs Radar Online LLC and James Robertson bring this action under the

Freedom of Information Act ("FOIA"), seeking records related to the FBI's investigation and

prosecution of financier Jeffrey Epstein for child sex trafficking crimes. (See Am. Cmplt. (Dkt.

No. 12)) Plaintiff Radar Online is an online investigative news outlet and Plaintiff Robertson is

one of its senior editors. (Id. ¶¶ 2-3)

       Plaintiffs submitted their FOIA request to the Federal Bureau of Investigation

("FBI") on April 20, 2017. (Id.¶ 10) Plaintiffs received no response, and filed this action on

May 25, 2017. (Cmplt. (Dkt. No. 1)) The Amended Complaint was filed on August 28, 2017.

(Am. Cmplt. (Dkt. No. 12)) After an initial case management conference on September 7, 2017,

the FBI agreed to begin producing documents at a rate of 500 pages per month. The FBI has

now processed 11,571 responsive pages, most of which were redacted in part or withheld in full

based on certain exemptions to disclosure under FOIA. (Second Seidel Decl. (Dkt. No. 58) ¶ 3)

       In July 2019, Jeffrey Epstein was arrested and charged with new Federal offenses,

at which point the FBI asserted Exemption 7(A) to FOIA – the exemption for "records or

information compiled for law enforcement purposes[,] . . . [the disclosure of which] could

reasonably be expected to interfere with enforcement proceedings" 5 U.S.C. § 552(b)(7)(A) –

over pages that were previously processed and withheld and over all "remaining responsive

records." (Id. ¶ 7)

On December 10, 2020, this Court directed the parties to file cross-motions for

summary judgment. (Dkt. No. 26)  In a September 19, 2023 order (the "Summary Judgment

Order"), this Court granted in part and denied in part each side's cross-motion. (Summary

Judgment Order (Dkt. No. 51))  In its Order, this Court directed the parties to file a joint letter

addressing next steps, including a proposed schedule for the FBI's revised declarations and any

renewed motions for summary judgment. (Id. at 54) [1]  On October 3, 2023, this Court set a

briefing schedule for the parties' renewed cross-motions for summary judgment. (Dkt. No. 53)

For the reasons stated below, the FBI's motion for summary judgment will be

granted, and Plaintiffs' motion for summary judgment will be denied.

## BACKGROUND[2]

### I.  FACTS

In support of its renewed summary judgment motion, the FBI submitted a revised

declaration from Maureen Comey, an Assistant United States Attorney ("AUSA") in the United

States Attorney's Office for the Southern District of New York. (Third Comey Decl. (Dkt. No.

59) ¶ 1), and a revised declaration from Michael G. Seidel, the Section Chief of the

Record/Information Dissemination Section ("RIDS") of the FBI's Information Management

Division ("IMD"). (Second Seidel Decl. (Dkt. No. 58) ¶ 1)

---

[1] The page numbers referenced in this opinion correspond to the page numbers designated by
this District's Electronic Case Files ("ECF") system.
[2] The relevant facts and procedural history are set forth in greater detail in the Summary
Judgment Order and are only summarized below. (Summary Judgment Order (Dkt. No. 51))
Familiarity with the Summary Judgment Order is assumed.

### A.    Plaintiffs' FOIA Request and the Instant Action

Epstein was a financier who in June 2008 pleaded guilty to "a criminal charge of procuring prostitution of a minor," and served thirteen months of an eighteen-month sentence. (Second Seidel Decl. (Dkt. No. 58) ¶ 6)  On April 20, 2017, Plaintiff Robertson submitted a FOIA request to the FBI seeking "all documents relating to the FBI's investigation and prosecution" of Epstein.  (First Seidel Decl., Ex. A. (FOIA Request) (Dkt. No. 50-1) at 4)

On July 2, 2019, Epstein was indicted by a federal grand jury in this District on "one count of conspiracy to commit sex trafficking . . . [and] one count of sex trafficking." (Second Seidel Decl. (Dkt. No. 58) ¶ 6 (citing United States v. Epstein, 19 Cr. 490 (RMB) (S.D.N.Y.), Indictment (Dkt. No. 2)))  After the July 2, 2019 indictment, the FBI "began to categorically assert Exemption 7(A) with respect to information in the remaining documents it was processing . . . on the basis that release could negatively impact the then-pending prosecution of Jeffrey Epstein and any related investigations."  (Id. ¶ 7)  The FBI further "asserted Exemption 7(A) over all information that had been withheld under other exemptions prior to that date."  (Id.)

Epstein committed suicide at the Metropolitan Correction Center in Manhattan on August 10, 2019, while the charges against him were pending.  (Id. (citing United States v. Epstein, 19 Cr. 490 (RMB), Nolle Prosequi (Dkt. No. 52)))

### B.    The Prosecution of Ghislaine Maxwell

On June 29, 2020, Ghislaine Maxwell was indicted by a grand jury in this District on "one count of conspiracy to entice minors to travel to engage in illegal sex acts"; "one count of enticement of a minor to travel to engage in illegal sex acts"; "one count of conspiracy to transport minors with intent to engage in criminal sexual activity"; "one count of transportation

of a minor with intent to engage in criminal sexual activity"; "and two counts of perjury." (Third Comey Decl. (Dkt. No. 59) ¶ 6)

On December 29, 2021, a jury found Maxwell guilty of enticing a minor to travel to engage in illegal sex acts, transporting minors with the intent to engage in criminal sexual activity, and three related conspiracy counts. (Third Comey Decl. (Dkt. No. 59) ¶ 8; 20 Cr. 330, Dkt. Sheet at Dec. 29, 2021) On June 28, 2022, Maxwell was sentenced to 20 years' imprisonment. (Third Comey Decl. (Dkt. No. 59) ¶ 8; 20 Cr. 330, Judgment (Dkt. No. 696))

On July 7, 2022, Maxwell appealed her conviction to the Second Circuit. (Third Comey Decl. (Dkt. No. 59) ¶ 9) Maxwell seeks, inter alia, "a new trial based on alleged juror misconduct and alleged evidentiary issues." (Id.) Her appeal remains pending. (Id. ¶ 8)

## II.    THE SEPTEMBER 19, 2023 SUMMARY JUDGMENT ORDER

In its September 19, 2023 Order, this Court granted the FBI summary judgment as to records withheld under Exemption 3 pursuant to the Child Victims' Act (Summary Judgment Order (Dkt. No. 51) at 26); Exemption 5 for attorney work-product privilege (id. at 31-33); Exemptions 6 and 7(C) to protect persons from an unwarranted invasion of personal privacy (id. at 33-42); Exemption 7(D) to protect confidential information provided by local law enforcement agencies (id. at 47-48); and Exemption 7(E) to protect against disclosure of law enforcement techniques, procedures, and guidelines. (Id. at 48-51)

As to Exemption 7(A), this Court found that the FBI's invocation of this Exemption was timely and that the requested records were compiled for law enforcement purposes and related to a pending or prospective law enforcement proceeding. (Id. at 11-18) The FBI, however, "ha[d] not explicitly linked any of the document categories – whether Seidel's or Comey's – to the four types of potential harm cited in the 2021 Comey declaration."

4

(Id. at 21)  As a result, this Court denied the FBI's motion for summary judgment without prejudice as to Exemption 7(A) because the FBI had not demonstrated that the disclosure of the requested records would interfere with pending or prospective law enforcement proceedings. (Id. at 18-25)

This Court also denied without prejudice the FBI's motion for summary judgment as to records withheld under Exemption 3 pursuant to the Juvenile Justice and Delinquency Act, 18 U.S.C. § 5038, which shields the arrest information and criminal history of third-party juveniles, and Fed. R. Crim. P. 6(e), which shields matters occurring before the grand jury.  (Id. at 26-31)

Finally, this Court denied without prejudice the FBI's motion for summary judgment as to records withheld under Exemption 7(D) for the protection of information provided under an explicit or implicit assurance of confidentiality, and for information provided by foreign agencies.  (Id. at 42-47)

As noted above, in the Summary Judgment Order, this Court directed the parties to submit a joint letter as to next steps, and to propose a "schedule for the FBI's submission of revised declarations, as well as any renewed motions for summary judgment."  (Id. at 54)  After the parties submitted a joint letter (Dkt. No. 52), this Court issued an October 3, 2023 order setting a briefing schedule for the parties' renewed cross-motions for summary judgment.  (Dkt. No. 53)

On January 30, 2024, the parties filed their renewed cross-motions for summary judgment. (Dkt. Nos. 56, 61)

## DISCUSSION

I.    **LEGAL STANDARDS**

A.    **Rule 56 Standard**

Summary judgment is warranted where the moving party shows that "there is no genuine dispute as to any material fact" and that it "is entitled to judgment as a matter of law." Fed. R. Civ. P. 56(a). "A dispute about a 'genuine issue' exists for summary judgment purposes where the evidence is such that a reasonable jury could decide in the non-movant's favor." Beyer v. County of Nassau, 524 F.3d 160, 163 (2d Cir. 2008). "When no rational jury could find in favor of the nonmoving party because the evidence to support its case is so slight, there is no genuine issue of material fact and a grant of summary judgment is proper." Gallo v. Prudential Residential Servs., Ltd. P'ship, 22 F.3d 1219, 1224 (2d Cir. 1994) (citing Dister v. Cont'l Grp., Inc., 859 F.2d 1108, 1114 (2d Cir. 1988)).

In deciding a summary judgment motion, the Court "'resolve[s] all ambiguities, and credit[s] all factual inferences that could rationally be drawn, in favor of the party opposing summary judgment.'" Spinelli v. City of New York, 579 F.3d 160, 166 (2d Cir. 2009) (quoting Brown v. Henderson, 257 F.3d 246, 251 (2d Cir. 2001) (internal quotation marks and citation omitted)). However, a "'party may not rely on mere speculation or conjecture as to the true nature of the facts to overcome a motion for summary judgment. . . . [M]ere conclusory allegations or denials . . . cannot by themselves create a genuine issue of material fact where none would otherwise exist.'" Hicks v. Baines, 593 F.3d 159, 166 (2d Cir. 2010) (alterations in original) (quoting Fletcher v. Atex, Inc., 68 F.3d 1451, 1456 (2d Cir. 1995)).

"The same standard[s] appl[y] where, as here, the parties file[] cross-motions for summary judgment. . . ." Morales v. Quintel Entm't, Inc., 249 F.3d 115, 121 (2d Cir. 2001). "[W]hen both parties move for summary judgment, asserting the absence of any genuine issues of material fact, a court need not enter judgment for either party.  Rather, each party's motion must be examined on its own merits, and in each case all reasonable inferences must be drawn against the party whose motion is under consideration."  Id. (internal citations omitted).

**B.    Summary Judgment in FOIA Cases**

"Summary judgment is the procedural vehicle by which most FOIA actions are resolved." Jones-Edwards v. Appeal Bd. of Nat. Sec. Agency Cent. Sec. Agency, 352 F. Supp. 2d 420, 423 (S.D.N.Y. 2005).  "In order to prevail on a motion for summary judgment in a FOIA case, the defending agency has the burden of showing that [1] its search was adequate[,] and [2] any withheld documents fall within an exemption to the FOIA." Carney v. U.S. Dept. of Justice, 19 F.3d 807, 812 (2d Cir. 1994).

A government agency may sustain its burden through "'[a]ffidavits or declarations [that] supply[] facts indicating that the agency has conducted a thorough search and [that] giv[e] reasonably detailed explanations why any withheld documents fall within an exemption.'" Associated Press v. U.S. Dept. of Justice, 2007 WL 737476, at *3 (S.D.N.Y. Mar. 7, 2007) (quoting Carney, 19 F.3d at 812); accord Garcia v. U.S. Dept. of Justice, Office of Info. & Privacy, 181 F. Supp. 2d 356, 366 (S.D.N.Y. 2002).  "'[T]he general rule in this Circuit is that in FOIA actions, agency affidavits alone will support a grant of summary judgment,' and Local Civil Rule 56.1 statements are not required." N.Y. Times Co. v. U.S. Dept. of Justice, 872 F. Supp. 2d 309, 314 (S.D.N.Y. 2012) (quoting Ferguson v. FBI, 1995 WL 329307, at *2 (S.D.N.Y.

June 1, 1995), aff'd, 83 F.3d 41 (2d Cir. 1996)).  "Affidavits submitted by an agency are presumed to have been made in good faith."  Garcia, 181 F. Supp. 2d at 366.

"[D]iscovery relating to the agency's search and the exemptions it claims for withholding records generally is unnecessary if the agency's submissions are adequate on their face."  Carney, 19 F.3d at 812.  "A district court . . . may grant summary judgment in favor of an agency 'on the basis of agency affidavits if they contain reasonable specificity of detail rather than merely conclusory statements, and if they are not called into question by contradictory evidence in the record or by evidence of agency bad faith.'"  Grand Cent. P'ship, Inc. v. Cuomo, 166 F.3d 473, 478 (2d Cir. 1999) (emphasis in original) (quoting Gallant v. N.L.R.B., 26 F.3d 168, 171 (D.C. Cir. 1994)).  A plaintiff may avoid summary judgment and obtain discovery where, "once the agency has satisfied its burden, the plaintiff . . . make[s] a showing of bad faith on the part of the agency . . . or provide[s] some tangible evidence that an exemption claimed by the agency should not apply."  Conti v. U.S. Dept. of Homeland Sec., 2014 WL 1274517, at *10 (S.D.N.Y. Mar. 24, 2014).

## II.    FOIA EXEMPTION 7(A)

The FBI again argues that all of the withheld records responsive to Plaintiffs' FOIA request were properly withheld under Exemption 7(A) to FOIA.  (See Def. Br. (Dkt. No. 57) at 10-21; Second Comey Decl. (Dkt. No. 47); Third Comey Decl. (Dkt. No. 59))  Plaintiff responds that the FBI's declarations do not link any of the document categories to potential harms.  (Pltf. Br. (Dkt. No. 62) at 3-4)  According to Plaintiffs, "[w]hile [the FBI declarations] now divide[] the material at issue into a greater number of categories, [they] offer[] nothing to substantiate how releasing records within that category will likely result in harm."  (Id. at 3 (emphasis in original))

8

A.    **Applicable Law**

Exemption 7(A) to FOIA permits government agencies to withhold "records or information compiled for law enforcement purposes" where "the production of such law enforcement records or information . . . could reasonably be expected to interfere with enforcement proceedings." 5 U.S.C. § 552(b)(7)(A). "This exemption 'prevent[s] harm to the government's case in court by not allowing litigants earlier or greater access to agency investigatory files than they would otherwise have.'" N.Y. Times Co. v. United States Dept. of Justice, 2016 WL 5946711, at \*7 (S.D.N.Y. Aug. 18, 2016) (quoting Conti, 2014 WL 1274517, at \*22). "[I]f the exemption applies, it 'will justify denial of release, not only to the objects of the investigation and any pending or prospective enforcement actions, but to third parties as well.'" Stein v. U.S. Sec. & Exch. Comm'n, 2017 WL 3141903, at \*11 (D.D.C. July 24, 2017) (quoting Kanter v. IRS, 433 F. Supp. 812, 817 (N.D. Ill. 1977)).

In order to demonstrate that Exemption 7(A) applies, the government must show that (1) "the requested records were compiled for law enforcement purposes," Local 32B-32J, Serv. Employees Int'l Union, AFL-CIO v. Gen. Servs. Admin., 1998 WL 726000, at \*7 (S.D.N.Y. Oct. 15, 1998) (internal quotation marks omitted); (2) "a law enforcement proceeding is pending or prospective," Amnesty Int'l USA v. C.I.A., 728 F. Supp. 2d 479, 525 (S.D.N.Y. 2010); and (3) "release of the information could reasonably be expected to cause some articulable harm." Id.

"'[A]lthough [courts] give deference to an agency's predictive judgment of the harm that will result from disclosure of information, it is not sufficient for the agency to simply assert that disclosure will interfere with enforcement proceedings; it must rather demonstrate how disclosure will do so.'" Stein, 2017 WL 3141903, at \*9 (quoting Citizens for Responsibility

9

& Ethics in Wash. v. U.S. Dept. of Justice ("CREW I"), 746 F.3d 1082, 1096 (D.C. Cir. 2014))
(emphasis in CREW I). "Ultimately, the government must 'allow[] the court to trace a rational
link between the nature of the document and the alleged likely interference.'" N.Y. Times Co.,
2016 WL 5946711, at *7 (quoting Ctr. for Nat'l Sec. Studies v. U.S. Dept. of Justice, 331 F.3d
918, 940 (D.C. Cir. 2003)).

**B.    Interference with Law Enforcement Proceedings
and the Applicability of Exemption 7(A)**

The FBI contends that "the records responsive to the FOIA requests withheld in
full or in part . . . [a]ll . . . fall within the scope of Exemption 7(A)" (Third Comey Decl. (Dkt.
No. 59) ¶ 11), because their "public disclosure . . . could reasonably be expected to interfere with
the pending prosecution of [Ghislaine] Maxwell." (Id. ¶ 12)

In previously denying the FBI summary judgment as to the applicability of
Exemption 7(A), this Court noted that (1) the Seidel and Comey Declarations submitted in
support of this request categorized the documents at issue inconsistently; and (2) "the FBI has
not explicitly linked any of the document categories . . . to the four types of potential harm cited
in the [First] Comey declaration." (Summary Judgment Order (Dkt. No. 51) at 21)

The First Comey Declaration grouped the responsive records sought by Plaintiffs
and withheld by the FBI into three categories: (1) "[i]nterview forms, reports and notes . . . of
interviews with individuals, including victims"; (2) "Federal Grand Jury Subpoenas and
Subpoenaed information"; and (3) "documents provided by state and local law enforcement
agencies, . . . . background information for witnesses . . . and subjects for the investigation[,]
communications within the FBI [and between the FBI and other agencies] regarding the
investigation[,] organizational documents, . . . the sources from and techniques through which

such information and evidence was gathered[,] . . . the methods used to analyze the information

and evidence, . . . and the focus of the investigation." (First Comey Decl. (Dkt. No. 39) ¶ 11)

The First Seidel Declaration – on the other hand – speaks of nine "types of

responsive records"[3] and three "functional categories of information":

(1) "Evidentiary/Investigative Materials," including "confidential witness statements" and

"information exchanged between the FBI and its local law enforcement partners";

(2) "Administrative [M]aterials," including internal agency "reporting communications"

pertaining to an investigation, and other "standardized forms used for a variety of purposes"; and

(3) "public source material," including news articles and court transcripts which have already

been "released . . . to Plaintiffs." (First Seidel Decl. (Dkt. No. 50) ¶¶ 58-68 (capitalization

altered)) This Court pointed out that "[t]he document categories in the [First] Seidel

[D]eclaration and in the [First] Comey Declaration do not match, and documents falling within

each of the Comey categories likely span multiple categories described by Seidel." (Summary

Judgment Order (Dkt. No. 51) at 21)

The FBI now relies on the First Seidel Declaration's three "functional categories

of information" – (1) Evidentiary/Investigative materials, (2) Administrative Materials, and (3)

Public Source/Non-Investigative Harm. (First Seidel Decl. (Dkt. No. 50) ¶ 59 – and the Third

Comey Declaration submitted in support of the FBI's instant motion adopts the same

categorization. (See Third Comey Decl. (Dkt. No. 59) 13) With the Government's

---

[3] (1) "FD-1057 - Electronic Communication"; (2) "Interview Forms (FD-302)"; (3)
"Handwritten Interview Notes"; (4) "State and Local Law Enforcement Documents";
(5) "Documents Implementing Sensitive Investigative Techniques"; (6) "Federal Grand
Jury Subpoenas/Subpoenaed Information"; (7) "FD-340, IA Envelopes"; (8) "Other
Investigative Documents"; and (9) "Internet Printouts." (First Seidel Decl. (Dkt. No. 50)
¶¶ 58-68 (formatting altered))

categorization of responsive documents now consistent, this Court can move on to consider whether the FBI has linked these document categories to potential harms and explained how those harms could "reasonably be expected to interfere with enforcement proceedings." 5 U.S.C. § 552(b)(7)(A).

As to the harm that would result from disclosure, the FBI notes that "the Maxwell criminal prosecution is still pending on appeal," and "[i]f the Second Circuit grants Maxwell the relief she seeks, there could be a new trial." (Third Comey Decl. (Dkt. No. 59) ¶ 12) Accordingly, "public disclosure of the FBI's records relating to the investigation and prosecution of Epstein that were withheld in full or in part under Exemption 7(A) could reasonably be expected to interfere with the pending prosecution of Maxwell." (Id.)

As discussed below, in the FBI's revised declarations filed in support of the instant motion, the Bureau now lists the potential harms that may arise from public disclosure, and does so as to each category of documents.

The first category of documents – Evidentiary/Investigative Materials – "includes copies of records or evidence, analysis of that evidence, and derivative communications summarizing or otherwise referencing evidence." (Third Comey Decl. (Dkt. No. 59) ¶ 14) This category includes business records and "documents and evidence provided by witnesses to law enforcement," as well as information regarding those witnesses. (Id.)

The second category of documents – Administrative Materials – consists of

internal communications among investigators within the FBI providing updates regarding the status of the investigation, including witness interviews and discussion of evidence gathered during the investigation; communications between the FBI and other government agencies regarding the investigation; grand jury subpoenas identifying the names of witnesses and documents sought during the investigation; and organizational documents such as envelopes used to organize and store documents and other evidentiary documents, bulky exhibit

cover sheets, transmittal forms, and letter routing slips, some of which contain the names of witnesses, including victim-witnesses, and subjects of the investigation.

(Id. ¶ 15)

As for the harm that would result from disclosure of the Evidentiary/Investigative Materials and the Administrative Materials, the FBI states that disclosure would (1) impact witness testimony, (2) impact witnesses' willingness to testify, (3) prejudice the jury pool "so as to hinder the Government's ability to present its case in court,"[4] (4) provide Maxwell with greater access "to the investigatory files than she would otherwise have during the criminal

---

[4] In connection with its previous summary judgment motion, the FBI described the harm that would result from disclosure as "impair[ing] the Government's (and the defendant's) ability to seat a fair and impartial jury in Maxwell." (First Comey Decl. (Dkt. No. 39) ¶¶ 17-19)  In denying the FBI's motion as to Exemption 7(A), this Court noted that "the FBI's concerns regarding the effects of disclosure on jury impartiality are properly raised under Exemption 7(B), and not under Exemption 7(A)."  (Summary Judgment Order (Dkt. No. 51) at 22 n.10) "Exemption 7(B) applies . . . when the disclosure of law enforcement records would deprive a person of the right to 'a fair trial or an impartial adjudication[,]' . . . [and] the word 'trial' means the ultimate determination of factual and legal claims by judge or jury in a judicial proceeding." Chiquita Brands Int'l Inc. v. S.E.C., 805 F.3d 289, 295 (D.C. Cir. 2015) (quoting 5 U.S.C. § 552(b)(7)(B)); see also Washington Post Co. v. U.S. Dep't of Just., 863 F.2d 96, 101 (D.C. Cir. 1988)  ("The exemption[] . . . was meant to prevent disclosures from conferring an unfair advantage upon one party to an adversary proceeding or leading to prejudicial publicity in pending cases that might inflame jurors or distort administrative judgment.").

In connection with its current motion, the FBI states that "the harm the government is articulating through a risk of prejudicing the jury pool is the harm of prejudicing the government's ability to present its criminal case in court."  (Def. Br. (Dkt. No. 57) at 17-18 (emphasis in original))  In this regard, the Government states that because the "majority of records in this category . . . were not admitted into evidence at Maxwell's first trial[,] . . . the jury may wonder why those materials were absent from the trial and may suspect the government of trying to hide evidence from the jury, causing jurors to draw an unwarranted adverse inference against the government."  (Id. at 16 (citing Third Comey Decl. (Dkt. No. 59) ¶ 14(c))) Accordingly, the harm now identified by the FBI is not prejudice to the parties' right to a fair and impartial jury, but instead unfair prejudice to the Government in presenting its case.  This type of potential harm is properly raised under Exemption 7(A).

discovery process," and (5) violate the Protective Order entered in the underlying case.  (Id. ¶¶ 14(a)-(e), 15(a)-(d))

In response, Plaintiffs renew their argument that the FBI has not linked the document categories to any potential harm.  (Pltf. Br. (Dkt. No. 62) at 3)  According to Plaintiffs, "the FBI insists that these are simply the kinds of documents that would tend to cause harm if released, without engaging the reality on the ground that the target of the investigation has seen millions of records and was convicted in one of the most high-profile trials in U.S. history."  (Id.) Plaintiffs also point out that "there is no new substantive factual information offered" in the revised declarations or the FBI's current motion for summary judgment.  (Id.)

The standard for application of Exemption 7(A) is not whether the "target of the investigation has seen millions of records," however, or whether an agency has proffered "substantive factual information" in support of a claimed exemption.  Instead, an agency "must explain to the court how the release of each category would interfere with enforcement proceedings."  Tipograph v. Dep't of Just., 83 F. Supp. 3d 234, 239 (D.D.C. 2015) (quoting Bevis v. Dep't of State, 801 F.2d 1386, 1389-90 (D.C.Cir. 1986)).  "The agency need not justify the withholding of each document with specific facts," however.  Robbins Geller Rudman & Dowd LLP v. United States Sec. & Exch. Comm'n, 419 F. Supp. 3d 523, 530 (E.D.N.Y. 2019). Instead, the agency need only make a showing that "allow[s] the court to be able to 'trace a rational link between the nature of the document and the alleged likely interference.'"  Id. (quoting N.Y. Times Co., 2016 WL 5946711, at *7).

The FBI has met that burden here.  Unlike in its previous motion (see Summary Judgment Order (Dkt. No. 51) at 22-23), the FBI has described the contents of each category and linked specific harms that would result from the public disclosure of the documents in each

14

category.  For example, the FBI has explained that public disclosure of the Evidentiary/Investigative Materials "could influence the testimony of witnesses by providing the opportunity for witnesses to shape their testimony to conform with other evidence gathered during the investigation, including both records and witness statements." (Third Comey Decl. (Dkt. No. 59) ¶ 14(a))  Disclosure of the Evidentiary/Investigative Materials could also have a chilling effect on witnesses because "[t]he public release of this information could lead to the identification and intimidation of witnesses, who may decline to cooperate with the parties and be disinclined to testify if their personal information is released to the public." (Id. ¶ 14(b))  Public disclosure could also cause unfair prejudice to the Government at a retrial, based on the fact that certain documents were available to the Government but not offered at the first trial.  Finally, public disclosure would provide Maxwell with greater access to investigatory materials than she would otherwise have.  (Id. ¶¶ 14(c)-(e), 15(a)-(d))

"Ultimately, an agency's justification for invoking a FOIA exemption is sufficient if it appears logical or plausible." Larson v. Dep't of State, 565 F.3d 857, 862 (D.C. Cir. 2009) (internal citation and quotations omitted).  Given the information contained within each category, and the potential harm that could result from public disclosure – as described in the Second Seidel Declaration and the Third Comey Declaration – the FBI has adequately demonstrated the necessary logical and plausible connection between disclosure and harm.

Plaintiffs argue, however, that

> (1) much of the evidence is already the subject of public record from the prior trial and other civil proceedings; (2) much of the evidence is otherwise in the public domain; and (3) the government makes no effort to segregate this material or particularize how the exposure of this material would influence witness testimony.

(Pltf. Br. (Dkt. No. 62) at 3)

15

The FBI has explained, however, that the exhibits admitted at trial "represent a

small fraction of the documents contained in [the Evidentiary/Investigative Materials] category."

The Government further represents that it "has made available to the press upon request copies

of all publicly admitted exhibits from the trial" and is willing to "provide a copy of those

publicly filed exhibits to the Plaintiffs upon request." (Third Comey Decl. (Dkt. No. 59) ¶ 14(f))

In connection with the instant FOIA application, the FBI has also reviewed responsive records

"on a document-by-document basis" (Second Seidel Decl. (Dkt. No. 58) at 2) and has separated

"publicly available news reporting and other open source materials that are already accessible

online through public sources" into a third category that "ha[s] already been produced to

Plaintiffs." (Third Comey Decl. (Dkt. No. 59) ¶ 16)  Finally, "an agency may satisfy its burden

of proof 'by grouping documents in categories and offering generic reasons for withholding the

documents in each category.'"  CREW I, 746 F.3d at 1098 (quoting Maydak, 218 F.3d at 765).

>           Where an agency
>
> > wishes to adopt the generic approach, [it] has a three-fold task.  First, it must
> > define its categories functionally.  Second, it must conduct a document-by-
> > document review in order to assign documents to the proper category.  Finally, it
> > must explain to the court how the release of each category would interfere with
> > enforcement proceedings.

Id., 746 F.3d at 1098 (quoting Bevis, 801 F.2d at 1389-90).  As discussed above, the FBI has

"defined its categories functionally"; it has performed "a document-by-document review in order

to assign documents to the proper category"; and it has explained how the disclosure of each

category would interfere with enforcement proceedings.

>           In connection with the harm element, the FBI has explained that the public

disclosure of the materials at issue could influence witness testimony by "providing the

opportunity for witnesses to shape their testimony to conform with [what is set forth in the non-

public records]."  (Third Comey Decl. (Dkt. No. 59) ¶¶ 14(a), 15(a))  "Courts allow withholding

16

under Exemption 7(A) [where] . . . '[p]ublic disclosure of information could result in destruction of evidence, chilling and intimidation of witnesses, and revelation of the scope and nature of the Government's investigation.'" Tipograph, 83 F. Supp. 3d at 239 (quoting Solar Sources, Inc. v. United States, 142 F.3d 1033, 1039 (7th Cir. 1998)). Indeed, "Exemption 7 was designed to prevent harm to the government's case in court by not allowing litigants earlier or greater access to agency investigatory files than they would otherwise have." Conti, 2014 WL 1274517, at *22 (citing Robbins Tire & Rubber Co., 437 U.S. at 224-25); see also New York Times, 2016 WL 5946711, at *13 ("Such explanations are sufficient to establish that the withholdings conceal records compiled for law enforcement purposes that disclose techniques and procedures for law enforcement investigations, and, therefore, justify nondisclosure.").

These paradigmatic harms are among the harms that the FBI now alleges would result from disclosure of the Evidentiary/Investigative Materials and the Administrative Materials. While the FBI previously failed to link these potential harms to each document category, it has now done so. There is no need for the FBI to further "particularize how the exposure of this material would influence witness testimony." (Pltf. Br. (Dkt. No. 62) at 3) "[T]he record establishes that the release of the requested information could reasonably be expected to cause articulable harm." Cui v. Fed. Bureau of Investigation, 551 F. Supp. 3d 4, 24 (E.D.N.Y. 2021)

This Court concludes that "[t]he [revised] declarations provide[] sufficient detail for the Court to trace a rational link between the information contained in the records and the potential interference with law enforcement proceedings," id. at 24, and the FBI has thus met its burden for withholding disclosure of the records under Exemption 7(A). Because "Exemption

17

7(A) continues to be asserted to protect all redacted information," (Second Seidel Decl. (Dkt. No. 58) ¶ 8), this Court need not evaluate the applicability of the other Exemptions.

## III.     SEGREGABILITY

"FOIA . . . provides that '[a]ny reasonably segregable portion of a record shall be provided to any person requesting such record after deletion of the portions which are exempt.'" Conti, 2014 WL 1274517, at *25 (quoting 5 U.S.C. § 552(b)). "[T]he agency must provide a detailed justification for its decision that non-exempt material is not segregable," but "is entitled to a presumption that it complied with its obligation to disclose reasonably segregable material." Id. (citing Mead Data Cent., Inc. v. U.S. Dept. of Air Force, 566 F.2d 242, 261 (D.C. Cir. 1977)). "[T]o justify withholding an entire document[,] the DOJ . . . must demonstrate that [it] cannot delineate between exempt and non-exempt information therein." Ayyad v. U.S. Dept. of Justice, 2002 WL 654133, at *2 (S.D.N.Y. Apr. 18, 2002).

Here, the FBI states that it has reviewed responsive records on a "document-by-document basis" and conducted a segregability review concerning 11,571 responsive pages. (Second Seidel Decl. (Dkt. No. 58) at 2, 20-21). The FBI further represents that "to the extent there is non-exempt information contained in the records withheld under Exemption 7(A), that information is intertwined with exempt information and cannot reasonably be segregated without risking interference with the Maxwell prosecution, referencing the harms described [previously]." (Def. Br. (Dkt. No. 57) at 30; Third Comey Decl. (Dkt. No. 59) ¶ 17) According to the FBI, "[t]he media coverage of speculation and theories about Maxwell's association with Epstein makes the segregation of any possibly non-exempt information particularly difficult because providing information pertaining to Epstein without complete context can reasonably be

expected to contribute to the dissemination of speculation and theories about the Maxwell case."
(Third Comey Decl. (Dkt. No. 59) ¶ 17)

"An agency's explanation that records are exempt in their entirety is sufficient to satisfy its segregability obligations with respect to the documents withheld under Exemption 7(A)." New York Times Co. v. United States Dep't of Just., 390 F. Supp. 3d 499, 519 (S.D.N.Y. 2019); Stein v. U.S. Sec. & Exch. Comm'n, 266 F. Supp. 3d 326, 353 (D.D.C. 2017) ("[T]he SEC has sufficiently described two categories of documents that it has withheld under Exemption 7(A) in their entirety, and explained that it is not possible to segregate non-exempt information from these documents, except as the Court has described above.  This is sufficient to satisfy the agency's segregability obligations with respect to the documents withheld under Exemption 7(A)."); Dillon v. Dep't of Just., 102 F. Supp. 3d 272, 298 (D.D.C. 2015) (concluding that the FBI satisfied its segregability obligation under FOIA by stating that it had "carefully reviewed the material withheld" and explained that "segregability is not possible because [the records] are exempt from disclosure [in their entirety] pursuant to Exemption 7(A)" (second alteration in original)).  This Court concludes that the FBI has satisfied its segregability burden with respect to the documents withheld in full under Exemption 7(A).

## CONCLUSION

For the reasons stated above, Defendant's motion for summary judgment (Dkt. No. 56) is granted, and Plaintiffs' cross-motion for summary judgment (Dkt. No. 61) is denied.

The Clerk of Court is directed to terminate the motions (Dkt. Nos. 56, 61) and to close this case.

Dated: New York, New York
      June 25, 2024            SO ORDERED.

_____
Paul G. Gardephe
United States District Judge

SPA-75

**UNITED STATES DISTRICT COURT**
**SOUTHERN DISTRICT OF NEW YORK**
------------------------------------------------------------------------X
RADAR ONLINE LLC and JAMES ROBERTSON,

|  |  |
|---|---|
| Plaintiff, | 17 **CIVIL** 3956 (PGG) |
| -against- | **JUDGMENT** |
| FEDERAL BUREAU OF INVESTIGATION, |  |
| Defendant. |  |

------------------------------------------------------------------------X

It is hereby **ORDERED, ADJUDGED AND DECREED:** That for the reasons

stated in the Court's  Order dated June 25, 2024, Defendant's motion for summary judgment  is

granted, and Plaintiffs' cross-motion for summary judgment  is denied; accordingly, the case is

closed.

**Dated:**  New York, New York
          June 26, 2024

                                        **DANIEL ORTIZ**
                              _____
                                   **Acting Clerk of Court**


                    **BY**   _[signature]_
                              _____
                                   **Deputy Clerk**

SPA-76



**United States District Court**
**Southern District of New York**

Daniel Ortiz
*Acting Clerk of Court*

Dear Litigant:

Enclosed is a copy of the judgment entered in your case. If you disagree with a judgment or final order of the district court, you may appeal to the United States Court of Appeals for the Second Circuit. To start this process, file a "Notice of Appeal" with this Court's Pro Se Intake Unit.

You must file your notice of appeal in this Court within 30 days after the judgment or order that you wish to appeal is entered on the Court's docket, or, if the United States or its officer or agency is a party, within 60 days after entry of the judgment or order. If you are unable to file your notice of appeal within the required time, you may make a motion for extension of time, but you must do so within 60 days from the date of entry of the judgment, or within 90 days if the United States or its officer or agency is a party, and you must show excusable neglect or good cause for your inability to file the notice of appeal by the deadline.

Please note that the notice of appeal is a *one-page* document containing your name, a description of the final order or judgment (or part thereof) being appealed, and the name of the court to which the appeal is taken (the Second Circuit) – *it does not* include your reasons or grounds for the appeal. Once your appeal is processed by the district court, your notice of appeal will be sent to the Court of Appeals and a Court of Appeals docket number will be assigned to your case. At that point, all further questions regarding your appeal must be directed to that court.

The filing fee for a notice of appeal is $605 payable in cash, by bank check, certified check, or money order, to "Clerk of Court, S.D.N.Y." *No personal checks are accepted.* Please see District Court fee schedule at https://www.nysd.uscourts.gov/programs/fees. If you are unable to pay the $605 filing fee, complete the "Motion to Proceed *in Forma Pauperis* on Appeal" form and submit it with your notice of appeal to the Pro Se Intake Unit. If the district court denies your motion to proceed *in forma pauperis* on appeal, or has certified under 28 U.S.C. § 1915(a)(3) that an appeal would not be taken in good faith, you may file a motion in the Court of Appeals for leave to appeal *in forma pauperis*, but you must do so within 30 days after service of the district court order that stated that you could not proceed *in forma pauperis* on appeal.

For additional issues regarding the time for filing a notice of appeal, see Federal Rule of Appellate Procedure 4(a). There are many other steps to beginning and proceeding with your appeal, but they are governed by the rules of the Second Circuit Court of Appeals and the Federal Rules of Appellate Procedure. For more information, visit the Second Circuit Court of Appeals website at **http://www.ca2.uscourts.gov/**.

THE DANIEL PATRICK MOYNIHAN
UNITED STATES COURTHOUSE
500 PEARL STREET
NEW YORK, NY 10007-1312

THE CHARLES L. BRIEANT, JR.
UNITED STATES COURTHOUSE
300 QUARROPAS STREET
WHITE PLAINS, NY 10601-4150

Rev. 5/23/14

SPA-77

# UNITED STATES DISTRICT COURT
# SOUTHERN DISTRICT OF NEW YORK

_____

_____

(List the full name(s) of the plaintiff(s)/petitioner(s).)

-against-

_____

_____

(List the full name(s) of the defendant(s)/respondent(s).)

_____CV_____ (      )(      )

**NOTICE OF APPEAL**

Notice is hereby given that the following parties: _____

_____

(list the names of all parties who are filing an appeal)

in the above-named case appeal to the United States Court of Appeals for the Second Circuit

from the      ☐ judgment      ☐ order      entered on: _____

(date that judgment or order was entered on docket)

that: _____

_____

(If the appeal is from an order, provide a brief description above of the decision in the order.)

| | |
|---|---|
| _____ | _____ |
| Dated | Signature* |

_____

Name (Last, First, MI)

| | | | |
|---|---|---|---|
| Address | City | State | Zip Code |

| | |
|---|---|
| Telephone Number | E-mail Address (if available) |

_____

*Each party filing the appeal must date and sign the Notice of Appeal and provide his or her mailing address and telephone number, EXCEPT that a signer of a pro se notice of appeal may sign for his or her spouse and minor children if they are parties to the case.  Fed. R. App. P. 3(c)(2).  Attach additional sheets of paper as necessary.

Rev. 12/23/13

SPA-78

# UNITED STATES DISTRICT COURT
# SOUTHERN DISTRICT OF NEW YORK

_____

_____      _____CV_____ (      )(      )
(List the full name(s) of the plaintiff(s)/petitioner(s).)

-against-      **MOTION FOR EXTENSION OF TIME TO FILE NOTICE OF APPEAL**

_____

_____
(List the full name(s) of the defendant(s)/respondent(s).)


I move under Rule 4(a)(5) of the Federal Rules of Appellate Procedure for an extension of time

to file a notice of appeal in this action. I would like to appeal the judgment

entered in this action on _____ but did not file a notice of appeal within the required
                              date

time period because:

_____

_____

_____
(Explain here the excusable neglect or good cause that led to your failure to file a timely notice of appeal.)


_____        _____
Dated:                                    Signature

_____
Name (Last, First, MI)

_____
Address                        City              State              Zip Code

_____        _____
Telephone Number                          E-mail Address (if available)


Rev. 3/27/15

SPA-79

# UNITED STATES DISTRICT COURT
# SOUTHERN DISTRICT OF NEW YORK

_____

_____          _____CV_____ (      )(      )
(List the full name(s) of the plaintiff(s)/petitioner(s).)

-against-          **MOTION FOR LEAVE TO PROCEED IN FORMA PAUPERIS ON APPEAL**

_____

_____
(List the full name(s) of the defendant(s)/respondent(s).)

I move under Federal Rule of Appellate Procedure 24(a)(1) for leave to proceed *in forma pauperis* on appeal. This motion is supported by the attached affidavit.

_____          _____
Dated          Signature

_____
Name (Last, First, MI)

_____
Address          City          State          Zip Code

_____          _____
Telephone Number          E-mail Address (if available)

SPA-80

## Application to Appeal In Forma Pauperis

_____ **v.** _____    Appeal No. _____

District Court or Agency No. _____

| **Affidavit in Support of Motion** | **Instructions** |
|---|---|
| I swear or affirm under penalty of perjury that, because of my poverty, I cannot prepay the docket fees of my appeal or post a bond for them. I believe I am entitled to redress. I swear or affirm under penalty of perjury under United States laws that my answers on this form are true and correct. (28 U.S.C. § 1746; 18 U.S.C. § 1621.)<br><br>Signed: _____ | Complete all questions in this application and then sign it.  Do not leave any blanks: if the answer to a question is "0," "none," or "not applicable (N/A)," write that response. If you need more space to answer a question or to explain your answer, attach a separate sheet of paper identified with your name, your case's docket number, and the question number.<br><br>Date: _____ |

My issues on appeal are: (<u>required</u>):

1.    *For both you and your spouse estimate the average amount of money received from each of the following sources during the past 12 months. Adjust any amount that was received weekly, biweekly, quarterly, semiannually, or annually to show the monthly rate. Use gross amounts, that is, amounts before any deductions for taxes or otherwise.*

| Income source | Average monthly amount during the past 12 months | | Amount expected next month | |
|---|---|---|---|---|
| | You | <u>Spouse</u> | You | <u>Spouse</u> |
| Employment | $ | $ | $ | $ |
| Self-employment | $ | $ | $ | $ |
| Income from real property (such as rental income) | $ | $ | $ | $ |

- 1 -

| | | | | |
|---|---|---|---|---|
| Interest and dividends | $ | $ | $ | $ |
| Gifts | $ | $ | $ | $ |
| Alimony | $ | $ | $ | $ |
| Child support | $ | $ | $ | $ |
| Retirement (such as social security, pensions, annuities, insurance) | $ | $ | $ | $ |
| Disability (such as social security, insurance payments) | $ | $ | $ | $ |
| Unemployment payments | $ | $ | $ | $ |
| Public-assistance (such as welfare) | $ | $ | $ | $ |
| Other (specify): | $ | $ | $ | $ |
| **Total monthly income:** | **$** | **$** | **$** | **$** |

2.      *List your employment history for the past two years, most recent employer first. (Gross monthly pay is before taxes or other deductions.)*

| Employer | Address | Dates of employment | Gross monthly pay |
|---|---|---|---|
| | | | $ |
| | | | $ |
| | | | $ |

3.      *List your spouse's employment history for the past two years, most recent employer first. (Gross monthly pay is before taxes or other deductions.)*

| Employer | Address | Dates of employment | Gross monthly pay |
|---|---|---|---|
| | | | $ |
| | | | $ |
| | | | $ |

SPA-82

4.    *How much cash do you and your spouse have? $_____*

*Below, state any money you or your spouse have in bank accounts or in any other financial institution.*

| Financial Institution | Type of Account | Amount you have | Amount your spouse has |
|---|---|---|---|
| | | $ | $ |
| | | $ | $ |
| | | $ | $ |

***If you are a prisoner seeking to appeal a judgment in a civil action or proceeding, you must attach a statement certified by the appropriate institutional officer showing all receipts, expenditures, and balances during the last six months in your institutional accounts. If you have multiple accounts, perhaps because you have been in multiple institutions, attach one certified statement of each account.***

5.    *List the assets, and their values, which you own or your spouse owns. Do not list clothing and ordinary household furnishings.*

| Home | Other real estate | Motor vehicle #1 |
|---|---|---|
| (Value) $ | (Value) $ | (Value) $ |
| | | Make and year: |
| | | Model: |
| | | Registration #: |

| Motor vehicle #2 | Other assets | Other assets |
|---|---|---|
| (Value) $ | (Value) $ | (Value) $ |
| Make and year: | | |
| Model: | | |
| Registration #: | | |

- 3 -

SPA-83

6.      *State every person, business, or organization owing you or your spouse money, and the amount owed.*

| Person owing you or your spouse money | Amount owed to you | Amount owed to your spouse |
|---|---|---|
|  | $ | $ |
|  | $ | $ |
|  | $ | $ |
|  | $ | $ |

7.      *State the persons who rely on you or your spouse for support.*

| Name [or, if a minor (i.e., underage), initials only] | Relationship | Age |
|---|---|---|
|  |  |  |
|  |  |  |
|  |  |  |

8.      *Estimate the average monthly expenses of you and your family. Show separately the amounts paid by your spouse. Adjust any payments that are made weekly, biweekly, quarterly, semiannually, or annually to show the monthly rate.*

| | You | Your Spouse |
|---|---|---|
| Rent or home-mortgage payment (including lot rented for mobile home)<br>        Are real estate taxes included?        [   ] Yes  [   ] No<br>        Is property insurance included?        [   ] Yes  [   ] No | $ | $ |
| Utilities (electricity, heating fuel, water, sewer, and telephone) | $ | $ |
| Home maintenance (repairs and upkeep) | $ | $ |
| Food | $ | $ |
| Clothing | $ | $ |
| Laundry and dry-cleaning | $ | $ |
| Medical and dental expenses | $ | $ |

- 4 -

SPA-84

| | | |
|---|---|---|
| Transportation (not including motor vehicle payments) | $ | $ |
| Recreation, entertainment, newspapers, magazines, etc. | $ | $ |
| Insurance (not deducted from wages or included in mortgage payments) | | |
|     Homeowner's or renter's: | $ | $ |
|     Life: | $ | $ |
|     Health: | $ | $ |
|     Motor vehicle: | $ | $ |
|     Other: | $ | $ |
| Taxes (not deducted from wages or included in mortgage payments) (specify): | $ | $ |
| Installment payments | | |
|     Motor Vehicle: | $ | $ |
|     Credit card (name): | $ | $ |
|     Department store (name): | $ | $ |
|     Other: | $ | $ |
| Alimony, maintenance, and support paid to others | $ | $ |
| Regular expenses for operation of business, profession, or farm (attach detailed statement) | $ | $ |
| Other (specify): | $ | $ |
| **Total monthly expenses:** | $ | $ |

9.    *Do you expect any major changes to your monthly income or expenses or in your assets or liabilities during the next 12 months?*

      [  ] Yes       [  ] No       If yes, describe on an attached sheet.

10.    *Have you spent — or will you be spending —any money for expenses or attorney fees in connection with this lawsuit?* [  ] Yes [  ] No

      *If yes, how much?* $ _____

SPA-85

11.    *Provide any other information that will help explain why you cannot pay the docket fees for your appeal.*

12.    *Identify the city and state of your legal residence.*

City _____    State _____

Your daytime phone number: _____

Your age: _____    Your years of schooling: _____

Last four digits of your social-security number: _____